**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI, FLORIDA**

99-3458CIV-LENARD

| | |
|---|---|
| MAZEN AL NAJJAR, | ) CASE NO. |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) |
| JANET RENO, Attorney General, | ) |
| United States Department of Justice; | ) |
| DORIS MEISNER, Commissioner, | ) |
| Immigration and Naturalization Service; | ) |
| PAUL SCHMIDT, Chairman, Board of | ) |
| Immigration Appeals; | ) |
| ROBERT WALLIS, District Director, | ) |
| Miami District of the INS; and | ) |
| S. KENT DODD, Warden, Manatee | ) |
| County Downtown Facility; | ) |
| | ) |
| Respondents. | ) |
| | ) |

MAGISTRATE JUDGE

99 DEC 22 PM 5: 09

## EXHIBIT LIST

A. Matter of Al Najjar, Bond Decision of Immigration Judge, June 23, 1997

B. Matter of Al Najjar, Bond Decision of Board of Immigration Appeals, Sept. 15, 1998

C. Matter of Al Najjar, Deportation Decision of Immigration Judge, May 13, 1997

D. Matter of Al Najjar, Excerpts from Deportation Hearing Transcript

E. Matter of Al Najjar, INS Notice of Intent to Present Classified Evidence

F. Matter of Al Najjar, Unclassified Summary of Classified Evidence

G. Declaration of Luis Coton

H. Matter of Al Najjar, Deportation Decision of Board of Immigration Appeals, Oct. 26, 1999

1

I.  Office of the Deputy Commissioner, "AEDPA Implementation Instruction #3: The Effects of AEDPA on Various Forms of Immigration Relief" at 3-6 (Aug. 6, 1996)

J.  Matter of Kiareldeen, A77-025-332, Decision of Immigration Judge (April 2, 1999)

K.  Matter of Kiareldeen, A77-025-332 (BIA, October 15, 1999)

L.  Matter of Ahmed, A90-674-28, Decision of Immigration Judge (July 30, 1999) and Declassified Version of Classified Attachment (June 24, 1999)

M.  Matter of Ahmed, Declassified Version of *In Camera* Hearing

2

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
BRADENTON, FLORIDA

A26-599-077
IN THE MATTER OF:
Mazen A AL-NAJJAR
Respondent

IN CUSTODY REDETERMINATION PROCEEDINGS

**On Behalf of Respondent:**
Luis D. Coton & Martin B. Schwartz
3434 W. Columbus Drive, Suite 202
Tampa, Florida 33677

**On Behalf of Service:**
Daniel N. Vara, Jr. & George Perez
District Counsel & Assist. District Counsel
Miami, Florida 33138

## MEMORANDUM DECISION OF THE IMMIGRATION JUDGE

### I. Background

The respondent is a thirty-nine year old male native of Gaza and holder of an expired Palestinian refugee travel document issued by the Egyptian government. On December 8, 1984, he entered the United States as a nonimmigrant graduate student to attend the Agricultural and Technical State University in Greensboro, North Carolina. Subsequently, the Immigration and Naturalization Service ("Service") issued an Order to Show Cause charging the respondent as deportable pursuant to INA section 241(a)(9), failure to maintain and comply with the nonimmigrant status under which he was admitted.

On May 13, 1997, an immigration judge in Miami, Florida found that the respondent was deportable as charged, and pretermitted the respondent's application for suspension of deportation and denied the respondent's applications for asylum and withholding of deportation. The respondent was ordered deported to the United Arabs Emirates. The respondent has appealed the immigration judge's decision and order of May 13, 1997. Pending the appeal, the respondent was taken into custody by the Service and detained under no bond. The respondent requested a redetermination of his custody status, and a bond redetermination hearing was held on May 29, 1997 in Bradenton, Florida.

### II. Bond

Bond proceedings are informal hearings that are separate and apart from deportation hearings. Matter of Chirinos, 16 I&N Dec. 276, 277 (BIA 1977). In a bond proceeding, the record may contain any information which is helpful to an immigration judge in determining the bond. Id. An alien should be detained or required to post a bond if he poses a threat to national security or he is a flight risk. Matter if Andrade, 19 I&N Dec. 488, 489 (BIA 1987); Matter of Patel, 15 I&N Dec. 666, 666 (BIA 1976). In determining the necessity for and the amount of bond, such factors as a stable employment history, the length of residence in the community, the existence of family ties, a record of nonappearance at court proceedings, manner of entry, and previous criminal or

immigration law violations may be considered. Matter of Andrade, 19 I&N Dec. 488, 489 (BIA 1987); Matter of Sugay, 17 I&N Dec 637, 638-39 (BIA 1981); Matter of Shaw, 17 I&N Dec. 177, 178 (BIA 1979); Matter of Spiliopoulos, 16 I&N Dec. 561, 563 (BIA 1978); Matter of Patel, 15 I&N Dec. 666, 666-67 (BIA 1976); Matter of San Martin, 15 I&N Dec. 167, 168-69 (BIA 1974); Matter of Moise, 12 I&N Dec. 102, 104-05 (BIA 1967); Matter of S-Y-L-, 9 I&N Dec. 575, 577 (BIA 1962).

## III. Evidence Presented

### A. Respondent's Witnesses: May 29, 1997

1. Pilar Saad. Ms. Saad testified to the following: She is a teacher and an administrator. She is a close friend of the respondent and knows him on a professional and social level. The respondent is an expert in Islamic Law and a spiritual leader who teaches peace and justice. The Islamic community cannot function without him nor can his family. The respondent would never advocate violence. She does not know how the respondent supports his family. If the respondent voted illegally in the United States, it would not change her opinion of him. However, if the respondent was a terrorist her opinion of him would change.

2. Rebecca Lynn Al-Masri. Ms. Al-Masri testified to the following: She first came to know the respondent through his Islamic sermons and teachings. She has used the respondent for Islamic marital counseling. The respondent is a spiritual "Iman" because he is well versed in the Koran. She currently helps take care of the respondent's children. She has no idea how the respondent supports his family. The respondent would never advocate violence. If the respondent was a terrorist it would affect her opinion of him, but she would still go to him for counseling. She does not believe it is a problem if he voted illegally in the United States. The respondent does not believe in killing, nor does he support the Palestinian Islamic Jihad.

3. Arthur Lowrie. Mr. Lowrie is an adjunct professor in international studies at the University of South Florida. He testified basically about the Committee for Middle Eastern Studies of the University of South Florida (hereinafter "CMES"), the World and Islam Studies Enterprise (hereinafter "WISE"), and his association with these two organizations. He testified about the former leader of WISE, R.A. Shallah, who left the United States, and six months later became the leader of the Palestinian Islamic Jihad. Mr. Lowrie had no idea that R.A. Shallah was involved with the Palestinian Islamic Jihad. He testified that the organization WISE was a great asset to the Islamic community and it is a shame that it has ceased to exist. Mr. Lowrie believes terrorism is stupid and knows the respondent agrees with him. Mr. Lowrie does recognize that the Palestinian Islamic Jihad is a violent terrorist organization. If he knew of any terrorist activity he would have informed the FBI.

4. Proffered testimony of Mustafa Alvi. Mr. Alvi has known the respondent for since 1985. Mr. Alvi offers Islamic spiritual and religious counseling to prisoners. Often, the respondent has assisted him in the counseling of prisoners. Mr. Alvi relies on the respondent because of the respondent's vast amount of knowledge about the Koran. Mr Alvi has never heard the respondent advocate violence If the respondent was a terrorist, he would cease all relations with him. He has no knowledge that the respondent may have engaged in criminal activities

5. Proffered testimony of Dr. Rick Mitwalli. Dr. Mitwalli has known the respondent for six years. He participated in sermons the respondent presented. In these sermons, the respondent never advocated violence or terrorism. He would be shocked if he learned the respondent was a terrorist. He has no personal knowledge of any of the respondent's alleged criminal activities.

**B. Service's Witnesses: May 29, 1997**

1. William D. West. Mr. West has been a Special Agent with the Immigration and Naturalization Service for nineteen years. He testified to the following: The respondent was a member of WISE, an organization that supports the Palestinian Islamic Jihad. There is currently a multi-agency investigation regarding the respondent's involvement in visa fraud, voter fraud, support to known terrorist organizations, and a sham marriage. Grand Jury activity for the respondent's terrorism ties has been initiated. As a member of WISE, the respondent was involved in the preparation of fraudulent visas for Mr. Shallah and Mr. Odeh. Primarily, through setting up conferences for the Islamic Committee for Palestine (hereinafter "ICP"). The ICP and WISE were separate entities, but closely linked. Both of these organizations were managed by the same people. The respondent entered a sham marriage to adjust his immigration status. The respondent claimed to be an United States citizen in order to vote in an election. The respondent failed to appear for a deportation hearing in 1986, and this is one of the reasons why he believes the respondent to be a flight risk.

2. In camera hearing. On May 29, 1997, an in camera hearing was convened in order to receive classified information regarding the respondent's association with the Palestinian Islamic Jihad. On June 2, 1997, pursuant to 8 C.F.R. 242.17 (a)[1], the respondent was provided with an unclassified summary of the evidence that was submitted at the in camera hearing. Respondent's counsel expressed concern about the vagueness and insufficiency of the unclassified summary. However, the unclassified summary is all the information that can be provided to the respondent while guarding the classified information.

---

[1] There is no provision that addresses in camera hearings in bond proceedings. However, the Court has looked to other provisions in the Regulations for guidance.

3

> Whenever the immigration judge believes that he or she can do so while safeguarding both the [classified] information and its source, the immigration judge should inform the respondent of the general nature of the information in order that the respondent may have an opportunity to offer opposing evidence. A decison based in whole or part of such classified information shall state that the information is material to the decision.

8 C.F.R. 242.17 (a) (1997).

## C. Respondent's rebuttal witnesses: June 6, 1997

1. <u>Dr. Louis Cantori.</u> Dr. Cantori is a professor of political science at the University of Maryland. He testified to the following: He was an advisory editor on a journal on which the respondent was the managing editor. He also attended two conferences sponsored by WISE where he exchanged ideas and opinions with the respondent. The respondent is remarkably objective and detached from political issues of the Middle East. The Palestinian Islamic Jihad is a terrorist organization. Fund raising for the Palestinian Islamic Jihad is very restrictive and regional. Funds usually come from other Middle Eastern States and other Palestinian movements. He met and knew Mr. Shallah, the current leader of the Palestinian Islamic Jihad, through conferences sponsored by WISE. He did not know that Mr. Shallah was connected with the Palestinian Islamic Jihad when he met him at these conferences and co-edited a journal with him. He would be equally shocked if he found out that the respondent was associated with the Palestinian Islamic Jihad. He has no knowledge of any classified information regarding the respondent.

2. <u>Ramsey Clark.</u> Mr. Clark is currently an attorney working in New York. He was the United States Attorney General and Deputy Attorney General from 1960 to 1969. He testified to the following: He dealt with classified information as Attorney General and Deputy Attorney General of the United States. Based on his experiences as Attorney General and Deputy Attorney General, he is concerned about the reliability of the classified information. In criminal investigations, federal agencies gather all information, including rumors, suspicions, and falsified information. Corroboration of classified information may be difficult. In the 1960's, information gathered by the Federal Bureau of Investigations was often false. He was last employed by The United States in 1969. He does not know the respondent. He currently represents the Palestinian Liberation Organization. He is not sure if he is involved in any pending litigation against the United States.

3. <u>Proffered testimony of Ziad Abu Amr.</u> Mr. Amr is a Professor of Political Science at the Bir Zeit University in the West bank. His testimony would be similar to that of Professor Arthur Lowrie.

4. <u>Proffered testimony of Mr. Richard H. Curtis.</u> Mr. Curtis's testimony would be similar in nature as Mr. Clark's testimony regarding the reliability of classified information.

4

## IV. Findings of the Court

### A. Employment history

The respondent has submitted evidence of stable employment. He was employed for five years at the University of Florida, where he taught the Arabic language. (Respondent Exhibit IIA). The respondent has also taught at The Islamic Academy of Florida for five years. Id. He has been praised for his professional and academic accomplishments by other professionals. (Respondent Exhibit III) The record also indicates that the respondent has been offered employment by the Nationwide Realty Group on the condition he passes the June 1997 real estate exam ( Respondent Exhibit IIB). However, the Court does note that the respondent was illegally employed in the United States. (?) *This was not substantially, or perhaps prejudicial, since one the issue.*

### B. Length of residence in community

The respondent has been in the member of the Florida Islamic community for more than ten years. The respondent has submitted evidence which indicates his strong community ties. First, the respondent's witnesses have testified about the respondent's strong community ties. In addition, over one hundred members of the community have submitted letters on behalf of the respondent. The authors of theses letters are family members, family friends, members of the Islamic community, professional associates, and students. (Respondent Exhibit Tabs III, IV, and V). These letters attest to the respondent's good character and his role as a religious and spiritual leader in the Islamic community. Id. The Court has favorably considered the respondent's length of time in the community, strong community ties, and leadership in the community.

### C. Family ties

The respondent has also submitted favorable evidence regarding his family ties in the United States. His wife, three young daughters, siblings, and parents reside in the United States. His wife, parents, sister, two brothers, two nieces, nephew, and daughter have written letters on his behalf. These letters attest to the respondent's unselfish nature, the vital role he plays in their lives, his leadership in the community, and that he provides invaluable spiritual and religious guidance to them. (Respondent Exhibit IV).

### D. Immigration violations

There has been testimonial evidence introduced regarding the respondent's past immigration violations. Special Agent West testified about possible visa fraud and voter fraud involving the respondent. The Court will not make a finding on these two issues absent presentation of the full record.

### E. Failure to Appear at Scheduled Hearings

Special Agent West has testified that the respondent failed to appear at his June 4, 1986 deportation hearing. It appears that there was some mix up and the respondent did not timely receive

5

written notice of the hearing. In any event, the case was reopened on that basis. (Judge Dowell's Written Decision, May 13, 1997 p 2.) The Court does not find that the respondent has a history of nonappearance at court proceedings.

F. Classified Information

The Court finds the classified information to be pertinent and reliable on the issue of respondent's threat to national security. Although I do not devalue Mr. Clark's testimony regarding his opinion and experiences with classified information, I must note that the experiences that he testified to occurred about thirty years ago. Mr. Clark was last employed as Attorney general of the United states in 1969. Since then, there has been numerous administration changes, domestic policy changes, foreign policy changes, and technological advances. I cannot find that the practices regarding classified information have remained status quo since 1969. Therefore, I do find the classified information to be reliable. Based on the classified information, I find that the respondent is associated with a terrorist organization known as the Palestinian Islamic Jihad.

## IV. Conclusion

Based on the foregoing, I find that the respondent is a well respected man, socially, religiously, and professionally. He has strong community and family ties. However, based on the classified information I received during these proceedings, I find that the respondent is a threat to national security. Specifically, because of his association with the Palestinian Islamic Jihad terrorist organization. Therefore, the respondent must be detained without bond.

Accordingly, the following order shall be entered:

**ORDER: It is hereby ordered that the requested change in bond be DENIED.**

Dated this 23/day of June 1997.

R. Kevin McHugh
Immigration Judge

6

U.S. Department of Justice

Decision of the Board of Immigration Appeals

Executive Office for Immigration Review

Falls Church, Virginia 22041

File:    A26 599 077 - Orlando                          Date:    SEP 1 5 1998

In re:   MAZEN A. AL-NAJJAR

IN BOND REDETERMINATION PROCEEDINGS PURSUANT TO 8 C.F.R. § 236.1(d)[1]

APPEAL

ON BEHALF OF RESPONDENT: → Luis D. Coton, Esquire
                            Coton and Canella, P.A.
                            P.O. Box 4838
                            Tampa, Florida  33677

                            Martin B. Schwartz, Esquire
                            Law Office of Martin B. Schwartz
                            3434 West Columbus Drive, Suite 202
                            Tampa, Florida  33607

ON BEHALF OF SERVICE:   Jorge Perez
                        Assistant District Counsel

APPLICATION:   Redetermination of custody status

In an order issued on June 6, 1997, an Immigration Judge denied the respondent's request for
a change in custody status on the ground that the respondent posed a threat to the national security
of the United States and ordered that the respondent remain in the custody of the Immigration and
Naturalization Service without bond. The respondent, through counsel, has timely appealed from
that decision.  The respondent's request for oral argument before this Board is denied as a matter
of discretion.[2] See 8 C.F.R. § 3.1(e) (1998).  The appeal will be dismissed.

---

[1] We note that the Immigration Judge conducted the bond proceedings in this matter pursuant to
the former 8 C.F.R. § 242.2(d) (1997).  Our adjudication of the bond appeal, however, is
governed by the new bond regulations at 8 C.F.R. § 236.1(d) (1998).

[2] We further deny the respondent's motion for the production of a transcript of the bond
redetermination hearings. See Matter of Chirinos, 16 I&N Dec. 276, 277 (BIA 1977) ("[T]here
is no right to a transcript of a bond redetermination hearing.").

A26 599 077

## I. BACKGROUND

The respondent is a 41-year-old Palestinian native of Gaza[3] who entered the United States on or about December 8, 1984, as a nonimmigrant student to pursue graduate studies in North Carolina. He and his family are residents of Tampa, Florida. The record reflects that the respondent holds a doctorate degree and has been affiliated with the University of South Florida and the University's former World and Islamic Studies Enterprise (WISE). The respondent has made significant academic contributions to the field of Islamic studies and is recognized as a spiritual leader in the Tampa Islamic community.

The Service has instituted deportation proceedings against the respondent alleging that he violated the terms and conditions of his nonimmigrant status.[4] On May 19, 1997, the Service placed the respondent in its custody without bond pending the adjudication of the respondent's appeal in the separate deportation proceeding. The respondent thereupon requested a bond redetermination hearing before an Immigration Judge pursuant to 8 C.F.R. § 3.19 (1997).

The Immigration Judge held the bond redetermination hearings over the course of 3 days: May 29, 1997; June 2, 1997; and June 6, 1997. On May 28, 1997, the Service filed a "Notice of Intent to Present Classified Evidence in an *In Camera* Proceeding." In its "Notice," the Service asserted that the classified evidence indicates that the respondent "is a flight risk and that he poses a threat to national security" and that the evidence could not be disclosed. On May 29, 1997, over the strenuous objection of the respondent, the Immigration Judge conducted an *ex parte* examination of the classified evidence adduced by the Service *in camera* to the exclusion of the respondent and his counsel.

On June 2, 1997, the Immigration Judge furnished the respondent an unclassified summary of the classified information that he considered *in camera*. The unclassified summary reads as follows:

---

[3] The respondent's citizenship is a matter of dispute. The record reflects that the respondent is the holder of an expired Palestinian Refugee Travel Document issued by the Egyptian government. The respondent maintains that he is stateless.

[4] The Order to Show Cause (Form I-221) is dated April 19, 1985. It appears that deportation proceedings were administratively closed for nearly a decade and reopened in 1995.

A26 599 077

> Pursuant to 8 C.F.R. § 242.17(a),[5] the Parties are notified of the following unclassified summary of classified information submitted to this Court for *in camera* review in the above-referenced bond proceeding held Thursday, May 29, 1997: This Court was provided with information as to the association of the Respondent with the Palestinian Islamic Jihad.[6]

The summary bears the Immigration Judge's signature.

Over the course of the three hearings, the Immigration Judge heard testimony from several witnesses for the respondent: (1) Ms. Pilar Saad, a teacher and administrator who knows the respondent well on both personal and professional levels; (2) Ms. Rebecca Lynn Al-Masri, a representative of Tampa's Islamic community who knows the respondent through his spiritual leadership in that community; (3) Professor Arthur Lowrie, an adjunct professor in international studies at the University of South Florida; (4) Dr. Louis Cantori, a professor of political science at the University of Maryland; and (5) Former Attorney General Ramsey Clark. The Immigration Judge also accepted proffered testimony from Mr. Mustafa Alvi, Dr. Rick Mitwalli, Mr. Ziad Abu Amr, and Mr. Richard H. Curtis. In addition, the Immigration Judge heard testimony from the Service's sole witness, Mr. William D. West, a Special Agent of the Service.

The Immigration Judge summarized the actual and proffered testimony of the aforementioned witnesses in his memorandum order, dated June 23, 1997. Inasmuch as neither the respondent nor the Service has objected to the Immigration Judge's summarization of the testimony, we will rely upon the Immigration Judge's memorandum as an accurate abstract of the testimonial evidence presented below.

---

[5] The federal regulations at 8 C.F.R. § 242.17(a), pertaining to deportation proceedings, have been redesignated as 8 C.F.R. § 240.49(a) (1998). The equivalent regulation governing removal proceedings is 8 C.F.R. § 240.11(a)(3) (1998).

[6] Pursuant to section 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189, the Secretary of State has designated the "Palestine Islamic Jihad-Shaqaqi Faction" a "foreign terrorist organization." 75 Interpreter Releases No. 8, Mar. 28, 1998, at 294-300 (reprinting State Department Cable No. 97-State-191813 (Oct. 9, 1997)). See generally Humanitarian Law Project v. Reno, ___ F. Supp. ___, 1998 WL 385955 (C.D. Cal. 1998) (rejecting First Amendment challenge to constitutionality of section 219 of the Act). The Secretary of State specified that the Palestinian Islamic Jihad-Shaqaqi Faction is "also known as": PIJ-Shaqaqi Faction, PIJ; Islamic Jihad in Palestine, Islamic Jihad of Palestine, and Abu Ghunaym Squad of the Hizballah Bayt Al-Maqdis.

A26 599 077

In addition to the extensive testimonial evidence, the record contains ample documentary evidence adduced by the respondent in support of his bond redetermination request. This evidence primarily relates to the respondent's employment history, educational attainment, family and community ties, lack of a criminal record, and professional reputation. Notably, the record bears testimonials and letters of support from over 50 adult members of the Tampa community, as well as hand-written letters from approximately 75 children from the community.

## II. IMMIGRATION JUDGE'S DECISION

In his June 23, 1997, memorandum order, the Immigration Judge issued favorable findings with respect to such relevant factors as the respondent's period of residence, employment history, and family and community ties in this country. Ultimately, however, the Immigration Judge concluded that the classified evidence was reliable and supportive of the Service's contention that the respondent, as one who "is associated with a terrorist organization known as the Palestinian Islamic Jihad," represents a threat to the national security of the United States. The Immigration Judge accordingly ordered that the respondent remain in the custody of the Service without bond.

## III. ARGUMENTS ON APPEAL

### A. Respondent's Arguments

On appeal, the respondent initially contends that the Immigration Judge erred in permitting the Service to introduce undisclosed, classified evidence in an *in camera, ex parte* proceeding. The respondent argues that such a procedure is not authorized by an applicable statute or regulation and that, absent clear statutory or regulatory authority, *in camera* proceedings are impermissible.

According to the respondent, the Act specifically authorizes the consideration, *ex parte* and *in camera*, of classified evidence only in two limited provisions: (1) the "Alien Terrorist Removal Procedures" of sections 501 of the Act et. seq., 8 U.S.C. §§ 1531 et. seq.; and (2) the special removal provisions for "Aliens Inadmissible on Security and Related Grounds" set forth in section 235(c) of the Act, 8 U.S.C. § 1225(c). The respondent contends that neither of these statutory provisions applies to the immediate case. With regard to the federal regulations, the respondent maintains that while the examination of secret evidence *ex parte* and *in camera* is authorized under 8 C.F.R. § 242.17,[7] this provision is strictly limited to adjudication of applications for discretionary relief from deportation or removal and does not extend to bond proceedings.

---

[7]   See supra note 5.                         —

4

A26 599 077

The respondent alternatively argues that the Immigration Judge's reliance upon undisclosed, *ex parte* evidence against him was unconstitutional. The Immigration Judge's actions, the respondent maintains, deprived him of his liberty without due process of law in violation of the Fifth Amendment.

In addition, the respondent submits that Immigration Judge denied him a fundamentally fair hearing by not allowing his counsel to secure necessary security clearance and participate in the *in camera* proceeding and review the classified evidence presented therein. The respondent maintains that "a procedure does exist which would allow . . . counsel to be privy to the classified matter without jeopardizing the source of the classified information" and would permit counsel to adequately protect the respondent's due process rights. The respondent avers that the Immigration Judge also erred in failing to keep a written record of the *in camera* proceeding and that the lack of a transcript of both the public and *in camera* bond proceedings deprived the respondent of fair, meaningful opportunity to contest the Immigration Judge's determination on appeal.

Lastly, the respondent contends that the Immigration Judge's reliance upon the secret evidence in finding the respondent to be a threat to national security also impermissibly impinged upon the respondent's First Amendment freedom of association. The respondent ultimately maintains that he poses neither a threat to the national security of the United States nor a flight risk and, therefore, should be released from custody under a reasonable bond pending the resolution of his deportation case.

### B. Immigration and Naturalization Service's Arguments

For its part, the Service argues that the Immigration Judge's *in camera, ex parte* consideration of the classified information was well within the Immigration Judge's broad discretion, delegated by the Attorney General, to determine the terms and conditions of an alien's custody during the pendency of deportation proceedings. According to the Service, the federal regulations -- specifically, 8 C.F.R. § 3.19(d) -- authorize the reliance by Immigration Judge on undisclosed classified evidence in making bond determinations. The Service avers that courts, in controlling immigration law precedent decisions, have specifically upheld bond determinations based upon confidential, *ex parte* information considered *in camera*. The Service maintains that the respondent's bond proceedings comported fully with the dictates of due process and that the evidence clearly supports the Immigration Judge's determination that the respondent represents a threat to the national security of the United States.

5

A26 599 077

## IV. ANALYSIS

Pursuant to 8 C.F.R. § 236.1(c)(8) (1998), the respondent is presumed to be ineligible for bond unless he can demonstrate by a preponderance of the evidence that his release from custody "would not pose a danger to property or persons, and that [he] is likely to appear for any futureproceedings."[8] The respondent may also be held in the custody of the Service without bond based upon a proper finding that his release would pose a threat to the national security of the United States. Matter of Patel, 15 I&N Dec. 666 (BIA 1976) (citing Carlson v. Landon, 342 U.S. 524 (1952)); see also Doherty v. Thornburgh, 943 F.2d 204, 209-11 (2d Cir. 1991); United States ex. rel. Barbour v. District Director, INS, 491 F.2d 573, 578 (5th Cir.), cert. denied, 419 U.S. 873 (1974).

Based on the classified, *ex parte* information the Service presented in an *in camera* hearing, the Immigration Judge held that the respondent, as one associated with the Palestinian Islamic Jihad, indeed represents a threat to the national security of this country. The respondent challenges both the propriety of the Immigration Judge's decision and the fundamental fairness of the bond proceedings leading to that decision.

### A. Board's Jurisdiction

We have jurisdiction over this bond matter pursuant to 8 C.F.R. § 3.1(b)(7) (1998).[9] This Board, however, does not have jurisdiction to entertain constitutional claims beyond procedural

---

[8] This final regulation at 8 C.F.R. § 236.1(c)(8), previously designated as 8 C.F.R. § 236.1(c)(2) (1997), reverses the longstanding presumption of bond eligibility for non-criminal aliens recognized by this Board in Matter of Patel, 15 I&N Dec. 666 (BIA 1976). See 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997); Reno v. Flores, 507 U.S. 292, 295 (1993). The regulation was originally effective April 1, 1997, as an interim rule and, therefore, governed the respondent's bond redetermination. Inasmuch as the Service has not alleged that the respondent is "deportable" under section 241(a)(4)(B) of the Act, 8 U.S.C. § 1251(a)(4)(B) (1994), we need not reach the issue of whether the respondent's bond redetermination is governed by the Transition Period Custody Rules. See section 303(b)(3)(A)(iv) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546 (enacted Sept. 30, 1996) ("IIRIRA"). See generally Matter of Melo-Pena, Interim Decision 3313 (BIA 1997); Matter of Valdez-Valdez, Interim Decision 3302 (BIA 1997); Matter of Noble, Interim Decision 3301 (BIA 1997).

[9] Neither the Service nor the respondent has asserted that the Immigration Judge and this Board lack jurisdiction over this matter under 8 C.F.R. § 3.19(h)(1)(i)(C) (1998) (divesting Immigration Judge's jurisdiction over redetermination of custody status of aliens described in national security, terrorism, and foreign policy grounds for deportation under the Act).

6

A26 599 077

due process claims that do not seek invalidation of the statutes and regulations we are charged with administering. See, e.g., Matter of Anselmo, 20 I&N Dec. 25, 30 (BIA 1989), and cases cited therein. Therefore, while our jurisdiction extends to a review of the propriety of the Immigration Judge's custody status redetermination and the respondent's claims as to the fundamental fairness of the bond proceedings, we are not empowered to pass upon the First Amendment claims and other purely constitutional challenges asserted by the respondent.

### B.  Fundamental Fairness of the Bond Proceedings

We turn first to the important procedural due process arguments raised in this matter. The respondent argues initially that the Immigration Judge's consideration of and reliance upon secret evidence *in camera* to inform his custody analysis violated the respondent's due process rights. We find that in view of the government's compelling need to shield important, classified national security information bearing upon this matter, the Immigration Judge's examination of the *ex parte* evidence *in camera* was proper and constitutionally sound.

The Attorney General has "broad discretion to determine whether, and on what terms, an alien arrested on suspicion of being deportable should be released pending the deportation hearing." Reno v. Flores, 507 U.S. 292, 294-95 (1993); see section 236 of the Act, 8 U.S.C. § 1226;[10] see also Doherty v. Thornburgh, supra; United States ex. rel. Barbour v. District Director, INS, supra. However, this discretion is not "untrammeled." Carlson v. Landon, supra, at 543. It is well-settled that the Fifth Amendment entitles aliens to due process of law in deportation proceedings. Reno v. Flores, supra, at 306 (citing The Japanese Immigrant Case, 189 U.S. 86, 100-101 (1903)); Matter of G-, 20 I&N Dec. 764, 780 (BIA 1993). The Fifth Amendment's protections extend to bond proceedings as well, for preventive detention requires that an alien's liberty be subordinated to the protection of the public interest. Doherty v. Thornburgh, supra, at 209. These procedural safeguards are embodied in various provisions of the Act and the regulations governing the conduct of administrative immigration proceedings. Immigration Judges and this Board, therefore, must ensure that such proceedings comport with the basic notions of fundamental fairness.

At the same time, however, we must recognize that "bond proceedings differ greatly from other immigration proceedings." Matter of Valles-Perez, Interim Decision 3306, at 3 (BIA 1997). The primary consideration in a bond determination is affording the parties an

---

[10] Section 236 of the Act, 8 U.S.C. § 1226, replaces the former section 242(a) of the Act, 8 U.S.C. § 1252(a) (1994). See section 306 of IIRIRA; see also section 303 of IIRIRA; Matter of Noble, supra note 8.

A26 599 077

opportunity to present evidence before an impartial arbiter "as promptly as possible." Matter of Chirinos, 16 I&N Dec. 276, 277 (BIA 1977). Bond proceedings accordingly are designed to be "less formal" and "more expeditious" than full-fledged deportation or removal hearings. Id. at 4-5; see also United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) ("[T]he need for speed necessarily makes . . . bail hearings typically informal affairs, not substitutes for trial or even for discovery. Often the opposing parties simply describe to the judicial officer the nature of their evidence; they do not actually produce it.").

### 1. Immigration Judge's Consideration of Undisclosed, Classified Evidence *In Camera*

Consonant with the speedy, informal nature of bond proceedings and the Attorney General's broad discretion in deciding custody matters under the Act, the regulations at 8 C.F.R. § 3.19(d) specify that "The determination of the Immigration Judge as to custody status or bond may be based upon any information that is available to the Immigration Judge or that is presented to him or her by the alien or the Service" (emphasis added). As is apparent from its expansiveness, this regulation on its face contemplates an Immigration Judge's review of classified, *ex parte* evidence *in camera*. See United States ex. rel. Barbour v. District Director, INS, supra.

In a precedent decision in the Eleventh Circuit directly on point, the former United States Court of Appeals for the Fifth Circuit[11] specifically ruled that the Attorney General's reliance upon *ex parte* classified evidence to find an alien to be a threat to national security and deny the alien a bond pending deportation proceedings was not violative of due process. United States ex. rel. Barbour v. District Director, INS, supra. The court concluded, citing Jay v. Boyd, 351 U.S. 345 (1956), that release on bail, which is a discretionary determination, "may be denied on the basis of confidential information, the disclosure of which would be prejudicial to the public interest, safety, or security, if the use of such information is sanctioned by regulations." Id. at 578.

The Barbour court found such regulatory imprimatur in the expansively worded 8 C.F.R. § 242.2(b) (1973), which, like its redesignated successor at 8 C.F.R. § 3.19(d) (1998), permitted an Immigration Judge to base a custody determination "upon any information which is available . . . or which is presented to him by the alien or the Service." Id.; cf. American-Arab Anti-Discrimination Comm. v. Reno, 70 F.3d 1045, 1068 (9th Cir. 1995) (finding "no statutory or regulatory basis supporting the Government's interest in use of classified

---

[11] Published decisions of the Fifth Circuit Court of Appeals issued before October 1, 1981, are binding precedent in the Eleventh Circuit, in which this case arises. Cuban American Bar Ass'n v. Christopher, 43 F.3d 1412, 1424 n.9 (11th Cir.), cert. denied, 516 U.S. 913 (1995).

8

A26 599 077

information in legalization decisions pursuant to [8 U.S.C.] § 1255a"). This decision is binding upon the Board. See Matter of S-O-S-, Interim Decision 3355, at 2-3 (BIA 1998); Matter of Anselmo, supra, at 31. We, therefore, reject the respondent's initial contention that the Immigration Judge's consideration of secret evidence *in camera* has no basis in the Act or regulations and *per se* deprived the respondent of a fundamentally fair hearing.[12] See United States ex. rel. Barbour v. District Director, INS, supra.

We further find that in analyzing the secret evidence adduced below, the Immigration Judge properly ensured that all appropriate procedural safeguards were employed to minimize the respondent's disadvantage of not being able to examine the evidence against him. See Matter of Exilus, 18 I&N Dec. 276, 278 (BIA 1982) ("Due process in an administrative proceeding is not defined by inflexible rules which are universally applied, but rather varies according to the nature of the case and the relative importance of the governmental and private interests involved."). In doing so, the Immigration Judge carefully balanced the respondent's significant due process liberty interests against the government's compelling interest in protecting sensitive national security information and "the appearance of confidentiality so essential to the effective operation of our foreign intelligence service." CIA v. Sims, 471 U.S. 159, 175 (1985); see Joint Anti-Fascist Refugee Comm. v. McGrath, supra, at 164 (Frankfurter, J., concurring) (observing that national

---

[12] When appropriate procedural safeguards have been employed, the courts have sanctioned resort to *in camera* inspection of secret and classified evidence *ex parte* in a variety of legal contexts presenting issues of national security. See, e.g., United States v. Reynolds, 345 U.S. 1 (1953) ("state secrets privilege"); United States v. Klimavicius-Viloria, 144 F.3d 1249 (9th Cir. 1998) (Classified Information Procedures Act); United States v. Innamorati, 996 F.2d 456 (1st Cir. 1993) (Fed. R. Crim. P. 16(d)(1)); United States v. Hamide, 914 F.2d 1147 (9th Cir. 1990) (Foreign Intelligence Surveillance Act); Arieff v. United States Dep't of the Navy, 712 F.2d 1462 (D.C. Cir. 1983) (Freedom of Information Act). Most germane to the case at hand, courts have explicitly recognized the necessity, in extraordinary circumstances, of an *in camera, ex parte* review of confidential evidence in pre-trial detention hearings; see, e.g., United States v. Accetturo, 783 F.2d 382 (3d Cir. 1986); United States v. Acevedo-Ramos, 755 F.2d 203 (1st Cir. 1985); United States v. Terrones, 712 F. Supp. 786 (S.D. Cal. 1989); and in a variety of immigration cases; see, e.g., Jay v. Boyd, 351 U.S. 345 (1956); Ali v. Reno, 829 F. Supp. 1415 (S.D.N.Y. 1993), aff'd on other grounds, 22 F.3d 442 (2d Cir. 1994); Naji v. Nelson, 113 F.R.D. 548 (N.D. Ill. 1986); Allende v. Shultz, 605 F. Supp. 1220 (D. Mass. 1985). But cf. American-Arab Anti-Discrimination Comm. v. Reno, 70 F.3d 1045 (9th Cir. 1995); Rafeedie v. INS, 880 F.2d 506 (D.C. Cir. 1989).

9

A26 599 077

security is "the greatest of all public interests"); Farrakhan v. Regan, 669 F. Supp. 506, 510-12 (D.D.C. 1987) (noting that government has "compelling" interest in protecting national security and ending terrorism), aff'd, 851 F.2d 1500 (D.C. Cir. 1988).

For guidance in ascertaining the appropriate procedural safeguards to be afforded in this matter, the Immigration Judge prudently referred to the former 8 C.F.R. § 242.17(a) (1997), now designated as 8 C.F.R. § 240.49(a) (1998). This regulation sets forth a procedure to be followed by an Immigration Judge if he or she is reviewing *ex parte*, classified evidence *in camera* in ruling on an alien's application for discretionary relief from deportation:

> In exercising discretionary power when considering an application under this paragraph, the [I]mmigration [J]udge may consider and base the decision on information not contained in the record and not made available for inspection by the respondent, provided the Commissioner [of the Immigration and Naturalization Service] has determined that such information is relevant and is classified under the applicable Executive Order as requiring protection from unauthorized disclosure in the interest of national security. Whenever the [I]mmigration [J]udge believes that he or she can do so while safeguarding both the information and its source, the [I]mmigration [J]udge should inform the respondent of the general nature of the information in order that the respondent may have an opportunity to offer opposing evidence. A decision based in whole or in part on such classified information shall state that the information is material to the decision.

8 C.F.R. § 240.49(a) (1998); see also 8 C.F.R. § 240.49(c)(4)(iv) (1998) (prescribing nearly identical procedure for *in camera* consideration of classified information in adjudication of asylum applications).

Pursuant to these guidelines, the Immigration Judge provided the respondent an unclassified summary of the classified information he reviewed *in camera*. The summary not only noted that the classified information pertained to the respondent's association with a foreign terrorist organization, but also disclosed the particular terrorist organization as the Palestinian Islamic Jihad. The provision of an unclassified summary of the secret evidence -- or at least a reasonable explanation for the Government's inability to produce such a summary -- has been held to be a critical safeguard in national security cases necessitating the *in camera* review of classified information. See United States v. Accetturo, 783 F.2d 382, 391 (3d Cir. 1986); United States v. Acevedo-Ramos, supra, at 209; American-Arab Anti-Discrimination Comm. v. Reno, 883 F. Supp. 1365, 1377 (C.D. Cal.), aff'd, 70 F.3d 1045 (1995); United States v. Terrones, 712 F. Supp. 786, 793-94 (S.D. Cal. 1989); Naji v. Nelson, 113 F.R.D. 548, 552 (N.D. Ill. 1986); Allende v. Shultz, supra.

10

A26 599 077

The respondent was then afforded a full hearing to offer opposing evidence and cross-examine the Service's principal witness, Special Agent West. Further, in his decision, the Immigration Judge specifically ruled that the classified evidence reviewed *in camera* was both "pertinent and reliable on the issue of the respondent's threat to national security" (I.J. at 6). We also note that the Service provided the respondent ample notice of its intent to introduce classified evidence *in camera*, and the Immigration Judge otherwise afforded the respondent the full panoply of due process rights normally attendant to a fair bond proceeding such as the right to counsel of his choice at no cost to the government, the right to present evidence and cross-examine witnesses for the government, and the right to appeal.

The protections afforded the respondent during proceedings below reflect a careful balancing of the competing interests of the respondent and the Service. The Immigration Judge accorded the respondent all process that was due without compromising the secrecy of the relevant, classified national security information that the Service adduced *in camera*. Accordingly, we reject the respondent's contention that the Immigration Judge failed to conduct the bond proceedings in a manner fully consistent with the dictates of due process.[13]

2. Access of Counsel to *In Camera* Review of Classified Information

The respondent further argues that the Immigration Judge erroneously denied his counsel an opportunity to obtain necessary security clearance and thereafter participate in the *in camera* review of the Service's classified information. We reject this argument as well.

Although an Immigration Judge enjoys broad discretion in bond matters, we are aware of no statutory or regulatory provision which vests Immigration Judges with the authority to arrange for counsel to get the necessary security clearances and grant access to classified information. Indeed, as the Service points out in its brief, section 4.2(b) of Executive Order No. 12958, 60 Fed. Reg. 19,825 (1995) provides in relevant part, "Classified information shall remain under the control of the originating agency or its successor in function. An agency shall not disclose information originally classified by another agency without its authorization." We agree with the Service that the regulation cited by the respondent as authority for this procedure, 28 C.F.R. § 68.42, is inapplicable to these bond proceedings.[14]

---

[13] Although *in camera* examination of *ex parte* evidence is part of an Immigration Judge's "'procedural arsenal,'" Arieff v. United States Dep't of the Navy, supra note 13, at 1469; this drastic measure should be taken most sparingly and "only when there exists a most compelling need and no alternative means of meeting that need," United States v. Jeffries, 679 F. Supp. 1114, 1118 n.5 (M.D. Ga. 1988).

[14] Even if it were authorized by statute or regulation, the risk presented by the participation of the respondent's counsel outweighs the utility of the presence of counsel in examining the classified
—                                                                                  (continued...)

11

A26 599 077

### 3. Lack of Transcript of Bond Redetermination Hearings

Lastly, the respondent maintains that he suffered material prejudice by not being provided a transcript of the bond proceedings, including those conducted *in camera*. The lack of a transcript, the respondent argues, significantly curtails his right to prepare an effective appeal to this Board and the federal courts. We find no merit in this contention. The Board has long held that because bond proceedings necessarily are speedy and informal, "there is no right to a transcript of a bond redetermination hearing." Matter of Chirinos, supra. Furthermore, inasmuch as Immigration Judges are not required to produce a transcript of bond redetermination hearings, the Immigration Judge did not err in failing to provide for the production of a transcript of the *in camera* bond proceedings.

### C. Merits of Respondent's Request for a Change in Custody Status

We turn now to the respondent's substantive challenge to the Immigration Judge's determination that the respondent poses a threat to the national security of the United States. Upon careful review of the record and the classified information considered by the Immigration Judge *in camera*, we affirm the Immigration Judge's denial of the respondent's request for a change in custody status.

The record reflects that the respondent is associated with the Palestinian Islamic Jihad, a foreign terrorist organization.[15] The Secretary of State's designation of the Palestinian Islamic Jihad as a "foreign terrorist organization" is predicated on twin findings that "the organization engages in a terrorist activity" and that "the terrorist activity of the organization threatens the security of United States nationals or the national security of the United States." Section 219(a)(1)(B-C) of the Act, 8 U.S.C. §§ 1189(a)(1)(B-C). See generally Humanitarian Law Project v. Reno, ___ F. Supp. ___, 1998 WL 385955 (C.D. Cal. 1998).

---

[14] (...continued)
supplement to the record. See, e.g., Arieff v. United States Dep't of the Navy, supra note 13 at 1469-70 (D.C. Cir. 1983); Hayden v. National Security Agency, 608 F.2d 1381, 1385-86 (D.C. Cir. 1979), cert. denied, 446 U.S. 937 (1980). An Immigration Judge's disclosure of sensitive national security information to counsel in cases such as this would create an incalculable risk that the circulation of confidential information to our intelligence agencies would be chilled. Moreover, the limited disclosure that the respondent seeks would fundamentally impair the attorney-client relationship, as the respondent's counsel would be barred from revealing the information to the respondent. See Arieff v. United States Dep't of the Navy, supra; see also Military Audit Project v. Bush, 418 F. Supp. 876, 878 (D.D.C. 1976) (noting that permitting limited disclosure of secret classified evidence to counsel would disadvantage *pro se* litigants).

[15] The respondent has not disputed that the Palestinian Islamic Jihad is a terrorist organization. In fact, one of the respondent's witnesses, Dr. Louis Cantori, testified to this fact (I.J. at 4).

12

A26 599 077

Based upon the testimonial and documentary evidence of record and the supplemental classified information presented by the Service, we conclude that the respondent's release from custody would pose a threat to both: (1) the national security of this country, see, e.g., Doherty v. Thornburgh, supra, at 209 ("It is axiomatic . . . that an alien's right to be at liberty during the course of deportation proceedings is circumscribed by considerations of the national interest."); and (2) the safety of other persons or property, see 8 C.F.R. § 236.1(c)(8) (1998). Inasmuch as this determination is dispositive of the respondent's bond redetermination request, see, e.g., Carlson v. Landon, supra; United States ex. rel. Barbour v. District Director, INS, supra; Matter of Patel, supra; the Immigration Judge properly ordered that the respondent remain in the custody of the Service without bond.

## V. CONCLUSION

For the foregoing reasons, we find that the Immigration Judge conducted the bond proceedings in a fundamentally fair manner and reached a proper determination that the respondent should not be released from the custody of the Service. Accordingly, the following order will be entered.

ORDER: The respondent's appeal is dismissed.

_____
FOR THE BOARD

13

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
Miami, Florida
Sitting at Orlando, Florida

File No.: A26-599-077                                      Date: May 13, 1997

In re:                              )
                                    )
                                    )
    Mazen Abdel Abdulkarim Al-Najjar)          IN DEPORTATION PROCEEDINGS
                                    )
    Respondent                      )

CHARGE:      Section 241(a)(9) of the Immigration and Nationality Act, 8
             U.S.C. 1251(a)(9) -- Failure to Maintain Conditions of
             Nonimmigrant Status 1/

APPLICATIONS: Section 244(a)(1) of the Immigration and Nationality Act, 8
             U.S.C. 1254(a)(1) -- Suspension of Deportation

             Section 208(a) of the Immigration and Nationality Act, 8 U.S.C.
             1158(a) -- Asylum

             Section 243(h)(1) of the Immigration and Nationality Act, 8
             U.S.C. 1253(h)(1) -- Withholding of Deportation

ON BEHALF OF THE RESPONDENT:                   ON BEHALF OF THE SERVICE:
Luis D. Coton, Esq.                            Jorge J. Perez, Esq.
Coton, Kilgore and Cannella P.A.               Assistant District Counsel
Post Office Box 4848                           7880 Biscayne Blvd., Ste. 1100
Tampa, Florida 33677-4838                      Miami, Florida 33138

### WRITTEN DECISION AND ORDER OF THE IMMIGRATION JUDGE

The respondent is a thirty-nine year old married male, native of Gaza and
holder of an expired Palestinian refugee travel document issued by the
Egyptian government. The respondent last entered the United States at New
York, New York by plane on December 8, 1984 with authorization to remain for
the duration of his nonimmigrant graduate student status at the Agricultural
and Technical State University in Greensboro, North Carolina. On April 19,
1985, the Immigration and Naturalization Service (hereinafter the Service)

----

1/ The respondent was placed in deportation proceedings in 1985, under section
241(a)(9) of the Immigration and Nationality Act, 8 U.S.C. 1251(a)(9)(1982).
That provision is now found at section 241(a)(1)(C), 8 U.S.C. 1251(a)(1)(C)

issued an Order to Show Cause, Notice of Hearing, and a Warrant for Arrest of Alien (Form I-221S) (hereinafter OSC), to the respondent for failing to maintain the conditions of his nonimmigrant status [Exhibit 1]. Following release from Service custody, the respondent failed to appear for his June 4, 1986 hearing; the case was administratively closed [Respondent Tab IXB]. On June 18, 1986, the respondent submitted a motion to reopen for not having received notice of the June 4, 1986 hearing date until June 6, 1986. The matter was recalendared for a February 8, 1996 hearing in Orlando, Florida [Exhibit 2].

On such date, the Service issued Form I-261 to supplement the factual allegations contained in the April 19, 1985 OSC [Exhibit 4]. Thereafter, the respondent through counsel: acknowledged proper service of both OSCs; admitted allegations 1, 3, 10-12; denied allegations 2, 5-9 and conceded deportability pursuant to section 241(a)(9) of the Immigration and Naturalization Act (hereinafter the Act). Based upon the respondent's admissions and concession, the court found the respondent deportable as charged by clear, convincing and unequivocal evidence. Woodby v. INS, 385 U.S. 276, 286 (1966). As relief from deportation, the respondent submitted to the court applications for suspension of deportation (Form I-256A), asylum and withholding of deportation (Form I-589) [Respondent Exhibit I and V]. In response to his alleged statelessness, the respondent not only declined to designate a country of deportation should his deportation be required, but similarly chose not to request voluntary departure. The court thereby designated the United Arab Emirates as the respondent's country of deportation, should his deportation become necessary. Section 243(a) of the Act.

For the reasons that follow, the respondent's applications for suspension of deportation, asylum and withholding of deportation are denied.

-2-

<u>Pretermission of the Respondent's Suspension of Deportation Application</u>

At an individual merits hearing dated June 21, 1996, thereafter consolidated with the respondent's wife on July 18, 1996, and October 7-9, 1996, the respondent testified to the issues regarding his application for suspension of deportation. The Service meanwhile, submitted a motion to pretermit such application. Specifically, the Service argued that under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, enacted as Division C of the Departments of Commerce, Justice and State, and the Judiciary Appropriations Act for 1997, Pub. L. No. 104-208, 110 Stat. 3009, _____ ("IIRAIRA"), Section 309(c)(5) creates an exception to the general effective date with regard to suspension of deportation for aliens with pending deportation proceedings and establishes a transition rule to be applied in these pending cases. See <u>Matter of N-J-B-</u>, Int. Dec. 3309 (BIA 1997). Under the provisions of this transition rule, service of the OSC terminates the period of continuous physical presence. <u>Id.</u> In the instant case, the OSC was served prior to the respondent's acquisition of the seven years continuous physical presence, and, consequently, the respondent is ineligible for suspension of deportation under the transition rule.

In light of the foregoing, and after consideration of all the evidence of record, the court finds that the respondent is statutorily ineligible for the relief of suspension of deportation. Therefore, the Service's motion to pretermit the respondent's application for suspension of deportation shall be granted.

-3-

Asylum and Withholding of Deportation
Applicable Law

To qualify for asylum a person must be unable or unwilling to return to his country of nationality or where last habitually resided because of persecution or a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group or political opinion." INA section 101(a)(42)(A). An asylum applicant's fear of being persecuted must be subjectively genuine and objectively reasonable. 8 C.F.R. 208.13; Matter of R-O-, 20 I & N Dec. 455 (BIA 1992); Matter of Mogharrabi, 19 I & N Dec. 439 (BIA 1987). An alien can sustain the burden of proving a well-founded fear of persecution if a pattern or practice of persecution is established on account of one of the protected grounds and their inclusion or identification with one such group. 8 C.F.R. section 208.13(b)(2)(i).

Persecution is defined as a threat to the life or freedom of, or the infliction of suffering or harm upon, those who differ in a way regarded as offensive. Matter of Acosta, 19 I & N Dec. 211 (BIA 1985). The harm or suffering need not be physical, but may take other forms, such as: the deliberate imposition of severe economic disadvantage which deprives a person of virtually all means of earning a living; the relegation to substandard dwellings; or the deprivation of liberty (enforced social and civil inactivity or passport denial), food or other essentials of life. Matter of Portales, 18 I & N Dec. 239 (BIA 1982); Matter of Laipenieks, 18 I & N Dec. 433, 456-7 (BIA 1983), rev'd on other grounds, 750 F.2d 1427 (9th Cir. 1985); Kovac v. INS, 407 F.2d 102 (9th Cir. 1969)(deprivation or threats that could result in the

-4-

loss of essential human rights). For the harm or suffering to be considered persecution however, it must be inflicted either by the government or by persons or organizations the government is unwilling or unable to control. Matter of Tan, 12 I & N Dec. 564 (BIA 1967).

The deprivation in a given area does not have to be total for the effect to rise to the level of persecution. See Matter of Prasad, 16 I & N Dec. 705 (BIA 1979); Matter of Courpas, 11 I & N Dec. 647 (BIA 1966). Even if one measure is not of a serious nature, several measures of restrictions can amount to a well-founded fear of persecution if one subjectively feels apprehension and insecurity about one's future existence. See Courpas, supra. A fear of persecution is strongest when one has been the victim of multiple discriminatory measures which has accumulated over time or increased in intensity and severity. See Matter of Leon-Orosco and Rodriquez-Colas, 19 I & N Dec. 136, 138-142 (BIA 1983, A.G. 1984). The more persistent the aggression, the less severity required to establish persecution. See Prasad, supra.

In addition to the alien statutorily qualifying as a refugee, asylum is granted if the alien presents evidence to show that he merits a favorable exercise of discretion. Section 208(a) of the Act.

An alien seeking withholding of deportation from any country must establish a "clear probability" that his "life or freedom would be threatened in such a country on account of race, religion, nationality, membership in a particular social group, or political opinion." Section 243(h)(1) of the Act. This "clear probability" standard requires a showing that it is "more

-5-

likely than not" that an alien would be subject to persecution because of one of the enumerated grounds.   Once it is determined that the alien qualifies for withholding of deportation, it must be granted.   This is a more stringent standard than that required for asylum.   Sanon v. INS, 52 F3d 648 (7th Cir. 1995).

## The Respondent's Application for Asylum and Withholding of Deportation

The Service similarly posited that the respondent is not statutorily eligible for a grant of political asylum where the respondent has not suffered from past persecution and has not demonstrated a well-founded fear of persecution if returned to the United Arab Emirates (UAE), his last place of habitual abode on account of his Palestinian ethnic origin, and actual and imputed political opinions.   The respondent however, testified that he feared persecution on the above-mentioned grounds [Exhibit V].   He explained that because of his Palestinian ancestry, he would not be able to locate and retain gainful employment, own property, travel in and out of the UAE, and ultimately attain the permanent right to reside there [Respondent Composite Exhibit #3F].   In addition, published allegations that he was engaged in fundraising terrorist efforts, would make it more difficult for him to obtain such benefits [Respondent Tab IIIe and VId; Service Exhibit 4, 32].   In regards to his United States citizen born daughters, ages eight, six and two, the respondent asserted that they would not be provided sufficient social, political and economic opportunities in the UAE [Respondent Composite Exhibits #3D and E; Exhibit 3].

To support his claim of a well-founded fear of persecution, the respondent discussed the members and whereabouts of his family. The respondent first related that his parents not only have temporary permits to reside in the UAE but are legal permanent residents of the United States [Respondent Exhibit E 10]. He then indicated that five of his brothers and sisters were born in Saudi Arabia. According to the respondent, his brother Yousef and his sister Huda, along with their spouses and children, presently live in the UAE. The respondent specified that his sister is a teacher in Dubai, UAE and his brother is a banker for the Arab Bank Limited in Dubai, UAE while involved in other business ventures such as accounting.

Similar to two of his siblings, the respondent indicated that he resided in the UAE from the age of 22-24. During that period, the respondent attested that he was a civil engineer/branch manager for a consulting firm in the construction business, located in Ajman, UAE. Even though the respondent did not foresee admission difficulties nor did he argue a lack of job opportunities, the respondent maintained that his chances of seeking and retaining gainful employment are not very high. The respondent explained that despite his qualifications, businesses with political preferences, will choose to contract with those who are non-Palestinians.

In addition to the inability to retain gainful employment, the respondent asserted that if returned to the UAE, he would never by granted permanent residency nor citizenship status. According to the respondent, it follows that admission by temporary permit does not guarantee his right to own property. To support this assertion, the respondent indicated that his parents do not own property nor businesses in the UAE. The respondent went on

-7-

to note that his sister's husband works for a company that belongs to a native of the UAE. Mr. Arthur Lowrie an Adjunct Professor at the University of South Florida, confirmed that it would be very difficult for the respondent to own property, attain permanent residency status and retain favorable employment in the UAE [Respondent Exhibit J 5; Tab VI Ae]. Nevertheless, the respondent admitted that in the smaller Emirates such as Ajman and Sharjah, noncitizens may be able to buy property where they are encouraged to invest.

Next, the respondent claimed a well-founded fear of persecution based on his political opinion. At the hearing, the respondent discussed his support of the Palestinian cause and its peaceful right to self-determination. The respondent added that he never belonged to a political organization while he resided in the UAE nor had he ever criticized their government. More importantly, however, the respondent contended that published allegations that he is a supporter of terrorist organizations, will worsen his ability to obtain principal residency status and gainful employment [Respondent Tab IIIe and VIAe].

As for his children, the respondent maintained their inability to accompany him to the UAE because as United States citizens, they do not have the right nor permission to reside anyplace else. The respondent opined that if granted admission into the UAE, they would never enjoy citizen rights and their civil and human rights cannot be guaranteed. Lastly, the respondent expressed concern for his children's educational opportunities in the UAE. Dr. Jamil Jersaet, an expert in public administration and governmental entities in the Middle East, likewise testified that as United States citizens, they might face special difficulties in obtaining economic and

educational opportunities.

As a matter of discretion, the Service contended that the respondent does not merit a favorable exercise of such, in light of the respondent's activities on behalf of two Tampa, Florida organizations, the World and Islam Studies Enterprise (WISE) and the Islamic Concern Project (formerly known as the Islamic Committee for Palestine) (ICP), which allegedly assisted in the support of Palestinian fundamentalist terrorist organizations.  Specifically, the Service maintained that from 1987 to 1995, the ICP and the WISE, while portraying legitimate academic research and fundraising institutions, solicited funds for the Islamic Jihad and Hamas, published and distributed propaganda to further Palestinian political causes and facilitated the entry of terrorist organization operatives into the United States, partly via its affiliation with the University of South Florida in Tampa [Service Exhibit 4, 32].  Within these two organizations, the Service contended that the respondent was a mid-level functionary where his responsibilities included the daily running of operations.  To support this allegation, the Service called: Supervisory Special Agent William D. West, of the Service's Investigations Division, who testified that given the totality of circumstances, the respondent should have known of the WISE's and the ICP's involvement with Middle East extremist groups; Senior Special Agent Thomas A. Habib from the Service's Special Operations Unit; and Mr. Fouad Ghorra, an Arabic language translator [Service Exhibits 1-43; Exhibit E, F, G].

The respondent countered the Service's contentions by describing the WISE and the ICP activities as legitimate charitable, cultural and academic research endeavors except for a former WISE official and University of South

-9-

Florida, at Tampa adjunct professor, who unexpectedly became leader of the Islamic Jihad [Respondent Tabs IVa-c; Vd].  The respondent went on to note that his past affiliations on behalf of both organizations regarded Islamic revivalism and not Islamic fundamentalism [Respondent Exhibit E1 and 2; see also Respondent Tabs IVc and VIIIa-c].  As such, scholars of the Middle East and Islamic studies for example, were invited to participate in lectures, conferences and roundtable discussions, in order to enhance global understanding of Islamic social, religious and political issues [Respondent Exhibits C; I including I 4-18; M; Tab VIa-h].

The Service's second point of contention for not warranting a favorable exercise of the court's discretion, related to the respondent's alleged marriage fraud [Exhibit 4].  Specifically, the Service maintained that the respondent's January 30, 1984 marriage to Ms. Jan Fairbetter Yarborough, was entered for the purpose of procuring permanent residency status; for example, it was argued that they never lived together [Service Exhibits 45; I; J, K].  The Service went on to note that the respondent stated otherwise upon his April 19, 1985 presentation of Form I-130, Form I-485 and sworn executed statement, supporting his application for permanent residency status as the spouse of a United States citizen.

The respondent however, asserted that the marriage was bona fide at the inception, that they had indeed resided together and that they remained involved even after the April 19, 1985 OSC issuance [Respondent Exhibit F1; H1-3; Tab Xa and c].  The respondent's sister, Ms. Nahla A. Al-Arian; brother-in-law, Mr. Khaled Amin Al-Arian; parents, Mr. Abdel Karim El-Nagger and Ms. Enaam Hosni Hammouda; and cousin's brother-in-law, Mr. Ibrahim Khader,

likewise attested to the bona fides of his relationship and marriage to Ms. Fairbetter Yarborough [Respondent Exhibits D1-4].

The Service additionally contested a favorable exercise of discretion where on September 30, 1994, the respondent submitted a "Hillsborough County Voter Registration/Information Form," in which he affirmed that he was a United States citizen upon execution of his signature [Service Exhibit 47]. The Service asserted that given the respondent's advanced education and his ability to read and write in the English language, he was aware of the oath on the form and thus had a fraudulent motive or intent for signing such form and falsely claiming United States citizenship.

The respondent rebutted by claiming a lack of evil intent and in fact countered that he signed the voter registration form without having fully read, much less understand that he was under oath upon execution. The respondent further maintained that an elder friend, Mr. Abdoul Samad Ibrahim had prepared the application, including the item regarding the respondent's citizenship status [Respondent Tab IIa and b]. Aside from the respondent and Brother Ibrahim, Mr. Saffet Abid Catovic, likewise testified in regards to the respondent's signing the voter registration form. To further support his claim of a favorable exercise of discretion, the respondent produced four witnesses: Mr. Bassam Abdallah, Ms. Pilar Saad, Mr. Mustafa Alvi, Mr. Husam Elrabi; and submitted statements on his behalf, including from Mr. and Ms. Nabeel and Tammie Sawalha and Ms. Nafeesah Abdurrashid [Respondent Exhibits A1-4, C1, 3-5].

Denial of Asylum and Withholding of Deportation

The respondent has failed to demonstrate his inability to return to the United Arab Emirates, his country of last habitual residence because of a well-founded fear of persecution on account of his Palestinian ancestry, actual and imputed political opinions [Respondent Exhibit J5; Tab VI Ae]. INA section 101(a)(42)(A); In re T-M-B-, Int. Dec. 3307 (BIA 1997). The respondent's fear of persecution is not objectively reasonable where neither he nor his family have ever suffered from physical or mental harm. Matter of Mogharrabi, supra; Faddoul v. INS, 37 F3d 185 (5th Cir. 1994). At hearing, the respondent testified that neither he during his residence in Ajman, UAE from 1979-1981, nor his family members have ever been arrested, detained, interrogated or physically harmed. Faddoul v. INS, supra; Kovac v. INS, 407 F2d 102 (9th Cir. 1969). In fact, the respondent's parents, sister, brother, their spouses and children, continue to reside in the UAE without incident. Matter of Shirinian, 12 I & N Dec. 392 (BIA 1967). Should unlawful assaults or violence occur, the respondent did not provide evidence to show that the UAE government would be unwilling to protect him or his family. DeSouza v. INS, 999 F2d 1156 (7th Cir. 1993).

The government of the UAE does not single out Palestinians for discriminatory treatment [Respondent Exhibit J5]. 8 C.F.R. 208.13(b)(2)(i); Faddoul v. INS, supra. Furthermore, the living and employment conditions of non-UAE citizens are not substantially restricted [Respondent Exhibit J5]. See Matter of Portales, supra; Matter of Barrera, 19 I & N Dec. 837 (BIA 1989); Matter of Courpas, supra. The respondent testified that his family of Palestinian ancestry in the UAE is financially secure where they significantly

-12-

funded his family's sustenance since arriving in the United States·[Respondent Tab Va, Exhibit A-1 and Vd]. Matter of Shirinian, supra; Carrete-Michel v. INS, 749 F2d 490 (8th Cir. 1984). No evidence was provided by the respondent 'to illustrate their inability to continue to prosper or his ability to seek and retain gainful employment in the UAE. The respondent's family may not be expected to support them for an indeterminate amount of time, but can certainly provide for their maintenance, while the respondent is readjusting to life in the UAE. Matter of Shirinian, supra; Matter of Lejman, 13 I & N Dec. 379 (1969); DeSouza v. INS, supra. Avenues of employment for those of Palestinian ancestry exist where: before retirement his father taught for the Ministry of Education, his one sister teaches and his brother is a banker, simultaneously involved in other business ventures. As for the respondent, he was a civil engineer/branch manager for a consulting firm in the construction business while he resided in the UAE. He related that his 1984 visit to the UAE produced some career prospects, but that his family encouraged him to return to the United States to pursue a doctorate degree which the respondent completed in 1994 [Respondent Exhibits E 2-9]. At the hearing, the respondent expressed interest in returning to the UAE in order to teach at a university or work with an industrial organization. In sum, the respondent attested that despite non-native's inability to own property or businesses in the larger UAEs, all family members are employed if they choose to be employed and can invest in the smaller UAEs. Faddoul v. INS, supra. Thus, the respondent has failed to establish the imposition of severe economic disadvantage which would deprive him of virtually all means of earning a living. Matter of Portales, supra.

The respondent did not establish a well-founded fear of persecution on

-13-

account of his Palestinian ancestry where educational opportunities exist for his daughters. Matter of Shirinian, supra. The government of the UAE can provide education for all, some or none where education is a matter of governmental policy and not a fundamental right. Faddoul v. INS, supra; DeSouza v. INS, supra. Within the UAE, educational opportunities are available to women, whom are also represented in the workforce in areas such as education and health services [Respondent Exhibit J5].

A fear of persecution based on denial of entry was not established. See Matter of Portales, supra; Matter of Barrera, supra. Laws regarding travel to and from the UAE allow nonimmigrant resident refugees to return in such status, but they must not remain outside of the UAE for an extended period of time. See Faddoul v. INS, supra. In this case, the respondent indicated that his parents reside in the United States for several months out of the year and thereafter resume their temporary residency status in the UAE [Respondent Exhibit 10]. See id. The conditions that the UAE have placed upon residence and reentry are not egregious where the respondent himself, did not foresee admission difficulty in regard to his subsequent return to the UAE.. Matter of Shirinian, supra; DeSouza v. INS, supra.

The respondent failed to sustain his claim that his children have a well-founded fear of persecution on account of their American nationality. Despite Dr. Jersaeat's testimony, the record does not demonstrate that United States citizens are subject to increased discriminatory treatment in the UAE, which rises to the level of persecution on account of their national origin.

The respondent has similarly failed to establish a well-founded fear of

-14-

persecution on account of his actual or imputed political opinion. Despite relating that he has never been a member of any political organization while in the UAE, there is nothing in the record to indicate his inability to support the Palestinian cause in a peaceful manner. This method of expressing support for Palestinian self-determination was evidenced at hearing where the respondent testified that he does not support the killing or intentional infliction of serious harm upon noncombatant civilians. In addition, the respondent has never caused harm or suffering to any person on account of the five protected grounds [Respondent Exhibit E 1]. As such, the respondent's civil rights will not be violated where he can practice his religion and voice his political opinion in a nonviolent manner [Respondent Exhibit J5]. Matter of Portales, supra. Lastly, the respondent failed to provide evidence that directly associates him with supporting terrorist efforts and that published allegations regarding such, would subject him to persecution [Respondent Tab IIIe and VIA d and e; Service Exhibit 4, 32].

The court finds that as an applicant for asylum, the respondent has statutorily failed to meet the burden of showing a well-founded fear of persecution on account of the above-stated grounds. As such, the court need not address whether asylum should be granted as a matter of discretion. Section 208(a) of the Act.

Inasmuch as the respondent has failed to satisfy the lower burden of proof required for asylum, it follows that he has also failed to satisfy the clear probability standard of eligibility required for withholding of deportation. See Matter of Mogharrabi, supra. The evidence does not establish that it is more likely than not that the respondent would be subject

-15-

to persecution on account of one of the five grounds specified in section 243(h)(1) of the Act.  See INS v. Stevic, 467 U.S. 407 (1984).

Accordingly, the following orders will by entered:

ORDER: IT IS ORDERED that the respondent is subject to deportation based upon the charge in the Order to Show Cause.

IT IS FURTHER ORDERED that the respondent's application for suspension of deportation pursuant to Section 244(a)(1) of the Act be PRETERMITTED.

IT IS FURTHER ORDERED that the respondent's application for asylum and withholding of deportation pursuant to sections 208(a) and 243(h) of the Act be DENIED.

IT IS FURTHER ORDERED that the respondent be deported from the United States to the United Arab Emirates on the charge contained in the Order to Show Cause.

J. Daniel Dowell
Immigration Judge

-16-

## CERTIFICATE PAGE

I hereby certify that the attached proceed[ ] before

JUDGE DANIEL J. DOWELL in the matters of:

MAZEN AL-NAJAR

FEDAA AL-NAJAR

A 26 599 077

A 73 228 388

ORLANDO, FLORIDA

was held as herein appears, and that this is the orig[ ]al

transcript thereof for the file of the Executive Offi[ ] for

Immigration Review.

Patricia E. Ives, Tran[ ]iber

Deposition Services, I[ ]
600 East Jefferson Str[ ]
Suite 103
Rockville, Maryland 2[ ]2
(301) 738-1042

November 14, 1996
(Completion Date)

pei

A.   Okay.

Q.   It's a little askew and what have you but I've compared the two and they appear to contain the same allegations, the same number, the same A number.

A.   Okay.

JUDGE FOR THE RECORD

For identification purposes, let me identify this now properly as Exhibit 1 in the case.

JUDGE TO COUNSEL

Q.   In addition, it appears that retired Immigration Judge Auslander (phonetic sp.) in Atlanta had closed this case administratively by an order dated June 4, 1986, indicating that at the time of the hearing the Service could not locate the file, and rather than recalendaring, he merely closed the file and had remained closed for some time, apparently, until the Service was able to locate their A file.

JUDGE TO MR. PEREZ

Q.   And, I'm going to ask Mr. Perez now, is that the A file that you have in front of you?

A.   Yes, Your Honor, I have the A file with me.

JUDGE TO COUNSEL

Q.   Then this matter was reopened and --

MR. COTON TO JUDGE

Q.   I believe this matter was reopened at the request of the respondent.

A 26 599 077                          7                        February 8, 1996

pei

MR. PEREZ TO JUDGE

Q.   Yes, it was, Your Honor.

A.   Okay.

JUDGE TO MR. COTON

Q.   Is Nancy Coton related to you?  That's not --

A.   No, Your Honor, that was then a problem that occurred, and this is why I had much less knowledge of this hearing than I normally receive, for some reason I think it was just a clerical error either in the Atlanta or the Miami offices where Nancy Cotton, her last name is C-O-T-T-O-N --

Q.   Oh, two T's.  Okay.

A.   Was erroneously sent a notice and picked up as his counsel.  I was advised in a --

Q.   Just because of the similarity in name apparently.

A.   Apparently, Your Honor, yeah.

Q.   All right.

A.   And, it came to my attention there was a hearing; I called Anabel (phonetic sp.) and we quickly sorted that out.

Q.   Okay.  Now, the office in Atlanta had reopened subsequent to Judge Auslander's retirement and the Honorable Mackenzie Rast then reopened this matter and changed venue to the Orlando office which is the office closest to serve the respondent's address in Tampa.

JUDGE FOR THE RECORD

A 26 599 077                        8                    February 8, 1996

pei

JUDGE TO COUNSEL

Q.   Let's move on and leave that issue asi[de].   The last thing that I would raise before we start with ou[r] witnesses would be the Government's made allegations regarding, I guess, the male respondent's association or membership in an[] organization.

JUDGE TO MR. PEREZ

Q.   I guess that the acronym, it's called [WI]SS?

A.   Yes, Judge, among others.

Q.   W-I-S-S. And, I believe what you have [in]timated in many of your motion papers is that you're going to [ar]gue or anticipate argument that he is either pretermitted or [ad]versely in discretion should be denied various relief because [of] your belief that he's tied to an organization that is terr[or]ists or terrorists activities?

A.   Terrorist front, Judge.

Q.   All right. If that is the case, my qu[es]tion that I want to pose to you is in light of the recent chang[e of] the law on April 24, 1996, under the Anti-Terrorist and Effec[tiv]e Death Penalty Act, why this wasn't a case that you brought [bef]ore the new removal court set up by the Chief Justice of the [Sup]reme Court of the United States?

A.   First of all, as to that issue, Judge, [th]e Government at this point is proceeding with this charg[e] --

Q.   Not a charge.

A 26 599 077/A 73 228 388          64                    J[u]ly 18, 1996

pei

A.   Proceeding with this manner, with this procedure, it is a tactical decision made by the Government. Also another point is I'm not quite sure and, quite frankly, whether the alien terrorist removal court is up and running. Yeah.

Q.   Well, whether it's up and running, it became law on April 24th that if you believed you had an individual who was a terrorist that as an attorney for the General Attorney, which you are, you could bring such information classified to the attention of the removal court. It may, perhaps, be their very first case, but there are five judges designated by the Chief Justice of the Supreme Court to take such classified information. I don't know if you intend to submit ex parte or in camera classified information to me or not.

A.   Well, I can state for the record at this point, we do not intend to submit in camera ex parte information.

Q.   Okay.

JUDGE TO COUNSEL

Q.   So, then in light of that, both counsel will agree then that I have jurisdiction over this matter?

A.   (Mr. Perez)  The Government would assert that you have jurisdiction over this matter.

A.   (Mr. Coton)  I certainly agree as to the issue of deportation and affirmative relief thereto that we're here for.

Q.   All right.

JUDGE TO MR. COTON

A 26 599 077/A 73 228 388          65          July 18, 1996

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
BRADENTON, FLORIDA

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| IN THE MATTER OF | ) | |
| | ) | |
| Mazen Abdel Adulkarim Al-Najjar | ) | IN BOND PROCEEDINGS |
| A 26 599 077 | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |

## SERVICE NOTICE OF INTENT TO PRESENT CLASSIFIED EVIDENCE IN AN *IN CAMERA* PROCEEDING IN SUPPORT OF INS CUSTODY DETERMINATION

Comes now, the United States Immigration and Naturalization Service (Service), by and through the undersigned representative, and files its notice of intent to present classified evidence in an *In Camera* proceeding in support of its determination that the respondent is a flight risk and poses a threat to national security.

1. The Respondent has had an immigration hearing, has been found deportable, and has been denied asylum, witholding of deportation and suspension of deportation[1] by order of an Immigration Judge, dated May 13, 1997.

2. Moreover, and after May 13, 1997, the Service has received classified information regarding the Respondent that evidences that the Respondent is a flight risk and that he poses a threat to national security.

---

[1] The federal litigation in Tefel, et. al. v. Reno, Case No. 97-0805-CIV-KING (S.D. of Fla.), and the temporary restraining order (TRO) issued in that matter, have no bearing on the pretermission of this Respondent's suspension of deportation claim. The TRO in Tefel, in pertinent part, ordered the Department of Justice to cease pretermitting suspension of deportation applications pursuant to Matter of NJB, Int. Dec. 3309 (BIA 1997). However, the TRO was issued on May 14, 1997 to be made effective at 6:00 p.m. on that date. The Immigration Judge's decision in the instant case was issued the day before, on May 13, 1997. The TRO thus has no effect on the Immigration Judge's decision denying relief from deportation to the Respondent in this matter.

3. The circumstances in the Respondents's case have thus changed in a manner authorizing the new custody determination that precludes the Respondent from release pending further deportation proceedings[2] in his case. See Matter of Sugay, 17 I&N Dec. 637 (BIA 1981).

4. The evidence to be submitted by the Service is classified and may thus not be disclosed to the Respondent and may only be presented in an *In Camera* proceeding. See U.S. ex rel Barbour v. District Director, USINS, 491 F. 2d 573 (5th Cir. 1974); 8 CFR 242.17; 28 CFR Part 16 (1994).

Respectfully submitted.

Daniel N. Vara, Jr.
District Counsel

George Perez
Assistant District Counsel
USINS
Miami District Office
7880 Biscayne Blvd., 11th Flr.
Miami, Florida 33138
(305) 536-5713

---

[2] The Respondent is entitled to further review and his deportation from the United States will not occur until that review is completed. See 8 CFR Sections 3.38, 3.39 and 243.3.

CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT A COPY OF THE FOREGOING NOTICE WAS SERVED ON THIS
DATE, May 28, 1997, BY REGULAR MAIL AND BY FACSIMILE TRANSMISSION, ON MARTIN B.
SCHWARTZ, ESQ., 3434 W. COLUMBUS DR., SUITE 202, TAMPA, FL. 33067, FAX  NO. (813) 872-
9149.

                              DANIEL N. VARA, JR.
                              DISTRICT COUNSEL

# UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## OFFICE OF THE IMMIGRATION JUDGE
## MIAMI, FLORIDA

IN THE MATTER OF:   )
            )
**AL-NAJJAR, MAZEN ABDEL**  ) IN BOND PROCEEDINGS
**A 26-599-077**      )
            )
RESPONDENT     ) BRADENTON DOCKET

## UNCLASSIFIED SUMMARY OF CLASSIFIED INFORMATION DISCLOSED TO IMMIGRATION COURT

Pursuant to 8 C.F.R. 242.17(a), the Parties are notified of the following unclassified summary of classified information submitted to this Court for in camera review in the above-referenced bond proceeding held Thursday, May 29, 1997:

This Court was provided with information as to the association of the Respondent with the Palestinian Islamic Jihad.

DATE:  June 2, 1997

R. Kevin McHugh
Immigration Judge

Copy to:

INS
Respondent

In Re; Al-Najjar, Mazen
A26-599-077

## BEGINNING OF CONTINUED BOND HEARING – JUNE 5, 1997
Found at Mid portion of Tape III of Recorded Record

Judge states, on the record in open court, in response to my questions as follows:

Q. (Attorney Luis Coton)    Was there a record made of the In Camera Proceeding?

A. (Judge) " There was absolutely no record made, at least not by me"

Q. (Attorney Luis Coton)    Was a record made by anyone else?

A. (Judge)    "They didn't have nobody recording verbatim"

" I would assume that there was some sort of general record made so in case, you know, in case it goes up that they'll have to present the same materials that they present to me to any appellate court."

"And there was, as I stated, there was a written document, the document as not self explanatory to me, the document was interpreted and given the what the different abbreviations and    Everything meant and ah then there was some questions on my part and I would say some definitely comments by the ah persons presenting the documents and um with it was, everything was taken back."

### CERTIFICATION

I hereby certify and confirm that I personally listened to a portion of the approximately ten hours of record proceedings. The foregoing responses of Immigration Judge Kevin McHugh are an accurate verbatim transcript of those statements of his at the hearing to the very best of my knowledge and ability.

Respectfully submitted this 23rd day of November. 1999 at Tampa, Florida

LUIS D. COTON, ESQUIRE
P.O. Box 4838
Tampa, Fl 33677
Tel: (813) 876-8516
Fax: (813) 87 -2046
FL Bar # 198404
Co-Counsel For Respondent



**U.S. Department of Justice**

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

_____

*5201 Leesburg Pike. Suite 1300*
*Falls Church. Virginia 22041*


**Hohenstein, Joseph C., Esquire**
**1300 Spruce Street,**
**Philadelphia, PA 19107-5812**

**Office of the District Counsel/OR**
**7880 Biscayne Blvd.**
**Miami, FL 33138**


**Name: AL-NAJJAR, MAZEN A.**                                    A26-599-077

**Date of this notice: 10/26/1999**

Enclosed is a copy of the Board's decision and order in the above-referenced case.

Very Truly Yours.

Paul W. Schmidt
Chairman


Enclosure


Panel Members:
    COLE, PATRICIA A.
    GRANT, EDWARD R.
    HEILMAN, MICHAEL J.

U.S. Department of Justice                                              Decision of the Board of Immigration Appeals
Executive Office for Immigration Review

Falls Church, Virginia 22041

File:   A26 599 077 - Miami                                    Date:

                                                                              OCT 26 1999
In re:   MAZEN AL-NAJJAR

IN DEPORTATION PROCEEDINGS

APPEAL

ON BEHALF OF RESPONDENT:   Joseph C. Hohenstein, Esquire
                            Nationalities Service Center
                            1300 Spruce Street
                            Philadelphia, Pennsylvania   19102

ON BEHALF OF SERVICE:   Daniel N. Vara
                         District Counsel

CHARGE:

     Order:   Sec.   241(a)(9), I&N Act [8 U.S.C. § 1251(a)(9)] - [1]
                     Nonimmigrant - failed to comply with conditions of status

APPLICATION:   Suspension of deportation; asylum; withholding of deportation


     The respondent, through counsel, appeals from an Immigration Judge's written decision,
dated May 13, 1997, finding the respondent deportable as charged and ineligible to apply for
suspension of deportation under section 244(a)(1) of the Immigration and Nationality Act,
8 U.S.C. § 1254(a)(1) (1995), and denying the respondent's applications for asylum and
withholding of deportation under sections 208(a) and 243(h)(1) of the Act, 8 U.S.C. §§ 1158(a),
1253(h)(1) (1995). The respondent's request for oral argument before this Board is denied. See
8 C.F.R. § 3.1(e). The appeal will be dismissed.[2] The respondent also moves for the record
to be remanded so that the Immigration Judge may consider a claim for relief under the
Convention Against Torture.[3] The motion to remand will be denied.

_____

[1] The respondent was placed in deportation proceedings in 1985, when an Order to Show Cause
was issued charging deportability under section 241(a)(9) of the Immigration and Nationality Act,
8 U.S.C. § 1251(a)(9) (1982). We note that this deportation charge was subsequently
redesignated as section 241(a)(1)(C) of the Act, 8 U.S.C. § 1251(a)(1)(C).

[2] We note that no classified information was considered by the Board in deciding the instant
appeal and motion to remand.

[3] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or
Punishment, adopted and opened for signature Dec. 10, 1984, G.A. res. 39/46 (annex, 39 U.N.
GAOR Supp. (No. 51) at 197), U.N. Doc. A/39/51 (1984) (entered into force June 26, 1987;

The respondent is a 42-year-old Palestinian and native of Gaza who last entered the United States as a nonimmigrant graduate student on December 8, 1984.[4]  On appeal, the respondent challenges the Immigration Judge's pretermission of his suspension of deportation application and the Immigration Judge's denial of his asylum and withholding applications.  The respondent, on appeal, does not challenge the Immigration Judge's deportability finding.

With regard to the arguments concerning the suspension of deportation application, we note that the Immigration Judge was correct in finding the respondent ineligible for such relief.  The respondent entered the United States on December 8, 1984.  An Order to Show Cause (Form I-221S) was issued against the respondent on April 19, 1985.  Thus, at the time of the issuance of the Order to Show Cause, the respondent had not accumulated the requisite 7 years of continuous physical presence.[5]  See section 244(a)(1) of the Act.  Further, the respondent's period of continuous physical presence concluded when he was served with the Order to Show Cause.  See Matter of Nolasco, Interim Decision 3385 (BIA 1999).  Accordingly, the respondent is ineligible to apply for suspension of deportation, and his application for that relief was properly pretermitted.  See Matter of Nolasco, supra.

Moreover, to the extent that the respondent argues that certain statutory sections we administer are unconstitutional, we note that this Board is without jurisdiction to entertain such constitutional arguments.  See Matter of Fuentes-Campos, Interim Decision 3318 (BIA 1997); Matter of C-, 20 I&N Dec. 529 (BIA 1992).

With regard to his applications for asylum and withholding of deportation, the respondent maintains that he is a stateless Palestinian who will likely be denied entry into Middle East countries.  The respondent contends that as a result of the Palestinian Liberation Organization's support of Iraq during the Persian Gulf War and the "dangerous and threatening political opinions" attributed to the respondent and his wife by the United States government, no Middle East country, including Saudi Arabia and the UAE, would accept them into its territory.  According to the respondent, the United States government's allegations that he and his wife support terrorism "will result in their persecution[,] including denial of basi[c] freedoms, employment opportunities, and probable interrogation, detention, imprisonment and possible [p]hysical harm."

---

for the United States Apr. 18, 1988) (Convention Against Torture).

[4]  The respondent's citizenship is a matter of dispute.  The record reflects that the respondent is the holder of an expired Palestinian Refugee Travel Document issued by the Egyptian government.  The respondent maintains that he is stateless.

[5]  We note that, although the respondent argues that a subsequent, "new" Order to Show Cause was issued on February 8, 1996, the only Order to Show Cause issued with regard to the respondent is the April 19, 1985, Order to Show Cause.  The February 8, 1996, document alleged additional facts in support of the original deportation charge but did not lodge additional charges of deportability against the respondent.

2

Upon review, we find that, with regard to the asylum and withholding of deportation applications, the Immigration Judge adequately considered all of the evidence presented below under the proper legal standards and correctly addressed the issues that the respondent has raised on appeal. We find that the Immigration Judge's factual findings and legal conclusions are well-supported by the record.

The Immigration Judge properly held, with regard to the asylum application, that the respondent did not meet his burden of demonstrating a "well-founded fear of persecution" on account of his race, religion, nationality, or membership in a particular social group, or on account of a political opinion, whether actual or imputed. See section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A); INS v. Elias-Zacarias, 502 U.S. 478 (1992); INS v. Cardoza-Fonseca, 480 U.S. 421 (1987); Lorisme v. INS, 129 F.3d 1441, 1444-45 (11th Cir. 1997); Faddoul v. INS, 37 F.3d 185, 188-90 (5th Cir. 1994); Matter of V-T-S-, Interim Decision 3308, at 5-6 (BIA 1997); Matter of S-M-J-, Interim Decision 3303, at 3-6 (BIA 1997); Matter of B-, Interim Decision 3251, at 6-8 (BIA 1995); Matter of Dass, 20 I&N Dec. 120, 124-25 (BIA 1989); Matter of Mogharrabi, 19 I&N Dec. 439 (BIA 1987); 8 C.F.R. §§ 208.13(a), (b)(2) (1998). Moreover, the Immigration Judge properly held that the respondent therefore had failed to satisfy the higher burden required for withholding of deportation. See Matter of Mogharrabi, supra.

Accordingly, we affirm the Immigration Judge's decision for the reasons set forth therein. See Prado-Gonzalez v. INS, 75 F.3d 631, 632 (11th Cir. 1996) (per curiam) (holding that the Board may adopt an Immigration Judge's decision as its own). [6]

With regard to the motion to remand to present a claim under the Convention Against Torture, we note that, on February 19, 1999, an interim rule was published setting forth the procedures for raising a claim for protection from torture pursuant to the Convention Against Torture. See 64 Fed. Reg. 8478 (Feb. 19, 1999) (to be codified at 8 C.F.R. Pts. 3, 103, 208, 235, 238, 240, 241, 253, and 507) (interim, effective Mar. 22, 1999).

The Interim Rule implementing the Convention provides, inter alia, that any alien in proceedings on or after March 22, 1999, may apply for protection under the Convention Against Torture. However, the regulations place the burden of proof in such an application with the applicant to establish that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2) (interim). We also note that, in motions to remand or reopen proceedings, the respondent bears a "heavy burden" in showing such action is warranted. INS v. Abudu, 485 U.S. 94, 110 (1988); Matter of Coelho, 20 I&N Dec. 464, 472 (BIA 1992). In the instant case, we have affirmed the Immigration Judge's finding that the respondent failed to establish a well-founded fear of persecution should he return to the United Arab Emirates. Consequently, for those same reasons articulated in the Immigration Judge's decision, the respondent is unable to meet the higher standard of presenting a prima facie case that "it is more likely than not that he . . . would be tortured" if he were

---

[6] We note that, given our disposition of this appeal, the respondent's November 7, 1997, motion to remand the instant case, for a hearing on the relief of suspension of deportation, is denied.

3

returned to the United Arab Emirates, the country to which he was ordered deported.[7]  See 8 C.F.R. § 208.16(c)(2) (interim).  Further, we note that, although the respondent argues that his detention by the Immigration and Naturalization Service is equivalent to torture, relief under the Convention Against Torture is applicable only to any possible torture in the proposed country of removal.  See 8 C.F.R. § 208.16(c)(2) (interim).  Moreover, torture does not include suffering arising from, inherent in, or incidental to lawful sanctions.  See 8 C.F.R. § 208.18(a)(3) (interim).  Thus, the motion to remand to allow the respondent to present a claim for relief under the Convention Against Torture will be denied.

Accordingly, the following orders will be entered.[8]

ORDER:   The motion to remand is denied.

FURTHER ORDER:   The appeal is dismissed.

---

_Edward R. Grant_
FOR THE BOARD

---

[7]  The respondent also argues that he might be tortured in Egypt and Saudi Arabia. However, the Convention Against Torture regulations are applicable only to possible torture in the proposed country of removal.  See 8 C.F.R. § 208.16(c)(2) (interim).

[8]  We note that the Attorney General plans to publish a regulation that would implement a procedure for terminating deportation proceedings for certain non-lawful permanent residents who are precluded from relief under section 309(c)(5)(A) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No.104-208, 110 Stat. 3009-546, 3009-627 (IIRIRA), and placing them in removal proceedings if they would be eligible for cancellation of removal. Such a procedure is authorized by section 309(c)(3) of the IIRIRA, 110 Stat. at 3009-626. See IIRIRA § 309(c)(5)(B), 110 Stat. at 3009-627.  The respondent potentially may be eligible for relief under this anticipated procedure.

**U.S. Department of Justice**

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

*5201 Leesburg Pike, Suite 1300*
*Falls Church, Virginia 22041*

**Hohenstein, Joseph C., Esquire**
**1300 Spruce Street,**
**Philadelphia, PA 19107-5812**

**Office of the District Counsel/OR**
**7880 Biscayne Blvd.**
**Miami, FL 33138**

Name: AL-NAJJAR, MAZEN A.                                A26-599-077

Date of this notice: 10/26/1999

Enclosed is a copy of the Board's decision and order in the above-referenced case.

Very Truly Yours.

Paul W. Schmidt
Chairman

Enclosure

Panel Members:
    COLE, PATRICIA A.
    GRANT, EDWARD R.
    HEILMAN, MICHAEL J.

U.S. Department of Justice
Executive Office for Immigration Review

Falls Church, Virginia 22041

File: A26 599 077 - Miami

Date:

**OCT 26 1999**

In re: MAZEN AL-NAJJAR

IN DEPORTATION PROCEEDINGS

APPEAL

ON BEHALF OF RESPONDENT:   Joseph C. Hohenstein, Esquire
Nationalities Service Center
1300 Spruce Street
Philadelphia, Pennsylvania   19102

ON BEHALF OF SERVICE:   Daniel N. Vara
District Counsel

CHARGE:

Order:   Sec.   241(a)(9), I&N Act [8 U.S.C. § 1251(a)(9)] - [1]
Nonimmigrant - failed to comply with conditions of status

APPLICATION:   Suspension of deportation; asylum; withholding of deportation

The respondent, through counsel, appeals from an Immigration Judge's written decision, dated May 13, 1997, finding the respondent deportable as charged and ineligible to apply for suspension of deportation under section 244(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1254(a)(1) (1995), and denying the respondent's applications for asylum and withholding of deportation under sections 208(a) and 243(h)(1) of the Act, 8 U.S.C. §§ 1158(a), 1253(h)(1) (1995). The respondent's request for oral argument before this Board is denied. See 8 C.F.R. § 3.1(e). The appeal will be dismissed.[2] The respondent also moves for the record to be remanded so that the Immigration Judge may consider a claim for relief under the Convention Against Torture.[3] The motion to remand will be denied.

---

[1] The respondent was placed in deportation proceedings in 1985, when an Order to Show Cause was issued charging deportability under section 241(a)(9) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(9) (1982). We note that this deportation charge was subsequently redesignated as section 241(a)(1)(C) of the Act, 8 U.S.C. § 1251(a)(1)(C).

[2] We note that no classified information was considered by the Board in deciding the instant appeal and motion to remand.

[3] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, adopted and opened for signature Dec. 10, 1984, G.A. res. 39/46 (annex, 39 U.N. GAOR Supp. (No. 51) at 197), U.N. Doc. A/39/51 (1984) (entered into force June 26, 1987;

The respondent is a 42-year-old Palestinian and native of Gaza who last entered the United States as a nonimmigrant graduate student on December 8, 1984.[4] On appeal, the respondent challenges the Immigration Judge's pretermission of his suspension of deportation application and the Immigration Judge's denial of his asylum and withholding applications. The respondent, on appeal, does not challenge the Immigration Judge's deportability finding.

With regard to the arguments concerning the suspension of deportation application, we note that the Immigration Judge was correct in finding the respondent ineligible for such relief. The respondent entered the United States on December 8, 1984. An Order to Show Cause (Form I-221S) was issued against the respondent on April 19, 1985. Thus, at the time of the issuance of the Order to Show Cause, the respondent had not accumulated the requisite 7 years of continuous physical presence.[5] See section 244(a)(1) of the Act. Further, the respondent's period of continuous physical presence concluded when he was served with the Order to Show Cause. See Matter of Nolasco, Interim Decision 3385 (BIA 1999). Accordingly, the respondent is ineligible to apply for suspension of deportation, and his application for that relief was properly pretermitted. See Matter of Nolasco, supra.

Moreover, to the extent that the respondent argues that certain statutory sections we administer are unconstitutional, we note that this Board is without jurisdiction to entertain such constitutional arguments. See Matter of Fuentes-Campos, Interim Decision 3318 (BIA 1997); Matter of C-, 20 I&N Dec. 529 (BIA 1992).

With regard to his applications for asylum and withholding of deportation, the respondent maintains that he is a stateless Palestinian who will likely be denied entry into Middle East countries. The respondent contends that as a result of the Palestinian Liberation Organization's support of Iraq during the Persian Gulf War and the "dangerous and threatening political opinions" attributed to the respondent and his wife by the United States government, no Middle East country, including Saudi Arabia and the UAE, would accept them into its territory. According to the respondent, the United States government's allegations that he and his wife support terrorism "will result in their persecution[,] including denial of basi[c] freedoms, employment opportunities, and probable interrogation, detention, imprisonment and possible [p]hysical harm."

---

for the United States Apr. 18, 1988) (Convention Against Torture).

[4] The respondent's citizenship is a matter of dispute. The record reflects that the respondent is the holder of an expired Palestinian Refugee Travel Document issued by the Egyptian government. The respondent maintains that he is stateless.

[5] We note that, although the respondent argues that a subsequent, "new" Order to Show Cause was issued on February 8, 1996, the only Order to Show Cause issued with regard to the respondent is the April 19, 1985, Order to Show Cause. The February 8, 1996, document alleged additional facts in support of the original deportation charge but did not lodge additional charges of deportability against the respondent.

Upon review, we find that, with regard to the asylum and withholding of deportation applications, the Immigration Judge adequately considered all of the evidence presented below under the proper legal standards and correctly addressed the issues that the respondent has raised on appeal. We find that the Immigration Judge's factual findings and legal conclusions are well-supported by the record.

The Immigration Judge properly held, with regard to the asylum application, that the respondent did not meet his burden of demonstrating a "well-founded fear of persecution" on account of his race, religion, nationality, or membership in a particular social group, or on account of a political opinion, whether actual or imputed. See section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A); INS v. Elias-Zacarias, 502 U.S. 478 (1992); INS v. Cardoza-Fonseca, 480 U.S. 421 (1987); Lorisme v. INS, 129 F.3d 1441, 1444-45 (11th Cir. 1997); Faddoul v. INS, 37 F.3d 185, 188-90 (5th Cir. 1994); Matter of V-T-S-, Interim Decision 3308, at 5-6 (BIA 1997); Matter of S-M-J-, Interim Decision 3303, at 3-6 (BIA 1997); Matter of B-, Interim Decision 3251, at 6-8 (BIA 1995); Matter of Dass, 20 I&N Dec. 120, 124-25 (BIA 1989); Matter of Mogharrabi, 19 I&N Dec. 439 (BIA 1987); 8 C.F.R. §§ 208.13(a), (b)(2) (1998). Moreover, the Immigration Judge properly held that the respondent therefore had failed to satisfy the higher burden required for withholding of deportation. See Matter of Mogharrabi, supra.

Accordingly, we affirm the Immigration Judge's decision for the reasons set forth therein. See Prado-Gonzalez v. INS, 75 F.3d 631, 632 (11th Cir. 1996) (per curiam) (holding that the Board may adopt an Immigration Judge's decision as its own). [6]

With regard to the motion to remand to present a claim under the Convention Against Torture, we note that, on February 19, 1999, an interim rule was published setting forth the procedures for raising a claim for protection from torture pursuant to the Convention Against Torture. See 64 Fed. Reg. 8478 (Feb. 19, 1999) (to be codified at 8 C.F.R. Pts. 3, 103, 208, 235, 238, 240, 241, 253, and 507) (interim, effective Mar. 22, 1999).

The Interim Rule implementing the Convention provides, inter alia, that any alien in proceedings on or after March 22, 1999, may apply for protection under the Convention Against Torture. However, the regulations place the burden of proof in such an application with the applicant to establish that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2) (interim). We also note that, in motions to remand or reopen proceedings, the respondent bears a "heavy burden" in showing such action is warranted. INS v. Abudu, 485 U.S. 94, 110 (1988); Matter of Coelho, 20 I&N Dec. 464, 472 (BIA 1992). In the instant case, we have affirmed the Immigration Judge's finding that the respondent failed to establish a well-founded fear of persecution should he return to the United Arab Emirates. Consequently, for those same reasons articulated in the Immigration Judge's decision, the respondent is unable to meet the higher standard of presenting a prima facie case that "it is more likely than not that he . . . would be tortured" if he were

---

[6] We note that, given our disposition of this appeal, the respondent's November 7, 1997, motion to remand the instant case, for a hearing on the relief of suspension of deportation, is denied.

returned to the United Arab Emirates, the country to which he was ordered deported.[7]  See 8 C.F.R. § 208.16(c)(2) (interim).  Further, we note that, although the respondent argues that his detention by the Immigration and Naturalization Service is equivalent to torture, relief under the Convention Against Torture is applicable only to any possible torture in the proposed country of removal.  See 8 C.F.R. § 208.16(c)(2) (interim).  Moreover, torture does not include suffering arising from, inherent in, or incidental to lawful sanctions.  See 8 C.F.R. § 208.18(a)(3) (interim).  Thus, the motion to remand to allow the respondent to present a claim for relief under the Convention Against Torture will be denied.

Accordingly, the following orders will be entered.[8]

ORDER:   The motion to remand is denied.

FURTHER ORDER:  The appeal is dismissed.

_____
FOR THE BOARD

---

[7]  The respondent also argues that he might be tortured in Egypt and Saudi Arabia. However, the Convention Against Torture regulations are applicable only to possible torture in the proposed country of removal.  See 8 C.F.R. § 208.16(c)(2) (interim).

[8]  We note that the Attorney General plans to publish a regulation that would implement a procedure for terminating deportation proceedings for certain non-lawful permanent residents who are precluded from relief under section 309(c)(5)(A) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No.104-208, 110 Stat. 3009-546, 3009-627 (IIRIRA), and placing them in removal proceedings if they would be eligible for cancellation of removal.  Such a procedure is authorized by section 309(c)(3) of the IIRIRA, 110 Stat. at 3009-626. See IIRIRA § 309(c)(5)(B), 110 Stat. at 3009-627.  The respondent potentially may be eligible for relief under this anticipated procedure.

4

Appendix II

# Memorandum



HQ 50/5.11.1(P)

| **Subject** AEDPA Implementation Instruction #3: The Effects of AEDPA on Various Forms of Immigration Relief | **Date** AUG - 6 1996 |
| --- | --- |

| **To** | **From** |
| --- | --- |
| Management Team | Office of the Deputy |
| Regional Directors | Commissioner |
| District Directors (Including Foreign) | |
| Chief Patrol Agents | |
| Officers in Charge (Including Foreign) | |
| Chief, ODTF, Glynco, GA | |
| Chief Patrol Agent, BPA, Glynco, GA | |
| Asylum Office Directors | |
| Service Center Directors | |
| Regional Counsel | |
| District Counsel | |

As you are aware, on April 24 the President signed into law the Antiterrorism and Effective Death Penalty Act (AEDPA). Most of you were forwarded on April 26 a red-lined version of the Immigration and Nationality Act (INA) incorporating the changes made by the new law. If you did not receive a copy, one can be obtained from your District or Regional Counsel.

The purpose of this memorandum is to provide officers of the Immigration and Naturalization Service (INS) with guidance on various sections of the INA that were amended by the AEDPA. This guidance will give a general review of the manner in which officers must consult the applicable definitions relating to "terrorist activities" provided at INA § 212(a)(3)(B) in order to make important immigration determinations.

Additional guidance on these and other changes effected by the new law will be issued in the future.

## I. Expanded Definitions of "Terrorist Activities"

Before reviewing precisely how the AEDPA amends sections of the INA denying various forms of relief to terrorists, it may be helpful to review first the definitions relating to terrorist activities. An understanding of these definitions is critical in determining whether an alien is subject to deportation on the basis of the terrorist provisions.

Attached is a red-lined version of the text of INA § 212(a)(3)(B), incorporating the amendments made by the AEDPA to the definitions relating to terrorist activities. It should be borne in mind that

Appendix II, continued

___

## Page 2

the general exclusion grounds contained in the INA do not always apply to aliens already in the United States (e.g., asylees are not subject to the exclusion grounds until the time of their adjustment to lawful permanent resident alien status). Nevertheless, INS officers should, where appropriate, consult the applicable definitions relating to terrorist activities provided in the exclusion ground at INA § 212(a)(3)(B) in order to make several different types of immigration determinations.

### (A) Background: Immigration Act of 1990

The Immigration Act of 1990 added a new exclusion ground at § 212(a)(3)(B). This section is subdivided into two categories of exclusion: § 212(a)(3)(B)(i)(I) excludes any alien who has engaged in a terrorist activity; and § 212(a)(3)(B)(i)(II) excludes an alien who the consular officer or the INS knows, or has reason to believe, is likely to engage in terrorist activity after entry.

The definition of "terrorist activity" at § 212(a)(3)(B)(ii) includes (1) hijacking or sabotage of aircraft, vessels, or other vehicles; (2) kidnapping; (3) violent attack or detention of government officials or diplomats; (4) assassinations; (5) use of biological, chemical, or nuclear weapons, or of conventional weapons with the intent to endanger the safety of individuals or to cause substantial property damage; or (6) a threat, attempt, or conspiracy to commit any of those actions. Id. The use of conventional weapons with the intent to endanger individuals or to cause substantial property damage will only be considered an act of terrorism if it was not done for "mere personal monetary gain." Id.

The definition of "engaged in terrorist activity" at § 212(a)(3)(B)(iii) includes an individual act of terrorism, and any act that the individual knows, or should know, "affords material support" to another individual, organization, or government in conducting terrorism. It includes the following acts among those that may constitute engaging in terrorist activity: (1) preparation or planning of terrorist activity; (2) gathering information on potential targets for terrorist activity; (3) providing a safe house, transportation, communications, funds, false identification, weapons, explosives, or training to any individual the actor has reason to believe has committed or plans to commit a terrorist activity; (4) soliciting funds for terrorist activities or organizations; and (5) soliciting individuals for membership in a terrorist organization or a terrorist government, or to engage in a terrorist activity. Id. These activities constitute engaging in terrorism whether they are done in an individual capacity or as a member of an organization. Additionally, the statute specifically provides at § 212(a)(3)(B)(i)(II) that officers, officials, representatives, or spokespersons of the Palestine Liberation Organization (PLO) are barred from entry because they are deemed by the 1990 Act to be "engaged in a terrorist activity."

### (B) AEDPA Amendments

The new law includes a process by which the U.S. Government will designate an organization as a "foreign terrorist organization." The law requires the State Department to designate such an organization by publication in the Federal Register. As importantly, the AEDPA expands the categories of aliens excludable as terrorists under § 212(a)(3)(B)(i) to include representatives (subclause III)) and members (subclause IV) of foreign terrorist organizations designated by the

Appendix II, continued

_____

## Page 3

Department of State. For purposes of the revised exclusion grounds, "representative" includes "an officer, official, or spokesman" of an organization, and any person who "directs, counsels, commands, or induces" an organization or its members to engage in terrorist activities.

To sum up, there are now 4 subclauses in the exclusion ground at § 212(a)(3)(B)(i): (I), (II)[1], (III), and (IV). Subclauses I and II were already in the statute (created by the Immigration Act of 1990), and the AEDPA added subclauses (III) (for representatives) and IV (for members). Both representatives and members of designated foreign terrorist organizations are now excludable, but this does not mean that representatives and members are ineligible for all forms of immigration relief. The AEDPA also creates a fairly complex set of ineligibility criteria.

## II. Ineligibilities Generally

It is important for INS officers to remember that the exclusion ground for terrorists, § 212(a)(3)(B), is broader in scope than the deportation ground, § 241(a)(4)(B). The deportation ground at § 241(a)(4)(B) refers to only one of the provisions of the exclusion ground, § 212(a)(3)(B)(iii), in designating deportable terrorists; it does *not* incorporate by reference *all* of the grounds on which terrorists may be excluded. In order for an alien to be deportable, it must be determined that the alien has engaged, is engaged, or at any time after entry engages in any terrorist activity as defined in § 212(a)(3)(B)(iii). The fact that an alien is a representative or a member of a designated foreign terrorist organization is sufficient to make the alien excludable, but not deportable.

This general distinction between the broader exclusion ground and the narrower deportation ground is important to the understanding of the ineligibilities created by the AEDPA. One of the ineligibilities - asylum - refers to some (but not all) of the provisions in the exclusion ground, as well as the deportation ground. Three of the other ineligibilities - withholding of deportation, suspension of deportation, and voluntary departure - refer to only the deportation ground. The final two ineligibilities - adjustment of status and registry - permit reference to *all* of the provisions contained in the exclusion ground, as well as the deportation ground.

Notwithstanding these statutory provisions, INS officers must consider carefully all applications for discretionary relief filed by aliens believed to be involved in any terrorist activity. While the alien may not be statutorily disqualified due to, for example, the reference in the ineligibility provision to the narrow § 241(a)(4)(B) ground, the adverse factors that may be present in an individual case - factors that are normally considered in discretionary relief - may nevertheless lead to a denial of relief.

_____

[1] The AEDPA adds "is engaged in" to INA 212(a)(3)(B)(i)(II) to clarify that present terrorist activities are included with past ("has engaged") and future ("is likely to engage") terrorist activities.

Appendix II, continued

## Page 4

## III. Ineligibility of Terrorists for Asylum

### (A) General Rule

The AEDPA amended INA § 208 to provide that:

> The Attorney General may not grant an alien asylum if the Attorney General determines that the alien is excludable under subclause (I), (II), or (III) of section 212(a)(3)(B)(i) or deportable under section 241(a)(4)(B) . . . .

Note from a careful reading of this amendment that subclause (IV) of § 212(a)(3)(B)(i), the exclusion ground relating to "members" of designated foreign terrorist organization, is not mentioned. This means that Congress intended that *members are still eligible for asylum*, while *representatives (subclause (III)) are not*. Note also, however, that this asylum ineligibility provision refers alternatively to the deportation ground at § 241(a)(4)(B). Under that section of law, if it is determined that the alien has engaged, is engaged, or at any time after entry engages in any terrorist activity as defined in § 212(a)(3)(B)(iii), that determination is sufficient to support a finding that the alien is ineligible for asylum irrespective of whether the alien is a member or representative of, or affiliated with any designated foreign terrorist group or organization.

The INA and the INS regulations at 8 CFR 208.14(d)(3) list the mandatory bars for asylum, which include when there are "...reasonable grounds for regarding the alien as a danger to the security of the United States." Terrorists (including representatives, but not members, of designated foreign terrorist organizations, as well as those who have engaged, are engaged, or at any time after entry engage in any terrorist activity) are barred from asylum under the amendment to § 208.

Unless the exception described in the following section applies, Asylum Officers shall refer to Immigration Judges as United States security dangers those asylum applicants who fall within the new asylum ineligibility criteria. Charging documents should also be issued to "deniable" terrorist asylum applicants (e.g., an F-1 in-status student). The regulations will be amended to conform to the AEDPA.

### (B) Discretionary Exception

The AEDPA creates an exception to the requirement that asylum may not be granted to an applicant who falls within the new asylum ineligibility criteria if the Attorney General determines in her discretion that there are "not reasonable grounds" for regarding the applicant as a "danger to the security of the United States."

The exception might apply in narrow circumstances involving, for example, an alien whose involvement with terrorist activities has ended, is unlikely to engage in a terrorist activity, and cannot reasonably be considered a danger to the security of the United States.

Appendix II, continued

## Page 5

Any asylum decision (whether a grant, referral or denial) involving an applicant who appears to fall within the new asylum ineligibility criteria (or the discretionary exception) must be reviewed by the INS Asylum Division Quality Assurance Branch in Washington, D.C., as an "Immediate Notification" case before becoming final.

## IV.  Ineligibility of <u>Deportable</u> Terrorists for Withholding of Deportation

### (A) Before AEDPA

Prior to the amendments made by AEDPA, § 243(h)(2) provided that an alien is ineligible for withholding of deportation if:

(A) the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group or political opinion;

(B) the alien, having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of the United States;

(C) there are serious reasons for considering that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States; or

(D) there are reasonable grounds for regarding the alien as a danger to the security of the United States.

For purposes of subparagraph (B), an alien who has been convicted of an aggravated felony shall be considered to have committed a particularly serious crime.

Note from a reading of the emphasized portion of the foregoing language that it clarifies that an aggravated felon "shall be considered" to have committed a particularly serious crime under subparagraph (B).

### (B) AEDPA Amendment: General Rule

The AEDPA adds one sentence following the emphasized language, and it has the same clarifying effect on subparagraph (D) that the emphasized language has on subparagraph (B):

For purposes of subparagraph (D), an alien who is described in section 241(a)(4)(B) shall be considered to be an alien for whom there are reasonable grounds for regarding as a danger to the security of the United States.

Unlike the asylum ineligibility provision, which expressly refers to subclauses (I), (II), or (III) of the exclusion ground at § 212(a)(3)(B)(i), the withholding ineligibility provision refers only to the

Appendix II, continued



## Page 6

deportation ground at § 241(a)(4)(B).  This means that Congress intended that *both representatives and members of designated foreign terrorist organizations are still eligible for withholding*.  Pursuant to § 241(a)(4)(B), however, if it is determined that the alien has engaged, is engaged, or at any time after entry engages in any terrorist activity as defined in § 212(a)(3)(B)(iii), that determination is sufficient to support a finding that the alien is ineligible for withholding irrespective of whether the alien is a member, representative, or affiliated with any designated foreign terrorist group or organization.

If the alien falls within the new withholding ineligibility criteria, the AEDPA requires that such alien "shall be considered" to be an alien for whom there are "reasonable grounds for regarding as a danger to the security of the United States."  By inserting this clarifying amendment into the framework of § 243(h)(2), Congress sought to make clear what might appear self-evident: that an alien who falls within the new withholding ineligibility criteria relating to terrorists is a danger to national security.

As with asylum, the INA and the INS regulations at 8 CFR 218.16(c)(2)(iv) list the mandatory bars for withholding applicants, which include when there are "...reasonable grounds for regarding the alien as a danger to the security of the United States."  Terrorists (those who have engaged, are engaged, or at any time after entry engage in any terrorist activity, but not including representatives or members of designated foreign terrorist organizations) are barred from withholding under this provision.

Unless the exception described in the following section applies, Asylum Officers shall refer to Immigration Judges as United States security dangers those withholding applicants who fall within the new withholding ineligibility criteria.  As with asylum, charging documents should also be issued to "deniable" terrorist withholding applicants.  Because of the asylum reform regulations, there are not many classes of asylum applicants for whom Asylum Officers still conduct review under the § 243(h) withholding standard.  The regulations will be amended to conform to the AEDPA, and to confirm that aliens who fall within the applicable definitions of terrorist activities are to be considered a danger to the security of the United States.

### (C) Discretionary Exception

The AEDPA also provides that "[n]otwithstanding any other provision of law," withholding of deportation can still be granted if the Attorney General determines in her discretion that:

(A) such alien's life or freedom would be threatened, in the country to which such alien would be deported or returned, on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(B) the application of paragraph (1) [the general withholding provision] to such alien is necessary to ensure compliance with the 1967 United Nations Protocol Relating to the Status of Refugees.

Appendix II, continued

## Page 7

As is apparent from the quoted language, a decision under this exception requires a finding that denial of withholding of deportation in a particular case is inconsistent with our obligations under the 1967 United Nations Protocol relating to the Status of Refugees.[2]  However, Asylum Officers do not have the authority to construe independently the consistency of an outcome in a particular case with United States obligations under the Protocol.  Such decisions will be made only by the INS Asylum Division Quality Assurance Branch in Washington, D.C.

Similar to the asylum exception, this exception to the bars to withholding will apply only in very narrow circumstances.  For instance, in our view, this provision does not generally void the bar to asylum and withholding of deportation for aggravated felons. (Nevertheless, there may be changes to the definition of aggravated felony in the future that will require application of this new section.  Should there be such a development, you will receive additional guidance on the applicability of this section.)  Rather, it was intended primarily to permit the Attorney General to provide withholding of deportation to aliens who may have engaged in "terrorist activities" but do not pose a danger to the security of the United States.  Thus, it should be applied in the same way as the exception to the terrorist grounds for denying asylum described above.  That is, in cases where the alien is automatically deemed a danger to the security of the United States, adjudicators should evaluate whether there are special circumstances that would make it reasonable to conclude that the alien no longer is such a danger (e.g., the alien's involvement in terrorist activities has ended).  In such unusual cases, a grant of withholding under this section may be appropriate.  As with asylum, such decisions must be reviewed by the INS Asylum Division Quality Assurance Branch in Washington, D.C. before becoming final.

## V.  Ineligibility of <u>Deportable</u> Terrorists for Suspension of Deportation.

By amending the first paragraph of INA § 244(a) to read as follows, the AEDPA renders aliens deportable under INA § 241(a)(4)(B) ineligible for suspension of deportation:

> (a) As hereinafter prescribed in this section, the Attorney General may, in his discretion, suspend deportation and adjust the status to that of an alien lawfully admitted for permanent residence, in the case of an alien (other than an alien described in subparagraph (B) or (D) of section 241(a)(4)) who applies to the Attorney General for suspension of deportation and . . . . .

Note that in disqualifying terrorists from suspension of deportation, INA § 244(a) refers to a specific ground of *deportability* which does *not* encompass all of the grounds rendering terrorists *excludable.  Both representatives and members of designated foreign terrorist organizations are still*

---

[2]   In this regard, it is important to note that the four bars to withholding of deportation in U.S. law are either expressly drawn from, in the cases of aliens who pose a security danger or have been convicted of a particularly serious crime, or are consistent with, in the cases of aliens who have persecuted others or are believed to have committed a serious non-political crime, Article 33 of the 1951 Convention relating to the Status of Refugees.  The United States is derivatively bound by Article 33 of the Convention by being a party to the Protocol.



Appendix II, continued



## Page 8

*eligible for suspension.* Pursuant to § 241(a)(4)(B), however, if it is determined that the alien has engaged, is engaged, or at any time after entry engages in any terrorist activity as defined in § 212(a)(3)(B)(iii), that determination is sufficient to support a finding that the alien is ineligible for suspension of deportation irrespective of whether the alien is a member, representative, or affiliated with any designated foreign terrorist group or organization.

The INS will oppose any request for suspension of deportation submitted by an alien who falls within the suspension ineligibility criteria on the ground that an alien deportable as a terrorist is statutorily ineligible for suspension of deportation.

## VI. Ineligibility of <u>Deportable</u> Terrorists for Voluntary Departure

By amending INA § 244(e)(2) to read as follows, the AEDPA renders aliens deportable under INA § 241(a)(4)(B) ineligible for voluntary departure:

> (2) The authority contained in paragraph (1) shall not apply to any alien who is deportable under section 241(a)(4)(B) or because of a conviction for an aggravated felony.

Like its amendment of the provisions relating to suspension of deportation, the AEDPA relies on the deportation ground for terrorists to disqualify applicants for voluntary departure. As such, *the AEDPA's changes to the grounds of terrorist excludability (relating to representatives or members of designated foreign terrorist organization) are not incorporated into the disqualification from voluntary departure.* The INS will not, however, grant voluntary departure to a deportable alien who, pursuant to INA § 241(a)(4)(B), has engaged, is engaged, or at any time after entry engages in any terrorist activity as defined in § 212(a)(3)(B)(iii), and will oppose any application for voluntary departure made by such an alien to an Immigration Judge.

## VII. Ineligibility of <u>Excludable</u> Terrorists for Adjustment of Status

The AEDPA amended INA § 245(c) to provide that aliens who are deportable under INA § 241(a)(4)(B) are ineligible for adjustment of status to that of a lawful permanent resident. INA § 241(a)(4)(B) provides for the deportation of any alien who has engaged, is engaged, or at any time after entry engages in any terrorist activity, as defined in INA § 212(a)(3)(B)(iii).

*The INS officers are not, however, limited to the narrower deportation ground at § 241(a)(4)(B) when making ineligibility determinations for adjustment of status.* Under another provision of INA § 245, an alien seeking adjustment must be "eligible to receive an immigrant visa and is admissible to the United States." In this respect, the alien is in the same position as an alien seeking an immigrant visa at a consular post. Thus if an alien is ineligible for issuance of an immigrant visa or excludable at entry - under any of the applicable exclusion grounds - such an alien is also ineligible for § 245 adjustment. *The INS officers should consult all of the definitions relating to terrorist activities and organizations contained in the broader exclusion ground at INA § 212(a)(3)(B), including whether the alien is representative or member of a designated foreign terrorist organization, when*



Appendix II, continued

---

## Page 9

making ineligibility determinations for adjustment of status. The implementing regulations will be amended to conform to the AEDPA.

Issues of excludability on qualitative grounds are highlighted by questions on the Form I-485 Application to Register Permanent Residence or Adjust Status, the application form that the § 245 applicant must file. Pending revision of the Form I-485, INS officers should add the following language to Part 3, question 4 (as subsection 4.b): "Have you engaged, or are you now engaged, or at any time after entry have you engaged in any terrorist activity, or are you a representative or a member of a foreign terrorist organization as designated by the Secretary of State under INA § 219?"

## VIII.  Ineligibility of <u>Excludable</u> Terrorists for Registry

As with adjustment of status, the AEDPA amended the registry provisions at INA § 249(b) to provide that aliens who are deportable under INA § 241(a)(4)(B) are ineligible for that benefit.

*The INS officers are not, however, limited to the narrower deportation ground at § 241(a)(4)(B) when making ineligibility determinations for registry applicants.* Under another provision of INA § 249, alien "subversives" are ineligible for registry. An alien who falls within any of the definitions relating to terrorist activities contained in the broader exclusion ground at INA § 212(a)(3)(B) is a "subversive"; more simply, a terrorist is a subversive. *The INS officers should consult all of the definitions provided at § 212(a)(3)(B), including whether the alien is representative or member of a designated foreign terrorist organization,* when making their ineligibility determinations of "subversives" for registry. The implementing regulations will be amended to conform to the AEDPA.

## IX.  Conclusion

This guidance is intended to serve as a useful tool for INS officers to implement the new requirements imposed by the AEDPA. Important national security and ineligibility determinations depend on the applicable definitions relating to "terrorist activities" provided at INA § 212(a)(3)(B). All INS officers are required to become thoroughly familiar with these definitions in order to ensure that our determinations are made in a uniform manner.

*Chris Sale*

Chris Sale
Deputy Commissioner

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
NEWARK, NEW JERSEY

File No.: A 77 025 332

In the Matter of                          :
    Hany Mahmoud KIARELDEEN,    :    In Removal Proceedings
    A/K/A Hany KIARELDEEN,      :
    A/K/A KHIARELDEEN,          :
Respondent                                :
                                      :

ON BEHALF OF RESPONDENT                  ON BEHALF OF THE SERVICE
Regis Fernandez, Esq. & Housida Saad, Esq.    Leo Webber, Esq. & Todd Witten, Esq.
744 Broad Street, Suite 1807             Assistant District Counsel
Newark, New Jersey 07102                 970 Broad Street, 11th Floor
                                         Newark, New Jersey 07102

CHARGE:              Immigration and Nationality Act §237(a)(1)(C)(i): After admission
                     as a nonimmigrant, failed to maintain or comply with the
                     conditions of nonimmigrant status under which admitted.

APPLICATIONS:        Immigration and Nationality Act § 208; Asylum;
                     Immigration and Nationality Act § 241(b)(3); Withholding of
                     Removal to Israel;
                     Immigration and Nationality Act § 240B; Voluntary Departure.;
                     Immigration and Naturalization Act § 245(a): Adjustment of
                     Status;
                     Relief pursuant to the United Nations Convention Against Torture
                     and Other Forms of Cruel, Inhuman or Degrading Treatment or
                     Punishment.

DECISION AND ORDER OF THE IMMIGRATION JUDGE

## I.  Procedural History

Hany Kiareldeen (Kiareldeen or "the respondent") is a thirty-one year-old, married male alien. He is an ethnic Palestinian, born in Israel and a citizen of Israel. He was admitted to the United States on April 27, 1990, as a nonimmigrant student with authorization to remain in this

1

country for the duration of his full-time student studies. On March 26, 1998, the Immigration and Nationality Service (I&NS or "the Service") served Kiareldeen with a Notice to Appear ("NTA") alleging that the respondent had failed to comply with the terms of his student status because he had stopped attending school and was instead employed on a full time basis from 1994 to the present thereby subjecting himself to removal pursuant to section 237(a)(1)(C)(i) of the Immigration and Nationality Act ("Act").

The respondent conceded that he was properly served with the NTA, admitted the allegations contained therein, and conceded removability as charged. He declined to designate a country for removal should that become necessary. Israel, the respondent's country of citizenship was named pursuant to section 241(b)(2) of the Act. The respondent sought relief from removability by applying for adjustment of status to that of a conditional legal permanent resident pursuant to sections 245 and 216 of the Act based upon a relative petition (Form I-130) filed by his United States citizen wife on May 14, 1998, and approved by the Service on June 2, 1998. In addition, the respondent applied for asylum, and withholding of removal to Israel, pursuant to sections 208(a) and 241(b)(3) of the Act. See, 8 CFR. §208.3. In the alternative, the respondent applied for voluntary departure pursuant to section 240B of the Act. The respondent also applied for relief pursuant to the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment ("Torture Convention").

The I&NS then presented classified and unclassified evidence in opposition to the respondent's applications for relief. The Service contends that Kiareldeen is a suspected member of a terrorist organization and that there are reasonable grounds to believe that he has or is likely to engage in terrorist activity and poses a threat to the national security and is therefore inadmissible pursuant to I&NA §212(a)(3)(B). Kiareldeen responded by arguing that his ex-wife, seeking revenge against him after a bitter divorce, was the probable source these allegations against him.

On August 11, 1998, the date scheduled for witness testimony to begin, the Service filed a motion *in limine* arguing that the respondent should be precluded from questioning witnesses about confidential interviews and discussions with law enforcement agencies. This motion was apparently submitted in anticipation of testimony expected on August 12, from the respondent's ex-wife. It was decided that a ruling on the Service's motion would be made on a question by question basis. The August 11, hearing consisted of direct testimony and cross-examination of the respondent, and testimony by Michael B. Campagna, the attorney that defended the respondent against domestic violence charges by his former wife, Amal Kamel, (aka Amal Kiareldeen, Amal Hashem, and Amal Mohammad).

The hearing was continued on August 12, 1998, at which time the respondent's current wife, Carmen Negron, was questioned. The respondent's former wife, Amal Kamel, who was appearing pursuant to the respondent's subpoena then began direct testimony. However, Ms Kamel declined to answer a question about her discussions with the Federal Bureau of Investigation (FBI) after being instructed to do so, stating that her life had been threatened. At

2

the respondent's request the proceedings were adjourned pursuant to 8 CFR § 3.35(b)(6), to seek the assistance of the United States District Court to compel Ms Kamel to answer the question. Eventually this issue was resolved by an order directing the parties to question Ms Kamel through the use of interrogatories. However, neither side chose to further question this witness in writing after the case was returned from the District Court.

The proceedings resumed on February 16, 1999, at which time Dr. Laurie Mylroie, an expert on the World Trade Center bombing testified. In addition the respondent presented testimony from roommates, friends and colleagues: Hector Vera, Mansour Sfufelhait, and Emad Qaid. The respondent's sister-in-law, Lily Damiano Hodge, also testified in his behalf. Testimony was completed on February 17, 1999, after the court heard from Joan Souza Perez, a co-worker, and the respondent's brother, Ghassan Khaireldin,. The I&NS did not present testimony from any witnesses. The record was closed but the parties were granted until March 1, 1999, to brief the relevant legal issues and present arguments.

## II.    Evidence

Along with the testimony given under oath, and legal memoranda submitted by the parties, the documentary evidence listed in Appendix 1 was entered into the Record of Proceedings and considered in this decision.

## III.    Legal Standards

### A. Adjustment of Status

Adjustment of status under section 245 of the Act is the general means under which a nonimmigrant may change his or her status to that of a person admitted for permanent residence. Striped to its bare essentials, adjustment of status has three prerequisites. First the nonimmigrant must make an application for such adjustment. Secondly the nonimmigrant must be eligible to receive an immigrant visa and be admissible to the United States for permanent residence. Finally, an immigrant visa must be immediately available to the nonimmigrant at the time the application is filed. IN&A §245(a)

Pursuant to section 216 of the Act, an alien spouse "shall be considered, at the time of obtaining the status of an alien lawfully admitted for permanent residence, to have obtained such status on a conditional basis subject to the provisions of this section."

Pursuant to the second requirement of section 245(a) of the Act, an alien within the United States seeking adjustment of status is assimilated to the status of a person seeking admission from abroad. Pei-Chi Tien v. IN&S, 638 F.2d 1324, 1326 (5th Cir. 1981); Hamid v. IN&S, 538 F.2d 1389 (9th Cir. 1976). An applicant for adjustment of status must thus prove that

3

they are "clearly and beyond doubt entitled to be admitted and [are] not inadmissible under section 212." IN&A §240(c)(2)(A).

Adjustment of status is a discretionary relief. In addition to establishing statutory eligibility, an applicant for adjustment has the burden of establishing that the favorable exercise of discretion is warranted. Ameeriar v. IN&S, 438 F.2d 1028, 1030 (3d Cir. 1971), *cert. denied*, 401 U.S. 954 (1971), Matter of Tanahan, 18 I&N Dec. 339, 342 (BIA 1981). To meet this burden, the applicant must present evidence of any positive factors he believes will support the favorable exercise of discretion. These factors include the character of the applicant, and his family and personal ties to the United States. Generally, absent any adverse factors, adjustment of status should be granted in the exercise of discretion, if the applicant establishes statutory eligibility. Matter of Arai, 13 I&N Dec. 494 (BIA 1978).

## B. Asylum and Withholding of Removal

The respondent facing removal bears the evidentiary burdens of proof and persuasion in applications for both asylum and withholding of removal. 8 C.F.R. § 208.13. A respondent seeking withholding of removal from any country must show that his "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." IN&A § 241(b)(3)(A). To make this showing, the respondent must establish a "clear probability" of persecution on account of one of the enumerated grounds. IN&S v. Cardoza-Fonseca, 480 U.S. 421 (1987); Matter of Mogharrabi, 19 I&N Dec. 439 (BIA 1987); IN&S v. Stevic, 467 U.S. 407, 413 (1984). This clear probability standard requires a showing that it is more likely than not that the respondent would be subject to persecution. Id. at 429-430.

A respondent seeking a discretionary grant of asylum must establish that he is a "refugee" within the meaning of section 101(a)(42)(A) of the Act. The respondent must demonstrate unwillingness or inability to return to his country because of past persecution, or a "well-founded fear of persecution" on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 C.F.R. § 208.13. A well-founded fear of persecution may be established upon a lesser showing than the clear probability of persecution which must be shown for the withholding of removal. IN&S v. Cardozo-Fonseca, supra. An applicant for asylum has established a well-founded fear if he shows that a reasonable person in his circumstances would fear such persecution. Matter of Mogharrabi, supra.

Persecution is defined as unjust harm or suffering inflicted upon an individual by the government of a country or by persons the government is unable or unwilling to control in order to punish his for possessing a belief or characteristic a persecutor finds offensive and seeks to overcome. Matter of Acosta, 19 I&N Dec. 211, 222 (BIA 1985). The respondent must show (1) the persecutor is aware, or could become aware, that the respondent possesses this belief or characteristic; (2) the persecutor has the capability of punishing the respondent; and (3) the

4

persecutor has the inclination to punish the respondent. Id., at 226; Matter of Mogharrabi, supra, at 446.

In determining whether a respondent is eligible for asylum, the respondent's subjective mental state must be considered against the background of circumstances prevailing in his home country. The objective reasonableness of the respondent's fear can be based on what has happened to others similarly situated, as reported in the current Department of State Country Reports On Human Rights Practices, or other reliable sources. Matter of Exame, 18 I&N Dec. 303, 304-5 (BIA 1982). In some cases, the only available evidence of the respondent's subjective fear is his own testimony. This may suffice where the testimony is believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis for the respondent's fears. Matter of Dass, 20 I&N Dec. 120, 124 (BIA 1989); Matter of Mogharrabi, supra, at 448. This does not mean that introducing supporting evidence is at the respondent's option. Generally such evidence must be presented when available. Matter of Dass, supra, at 124. This is particularly true when the basis of a respondent's asylum claim is allegations of general conditions in his or her home country. In such cases, corroborative background evidence may well be essential. Id. at 125; See also, In re S-M-J-, Interim Decision 3303 (BIA 1997).

Alternatively, eligibility for asylum may be established by a showing of past persecution based on any one of the five enumerated grounds. 8 C.F.R. § 208.13(b)(1); Matter of Chen, 20 I&N Dec. 16 (BIA 1989). The Board of Immigration Appeals has held that where past persecution is established, there is a presumption the respondent has reason to fear persecution in the future. Id.; See also, In re H-, Interim Decision 3276 (BIA 1996). The presumption may be rebutted if evidence shows conditions have changed so much that there is little likelihood of present or future persecution. The applicant must then show compelling reasons arising out of the severity of the past persecution for his unwillingness to return to his country. Id.

In addition to establishing statutory eligibility, an applicant for asylum has the burden of establishing that the favorable exercise of discretion is warranted. Matter of Shirdel, 19 I&N Dec. 33 (BIA 1984). To meet this burden, the respondent must present evidence of any positive factors he believes will support the favorable exercise of discretion. These factors include the character of the applicant and whether he or she has relatives legally in the United States or other personal ties to this country which were the motivation to seek asylum here rather than elsewhere. However, generally, absent any adverse factors, if otherwise eligible, asylum should be granted in the exercise of discretion. Matter of Pula, 19 I&N Dec. 467, 474 (BIA 1987).

Pursuant to section 208(b)(2)(A)(iv) of the Act, the Attorney General may not grant asylum to an alien if the Attorney General determines that there are reasonable grounds for regarding the alien as a danger to the security of the United States. Nor may asylum be granted to an alien found inadmissible under subclause (I), (II), (III), or (IV) of section 212(a)(3)(B)(i) of the Act. IN&A §208(b)(2)(A)(v).

5

## C. Relief under the Torture Convention.

Immigration Judges do not currently have jurisdiction to consider claims made under the Torture Convention. See, In re H-M-V-, Interim Decision 3365 (BIA 1998). As of March 22, 1999, regulations implementing the Torture Convention will become effective, and jurisdiction to decide relief pursuant to the Convention will be placed with Immigration Judges. See, Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 33, 8478 (February 19, 1999). The burden of proof established by these regulations is the same as that for withholding of removal, that is, the alien must establish that it is "more likely than not" that he will be tortured if removed to the proposed country of removal. Id.

## IV. Facts of the Case

The respondent is a thirty-one year-old, male native and citizen of Israel who entered the United States on or about April 27, 1990 as a nonimmigrant with F-1 student visa. The respondent is an ethnic Palestinian born on January 30, 1968, in Gaza. The respondent's father taught English for United Nations and his mother is a housewife. The respondent's parents reside in Gaza. The respondent has five siblings, three brothers and two sisters. Both of the respondent's sisters and one of his brothers reside in Gaza. Another of the respondent's brothers is deceased. The respondent's third brother, Ghassan, is a legal permanent resident living in Garfield, New Jersey.

The respondent graduated from Palestine High School in 1985, and then studied auto mechanics at a United Nations vocational school. Before leaving Gaza, the respondent worked full time doing construction work in Israel and Gaza. The respondent does not appear to have had any problems, either legal or political while residing in Gaza.

The respondent arrived in the United States on April 27, 1990, with a student visa he had been granted to attend a language program at Rutgers University. The respondent studied at Rutgers for a couple of months, and then transferred to Essex County College where he studied mechanical engineering. (Exhibit 27) The respondent studied at Essex County College for three years, but did not get a degree. The respondent stopped his studies in 1994, because he had gotten married and could not afford not to work.

When the respondent came to the United States he first lived in Newark, New Jersey for a couple of months with his brother, Ghassan and Nydal Rashid, a friend of his brother's, on Springfield Avenue. At the beginning of the summer of 1990, the respondent and Ghassan moved to 50 Prospect Street in Garfield, New Jersey. The respondent stayed at that address until February, 1994. (Exhibit 17) When they first moved into the residence in Garfield, there were two people already living there, Sayed and Mohammad Abdeljaber. In September 1991, when Mohammad moved out, Mansour Sfufelhait moved in. The respondent is still in touch with

6

Mansour who works at Main Medical Imaging in Clifton, New Jersey. One other person, named Esam, lived in the apartment for a few months until March 1992. The residence had three bedrooms on the first floor, and the landlord was Janina Lanch, who lived in Clifton, New Jersey. The rent was $825, the rent would be paid by different people and in different forms. The respondent sometimes paid the rent by check. (Exhibit 19)

The respondent was married for the first time of October 15, 1993. The respondent first met his wife, Amal Kamal, in April or May of 1993. Ms. Kamal was then living in Rhode Island. She later moved to New Jersey, and moved in with the respondent in August 1993. The respondent and his wife had two marriage ceremonies, one in a Mosque in August, and the other a civil ceremony on October 15, 1993.

In February 1994, the respondent moved to 66 Jackson Avenue in Hackensack, New Jersey with Ms. Kamal her children Hady and Mindy, and the couple's child, Nour, who was born January 30, 1994. The family lived there until September 1994, when they moved to 207 High Street in Nutley, New Jersey. The respondent sublet the basement of this address to a Mr. Rashid. After that the respondent's brother Ghassan moved in with him along with Hector Vera. Mr. Vera was a coworker and friend of the respondent. Both Mr. Vera and Ghassan moved in about April 1995. The respondent left that address in September 1995, after having some problems with Ms. Kamal.

After leaving Nutley, the respondent lived at several different addresses, including one in Passaic for a few months with Mr. Rasheed. The respondent then lived in Wayne for a month with a friend. The respondent testified that he was "in a state of moving" due to his separation from his wife. Following this period, in April 1997, the respondent moved to 61 Baldwin Street, in Bloomfield, New Jersey. Kiareldeen and Kamal divorced on June 11, 1997.

On September 11, 1997, the respondent married Ms. Carmen Negron, an American citizen. The respondent's new wife and stepson then moved in with the respondent. The respondent and his family have resided at 61 Baldwin Street since that time. Ms. Negron testified that she relies on the respondent for financial and emotional support, and that she has slipped into a deep depression since the respondent was taken into custody. Ms. Negron further testified that her son, Brian, views the respondent as his father. According to Ms. Negron, Brian has become depressed because of the respondent's incarceration

The respondent's current wife testified that the respondent is "the most caring loving person anyone could know." She testified that the respondent made her happy, and when he was arrested that happiness was taken away from her. According to Ms. Negron, the respondent has always taken excellent care of Brian, and treated him as his own son. Since being detained, the respondent consistently calls his wife, and always asks how she and her son are doing. The respondent has never hurt either his current wife or her son in any way.

Ms. Negron testified that the respondent has never talked to her about the World Trade

7

Center bombing or about Attorney General Janet Reno. The respondent's wife testified that she has never associated with terrorists, and to her knowledge neither has the respondent. Ms. Negron stated that she has become very good friends with her brother-in-law, Ghassan.

The first job the respondent had in the United States was delivering for a pizzeria in Hackensack. At first this was a part-time job while he was still a student, but at the beginning of 1993, the respondent began working nearly full time. The respondent started working there at the end of 1991. The respondent worked there with Ghassan and several other people who he became friends with. The respondent stopped working there in October 1994.

The respondent also worked at Infinity Sound, an electronics store in Passaic, New Jersey. The respondent began working there at the end of 1994. The respondent worked there with Ghassan, Hector Vera, and Joan Perez.

The respondent testified that he is not a religious person and aside from his marriage ceremony he has never been to a Mosque in the United States. The respondent further testified that he was not political or interested in politics. The respondent claimed that he did not know who Attorney General Janet Reno was before being placed in these proceedings.

An investigation report from the Nutley police department dated February 10, 1995, indicates that the respondent was placed under arrest by FBI agents in connection with wholesale duplication of video tapes in violation of federal copyright laws. (Exhibit 51) There is no other evidence of this arrest ever having taken place, and a "FBI fingerprint return" contains no record of this arrest. (Exhibit 14) The respondent testified that the FBI had actually arrested a "Mr. Rasheed" who sublet the downstairs apartment at that location. (See also, Exhibit 75)

The respondent testified that he was arrested approximately six times due to what he claims were false accusations against him by his ex-wife. The first time the respondent was arrested was on March 18, 1995, in Nutley. The respondent testified that his ex-wife insisted that he take her out or she would call the police on him. The respondent was tired and refused to take her out, and his ex-wife reported to the police that the respondent had hit and pushed her. According to the police report filed pursuant to this incident, Ms. Kamal told the officers responding to the call that the respondent struck her in the face. The report further states that the respondent "admitted to striking his wife in the face." (Exhibit 50) In these removal proceedings, the respondent testified that he has never laid a hand on Ms. Kamal.

The respondent testified that another incident took place the next evening despite his attempts to avoid confrontation by staying in the basement. The respondent was in the basement with Mr. Vera when Ms. Kamal came downstairs and asked the respondent to take her out. The respondent refused and an argument ensued. The respondent left the house and was arrested again. The police report filed pursuant to this incident states that Ms. Kamal told the officers responding to the call that the respondent had "bent her thumb back, hurting her hand." (Exhibit 50) Ms. Kamal apparently told the police at the scene that she did not wish to pursue a

8

temporary restraining order, but later did so. The respondent was also arrested and charged with simple assault. Id. The respondent testified that all charges arising out of these incidences were ultimately dismissed. On March 19, 1995, Ms. Kamal also spoke with a detective whom she told that the respondent and Ghassan were in the country illegally and she "also made allegations about their activities and their ties to certain Islamic groups." (Exhibit 51) The Service and the FBI were both informed of these allegations. Both agencies recommended that the respondent be processed on the domestic violence charges and that they would investigate the allegations made by Ms. Kamal. Id.

On March 3, 1996 the respondent was involved in an altercation which took place in front of Ms. Kamal's house. (Exhibit 32) It does not appear that any charges resulted from this incident.

During the time the respondent lived in Bloomfield, he had visitation rights with his daughter Nour. The respondent testified that following one of his visits with his daughter in May 1997, his ex-wife accused him of abusing his daughter. The respondent's ex-wife filed a domestic violence restraining order against the respondent. However, the Hudson County Court dismissed the domestic violence complaint. (Exhibit 72)

Another incident allegedly occurred on July 18, 1997. On July 18, 1997, at approximately 6:00 p.m., the respondent elicited the assistance of the police in enforcing the visitation agreement with his daughter Nour. When the respondent and an officer from the Bayonne police department arrived at his ex-wife's residence, they were met by the respondent's ex-mother-in-law, Nabila Safwat, who refused to allow the respondent to take the child. Because the officer could not determine from the face of the visitation agreement if that date was in fact the date that the respondent had visitation rights, the officer did not further attempt to enforce the visitation. On July 23, 1997, the respondent's ex-wife reported to the police that on July 18, 1997, the respondent had come to the house at approximately 4:00 or 4:30 p.m. and asked Ms. Safwat to give him his daughter. Ms. Kamal told the police that when Ms. Safwat refused to allow the visitation, the respondent told Ms. Safwat that he would put a bomb in his ex-wife's car. A hearing on a final domestic violence restraining order was held before the Superior Court of New Jersey, Law Division, Family Part, Hudson County, in October of 1997. (Exhibit 17) Following extensive testimony from the parties involved and several police officers, the court found that the allegations of threats by Ms. Safwat were not believable, and Ms. Kamal's complaint was dismissed. In these proceedings, the respondent stated that he believed that Ms. Kamal was attempting only to keep him from seeing his daughter.

The respondent has also made several complaints against Ms. Kamal. Most significantly, the respondent testified about an incident which occurred on September 9, 1995. According to a police report by the Nutley police, made following their response to a call made by the respondent, on their arrival at the respondent's address in Nutley at approximately 11:45 p.m, the respondent told them that Ms. Kamal had pushed his hand while he was drinking tea and that hot tea had spilled on him. (Exhibit 51) The officers also spoke to Ms. Kamal who told them that

9

nothing had happened and that she wanted them to leave. Ms. Kamal also advised the officers that she was suffering from mental depression and, responding to an offer by the officers, stated that she wanted to go to "Clara Maas" and speak to a doctor. Ms. Kamal was transported to Clara Maas Medical Center by two officers and advised to return to the Nutley residence when done, as the respondent had informed the officers that he would go and stay at Ghassan's house that evening. No further action was taken by the officers at that point.

Regarding this incident, Lily Damian Hodge, Ghassan's wife, testified that she had gone to Ghassan's apartment in Passaic, but he was not there. She heard from other friends who were at the apartment that Ghassan had gone to the hospital after the respondent had a fight with Ms. Kamal. At about midnight or one in the morning, the respondent and Ghassan came back to Ghassan's apartment and reported that Ms. Kamal had thrown hot water or tea at the respondent's face and that he had been treated for burns. The respondent did not want to return to his residence and decided to stay at Ghassan's apartment. Shortly thereafter, Ms. Kamal came to the apartment and began yelling. Ghassan went out to talk to her and to tell her that the respondent simply wanted to spend the night there and let tempers cool down. Ms. Kamal responded by yelling and pounding on the door of the apartment. The police came and escorted Ms. Kamal to the edge of Passaic, but she came back shortly thereafter. Ms. Kamal broke through a screen window and jumped into the apartment. She attacked Ghassan and the respondent, and when Ghassan went to get the telephone she hit Ghassan with the telephone. The police eventually returned and Ms. Kamal left the scene. A continuation page of the earlier police report confirms that Ms. Kamal had, against the advise of the police, gone to Passaic after speaking with doctors at the Medical Center, that she left Ghassan's apartment after being ordered to do so by the police but returned less then five minutes later. (Exhibit 51) According to the police report, when she returned to Ghassan's apartment, the respondent gave Ms. Kamal some cash and the keys to the car after which she went to the Nutley police department. Both parties apparently signed domestic violence complaints against each other, and received temporary restraining orders. No criminal complaints were filed by any of the parties at that time, however, DYFS (Division of Youth and Family Services) was contacted to investigate the situation of the three children.

The Service has presented evidence which it gathered from the Joint Terrorism Task Force of the Federal Bureau of Investigation ("FBI") which alleges that the respondent "maintains relationships with other members and/or suspected members of terrorist organizations dedicated to committing acts of violence against the people of the United States or its allies." (Exhibit 25, Unclassified Summary of July 28, 1998) The information provided by the FBI, further alleges that approximately one week before the World Trade Center (WTC) bombing the respondent hosted a meeting in which several individuals, including Nidal Ayyad (a convicted co-conspirator in the World Trade Center bombing), took part. Id. It is alleged that at this meeting Ayyad did most of the talking and stated that he had suggested to Sheikh Omar Abdel Rahman (another convicted co-conspirator) that a suicide bombing should be attempted on the World Trade Center, but Sheikh Rahman demurred.

10

The Service has also presented information from the FBI that the respondent has "expressed a desire to murder Attorney General Janet Reno for her role in the conviction of those responsible for the bombing of the World Trade Center." The FBI report concludes that the respondent poses a credible threat to Attorney General Reno.

## V. Analysis

### A. Adjustment of Status

The respondent has established that he was inspected and admitted to the United States and that an immigrant visa is immediately available to him as the beneficiary of an approved immediate relative petition filed for him by his United States citizen wife. IN&A §§201(b)(2) and 245(a) However, the Service argues that the respondent has failed to establish that he is clearly and beyond doubt admissible to the United States and that he is not inadmissible under section 212 of the Act. IN&A §§240(c)(2)(A) and 245(a)(2) The Service further argues that even if the respondent is statutorily eligible for adjustment of status, such relief should be denied in the exercise of discretion. IN&A§245(a); I&NS v. Bagamasbad, 429 U.S. 24 (1976); Von Pervieux v. I&NS, 572F.2d 114 (3rd Cir. 1978)

The Service argues that the classified and unclassified evidence from the FBI establishes that the respondent is not entitled to admission to the United States because: (1) the respondent has engaged in or incited terrorist activity and there are reasonable grounds to believe that the respondent is likely to engage in terrorist activity and poses a danger to national security; and (2) the respondent is a suspected member of a terrorist organization. See, I&NA §212(a)(3)(B) Specifically, the Service contends that Kiareldeen is a suspected member of a terrorist organization who hosted a meeting at his home in Nutley, New Jersey at which convicted terrorists planned the bombing of the World Trade Center in his presence. The Service further believes that Kiareldeen has threatened the life of Janet Reno, the Attorney General of the United States and that he poses "a credible threat" to the Attorney General. The Service contends that the respondent is therefore inadmissable to the United States as an individual who has engaged in terrorist activities pursuant to section 212(a)(3)(B) of the Act. That section of the Act holds that any person who has engaged in a terrorist act; See, §212(a)(3)(B)(i)(I), or who the Attorney General knows, or has reasonable grounds to believe is engaged in or, is likely to engage after entry in any terrorist activity; See, §212(a)(3)(B)(i)(II), or who has, under circumstances indicating an intention to cause death or serious bodily harm, incited terrorist activity; See, §212(a)(3)(B)(i)(III), or who is a representative of a foreign terrorist organization, as designated by the Secretary of State, which the alien knows or should have known is a terrorist organization; See, §212(a)(3)(B)(i)(IV), or who is a member of a foreign terrorist organization, as designated by the Secretary of State; See, §212(a)(3)(B)(i)(V), is inadmissible to the United States.

Aliens who have previously engaged in terrorist activities, as well as those who are likely

11

to engage in such activities prospectively, fall within the purview of I&NA 212(a)(3)(B). 9FAM §40.32 N.4 The term "terrorist activity" and the term "engage in terrorist activity" are defined terms. I&NA §§212(a)(3)(B)(ii) and (iii) The preparation or planning of a terrorist act is specifically defined in I&NA §212(a)(3)(B)(iii) as "engaging in terrorist activity." Generally, mere membership in or affiliation with a terrorist organization, absent the commission or planned commission of a terrorist act, does not constitute a basis for a finding of ineligibility under I&NA §212(a)(3)(B). 9 FAM §40.32 N6.1 (cf. N.6.2, "There are certain terrorist organizations which are of such a size and/or character that membership therein reasonably supports a conclusion that the alien has engaged in terrorist activity.") If there is reason to believe that a member or affiliate organization has engaged or will engage after entry in an act defined as a terrorist activity, it is the act, or planned act, which will render him or her ineligible for a visa, not his or her membership or affiliation. 9 FAM §40.32 N6.1

Credible information that an alien has engaged or is likely to engage in terrorist activity may be sufficient to create a reasonable suspicion that warrants a careful and detailed examination of the alien's background and eligibility for a visa. 9 FAM §40.32 N11.4-2. Reasonable suspicion may be made on the basis of less evidence than would be required to support a finding of ineligibility depending upon the gravity and immediacy of the threat. 9 FAM §40.32 N11.4-1 and N.11.4-2. Many factors must be weighed in evaluating reports of possible terrorists, including a careful evaluation of the credibility of the information as well as an identification of its source and an assessment of the source's reliability. 9FAM §40.32 N11.3 and N11.4-2

The allegations by the Service that the respondent was involved in the planning of the World Trade Center bombing and threatened to assassinate the Attorney General have not been sufficiently documented to reasonably establish that the respondent has engaged in or is likely to engage in a terrorist act. Neither has the Service proven its allegation that the respondent is a member of a foreign terrorist organization. Nearly a full year after the respondent was placed in proceedings by the Service, the government has not instigated any criminal proceedings relating to these charges, nor has Kiareldeen been charged in removal proceedings as a terrorist under sections 237(a)(4)(A) or (B) of the Act. The allegations made to the government may have been sufficient to arouse suspicion, but they remains unproven. The hearsay evidence of inadmissibility is too meager to provide reasonable grounds to believe that the respondent was actually involved in any terrorist activity. Hearsay evidence is admissible in removal proceedings, but it is not, by itself, sufficient to overcome the respondent's denial of the allegation made against him. See, Attachment 1, Analysis of Classified materials submitted by the Service.

It must next be determined whether there are reasonable grounds to believe the respondent is likely to engage in any terrorist activity in the future. Unlike the burden of proof for past acts or membership in foreign terrorist organization, this grounds of exclusion relates to those aliens for whom there exists a reasonable ground to believe they are likely to engage in any terrorist activity. There is a paucity of interpretation regarding this section of the Act, and it

12

appears that the meaning of the phrase "reasonable grounds to believe," in an immigration context has rarely been an issue before the BIA or the courts. The most clear interpretation of language mirroring that used by the Service to argue that the respondent is inadmissable is found in Adams v. Baker, 909 F.2d 643 (1st Cir. 1990). In that case the court found it necessary to interpret a phrase from the Temporary Prohibition on Exclusion or Deportation of Aliens for Certain Beliefs, Statements, or Association, 101 Stat. 1399, §901(a)(1988), which stated that a waiver of certain grounds of inadmissibility was not available to aliens who "a consular official...knows or has reasonable ground to believe has engaged, in an individual capacity or as a member of an organization, in a terrorist activity...." The court in Adams found that "'reasonable belief' may be formed if the evidence linking the alien to terrorist violence is sufficient to justify a reasonable person in the belief that the alien falls within the proscribed category." Id. at 649. The Third Circuit has interpreted "reasonable grounds to believe" standards in the context of an extradition proceeding. Sidali v. IN&S, 107 F.3d 191 (3d Cir. 1997), cert. denied, 118 S.Ct. 879. The court held that the government's burden would be met if a "person of ordinary prudence and caution could conscientiously entertain a reasonable belief of [the alien's] guilt." Id. at 200.

An evaluation of the evidence by a person of ordinary prudence and caution cannot sustain a finding that this respondent has engaged in terrorist activity, or conscientiously result in a finding that there exists a reason to believe he is likely to do so in the future. The evidence and testimony presented by the respondent discredits the evidence presented against him. The Service has not rebutted the respondent's evidence but has relied entirely upon their original allegations regarding the issue of public security.

The respondent has presented persuasive evidence to establish that he did not maintain a residence in Nutley at the time he was alleged to have hosted a meeting with convicted World Trade Center bombing conspirators. (Exhibit 71) The respondent presented credible evidence to establish that he was residing in Garfield, New Jersey one week prior to the World Trade Center bombing in February 1993. Moreover, the respondent presented testimony from several credible witnesses, including two who lived with him at the time he was alleged to have hosted the meeting. These witnesses testified that they were unaware of such a meeting ever having taken place, and that, because of the close living quarters they shared, it would have been impossible for the respondent to host such a meeting without their knowledge. It is true, as the Service has noted, that these witnesses were not disinterested parties, that they were family or friends of the respondent. However, the witnesses testified credibly and the Service has not offered anything whatsoever in the way of rebuttal evidence. The respondent has submitted canceled checks from that time period which demonstrate that he was paying rent on an apartment in Garfield. (Exhibit 19)

The Service's argument that "[i]nstead of focusing on the substance of the allegations against him, the respondent's trial strategy was in essence a campaign to discredit his ex-wife... whom he believed to be the source of the FBI's information" is somewhat disingenuous. Service Brief at 5. The respondent's defense was limited because the identity of his accusers remains

13

classified. The respondent was forced to speculate on the origin of the allegations made against him. Ms. Kamal had previously accused Kiareldeen of being involved in terrorist activities. (Exhibit 51) Kamal and Kiareldeen had recently concluded a bitter divorce and the animosity continued as they bickered over the custody of their child.(Exhibits 17 and 51) Quite naturally, he thought her the most likely source of these allegations. It was therefore predictable that the respondent would seek to bring her credibility into question. The use of classified information, while legally permissible, did handicap the respondent's defense. See, I&NA §240(b)(4)(B); 8 CFR § 240.11(a)(3)

The respondent did not simply attempt to undermine the credibility of Ms. Kamal, but submitted additional evidence that indicated that the allegations against him were untrue. For example, the respondent's evidence established that he resided in Garfield rather than in Nutely in February 1993. Kiareldeen presented evidence that the WTC bombing was carried out by misguided Muslim extremist and that he is not religious. Kiareldeen is known as an individual without any no interest in politics or religion according to each of the witnesses that testified on this issue. He drank alcohol and frequented nightclubs; improbable activities for a religious fanatic. The respondent is currently married to a United States citizen who is a practicing Christian. The I&NS was satisfied with the bona fides of the marriage as indicated by their quick approval of the I-130 relative petition. The respondent's wife testified that the respondent has on occasion accompanied her to Church.

Dr. Laurie Mylroie, an expert witness, was of the opinion that the respondent was not involved in the World Trade Center bombing. Dr. Mylroie has studied the bombing in depth, and has expertise in that area. Dr. Mylroie holds a Doctoral degree in Gulf Security from Harvard University. Dr. Mylroie has worked as an Assistant Professor at Harvard, and as an Associate Professor at the U.S. Navel War College. Dr. Mylroie also worked as a consultant to ABC news and Newsweek in their coverage of the bombing. James Fox, a retired Director of the New York City Office of the FBI, has praised Dr. Mylroie's work stating that she is "one of the world-class experts regarding Islam and the World Trade Center bombing." (Exhibit 73) Dr. Mylroie conceded that some experts disagree with her opinion that Iraq may have had a part in sponsoring the bombing.

Dr. Mylroie has extensively reviewed the evidence presented by the Government at the trial of the convicted World Trade Center bombers. Dr. Mylroie explained the importance of the telephone toll logs to establishing the nature of the conspiracy. Dr. Mylroie testified that by sifting through these logs one can establish a pattern of conspiracy among the actors. The records suggested the structure of the conspiracy. Ramsy Yousif was at the center of the conspiracy. There were close telephonic links between the other co-conspirators, although not every conspirator was necessarily in contact with every other conspirator.

Dr. Mylroie found no record of any calls to or from Kiareldeen to any of the conspirators in those extensive phone records. According to Dr. Mylroie, there was no way, at that time, to make anonymous phone calls using telephone cards, as in 1992 and 1993, all telephone cards

14

were linked to addresses. On cross-examination, Dr. Mylroie admitted that it would have been possible for a conspirator to make all of their arrangements from pay phones not located near there residences, but Dr. Mylroie noted that these types of safeguards were not utilized by the convicted conspirators. Nydal Ayyad made calls from his apartments in Bloomfield and Maplewood, and from his office. Dr. Mylroie testified that there was no suggestion that Ayyad tried to hide his contacts by using payphone, and that the government did track the records of payphones located near the conspirators' apartments. Dr. Mylroie testified that Kiareldeen was never mentioned in any documents that she reviewed in conjunction with the WTC bombing.

Dr. Mylroie further testified that, according to the FBI's 1994 report, the WTC bombing was an example of unaffiliated extremists getting together to carry out a single act of terrorism. The WTC bombing suspects had no ties to organized groups, but were individuals who acted out of religious belief or anti-American and anti-Israeli feeling and a sense of pride that Arabs could carry out such an act. According to Dr. Mylroie, the beliefs of the respondent do not match those of the New York/New Jersey area conspirators involved with the WTC bombing. The conspirators were all Muslim extremists. Moreover, according to Dr. Mylroie, a Muslim extremist would not drink or go out to night clubs, nor would they be likely to associate with anyone who did.

According to Dr. Mylroie, the allegation referring to a meeting at the respondent's home before the WTC bombing seems unlikely as that information did not come to light in either the trial of Nydal Ayyad or in the trial of Sheikh Omar Rahman. The idea that Ayyad and Rahman debated the form of the bombing did not come out at either trial. Dr. Mylroie also believes that anyone who had hosted a meeting with Ayyad shortly before the bombing would have been prosecuted for failure to warn of the bombing as happened following the bombing of the Federal Building in Oklahoma City.

The evidence presented by the respondent contradicts the evidence presented by the I&NS. The only evidence presented by the I&NS on the issue of national security was a classified report and an unclassified summary prepared by The Joint Terrorism Task Force (JTTF), an FBI supervised squad with detailed representation from numerous law enforcement agencies in the Newark, New Jersey area. The JTTF report qualifies as expert evidence based upon the knowledge, training, and skill of that organization. The classified report explains that efforts were made to evaluate the credibility of the information. The gravity of the allegations against Kiareldeen clearly required immediate action. However, Kiareldeen has subsequently presented rebuttal evidence including expert evidence that raised formidable doubts about the veracity of the allegations contained in the JTTF reports. The failure of the Service to answer those doubts with any additional evidence, be it at the public portion of the hearing or even *in camera*, proves fatal to their case. The issue is not whether there is sufficient evidence to meet the minimal "reasonable ground to believe" standard, but whether, following the introduction of evidence by the respondent, any of that evidence can be considered reliable. The Immigration Judge must ultimately evaluate the evidence even while respecting the opinions of the experts. The respondent contends that he was falsely accused. The Service had an opportunity to rebut the

15

respondent's evidence, clear up the doubts, and present testimony to establish that their original suspicions remain justified. The failure of the Service to call a Task Force witness to testify, even *in camera, is significant.* If the allegations made against Kiareldeen are legitimate, he should be facing serious criminal charges rather than an airline ticket to Israel at taxpayer expense. The evidence as a whole is insufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief that the respondent either participated in past acts of terrorism or is motivated and likely to engage in such behavior in the future.

The Service maintains that even if the respondent is not statutorily ineligible for adjustment of status, such relief should be denied as a matter of discretion. The Service argues that it has been "established to the satisfaction of the Court that the respondent submitted a fraudulent document." Service Brief at 8, referring to Exhibit 76. The Service argues that the respondent's submission of a fraudulent birth certificate not only puts the respondent's credibility in doubt but should serve to render him inadmissible pursuant to section 212(a)(6)(c)(i) of the Act. The respondent apparently copied his brother, Ghassan's birth certificate and then substituted his own name and date of birth for that of his brother. That document was submitted with the respondent's application for adjustment of status. The Service does not dispute the respondent's identity or his place of birth, therefore, the use of his brother's birth certificate in this context does not establish inadmissability pursuant to section 212(a)(6)(c)(i) of the Act because the respondent's misrepresentation was not material. In re Tijam, Int. Dec.3372 (BIA 1998) (Rosenberg, Concurring and Dissenting Opinion, pgs. 18-23) Although the submission of an altered birth certificate by the respondent does reflect upon the respondent's credibility and character, this situation is not similar to that in In re O-D-, Interim Decision 3334 (BIA 1998). In that decision the alleged fraud was directly material and central to the alien's entire claim. The Board there found "that the respondent's fraud pertains to a central element of his asylum claim, i.e., his identity, perhaps the most critical elements [sic.], and thereby significantly undermines the credibility of his request for asylum." Id. The Board did not make a finding that the submission of a document containing false information pertaining to a nonmaterial fact would mandate a *per se* adverse credibility finding.

The Service further argues that the respondent should be denied adjustment of status in the exercise of discretion because of the Nutley police report for the incident which took place on March 18, 1995. The report states that the respondent "admitted to striking his wife in the face." (Exhibit 50) The respondent *denies that he struck his ex-wife and no charges were ultimately pursued.* Kamal and Kiareldeen made various charges against each other during their stormy relationship. Even if true, these allegations must be balanced against the equities presented by the respondent in determining whether relief will be granted in the exercise of discretion.

The Service also argues that the respondent's "arrest for the assault of Samir Tahhan" should be considered a significant adverse factor that mandates a denial as a matter of discretion. In relation to this incident, the police report states that the respondent was "transported to H.Q.'s by this officer to check for violation of a T.R.O. (Temporary Restraining Order) at H.Q.'s." (Exhibit 32) The report does not indicate that an arrest was made, but does indicate that the

16

respondent was able to produce a copy of an order vacating the restraining order in question.

In suggesting that the police report of this incident and the police report of the incident on March 18, 1995, are probative in determining the respondent's eligibility for discretionary relief, the Service relies heavily upon the Board's decision in In re Thomas, Interim Decision 3245 (BIA 1995). The Board in that decision did state that it is "appropriate to consider evidence of unfavorable conduct, including criminal conduct which has not culminated in a final conviction for purposes of the Act." Id. However, in that case, and all of the cases cited therein, there had been convictions, guilty pleas, or diversions. None of the cases contemplated by the Board in Thomas dealt with cases where the respondent was arrested and later found not guilty, or where there were never any charges filed against the respondent.

Police reports implicating an alien in criminal activity, but which never resulted in prosecution due to a lack of sufficient evidence are not probative. Sierra-Reyes v. INS, 585 F.2d 762, 764 n.3 (5th Cir. 1978). Because neither of these incidences resulted in any criminal charges being filed against the respondent, it is appropriate to give the police reports, absent any further corroboration, little weight. Id., see also, Thomas, supra. ("When an alien's conduct results in his having had contact with the criminal justice system or being placed in criminal proceedings, the nature of those contacts and the stage to which those proceedings have progressed should be taken into account and weighed accordingly.")

The Service also suggests that the respondent should be denied adjustment of status in the exercise of discretion because testimony established that he failed to pay court-ordered child support for an extended period of time. The respondent has not paid child support since being taken into custody by the Service. It is unreasonable to expect that a person held in detention, and deprived of any income, would be able to make timely child support payments. There is no other indication that the respondent has abandoned or failed to support his child. Furthermore, there is no evidence in the record to suggest that legal action has been taken to collect any child support which is currently in arrears.

The Service has further alleged that the respondent has failed to file accurate income taxes. The Service argues that the respondent must have underreported his taxable income based upon his testimony as to his normal household expenses. However, the respondent testified that he has received significant financial support from his father. Moreover, there is no indication in the record that the respondent is the subject of a civil or criminal investigation by the Internal Revenue Service. Mere conjecture that the respondent has failed to file accurate income tax returns is due little weight.

Finally, the Service urges that the respondent's violation of the immigration laws should be considered a significant adverse factor that mandates a denial as a matter of discretion. Unauthorized employment is an adverse discretionary factor. Matter of Khan, 17 I&N Dec. 508, 510 (BIA 1980). However, that "factor alone should not ordinarily result in the discretionary denial of adjustment of status to those individuals who are statutorily eligible for that relief and

17

who present no other negative considerations." Id.

The adverse discretionary factors presented by the I&NS must be balanced cumulatively and in total against countervailing the positive equities presented by the respondent.[1] The respondent has made a compelling case that he deserves the exercise of discretion in his favor. The respondent has lived in the United States for almost nine years after admission with a valid student visa. The respondent attended school for several years before he stopped attending. The respondent has presented evidence of political instability in his area of the middle-east. He alleges that Palestinians face discrimination and persecution in Israel. The respondent is married to a United States citizen. The respondent's wife testified that both she and the respondent's step-son rely heavily upon the respondent for emotional and financial support. The respondent's wife testified that since the respondent has been detained both she and her son have been upset and depressed. There does not appear to be any question regarding the *bona fide* status of this relationship. In approving Ms. Negron's visa petition, the Service has at least tacitly expressed its belief that the marriage is valid.

The respondent also has a United States citizen daughter from his previous marriage. The respondent has presented testimony from several parties who stated that he is an exceptionally loving and caring father. The respondent has attempted to maintain a visitation schedule with his daughter and expressed a great sadness at not being able to see her while he was in detention. The respondent has a close relationship with his brother, Ghassan, a permanent resident alien. The respondent has also developed an extensive network of friends in the United States. Many of these friends provided favorable character testimony for the respondent.

The Service points to the following adverse factors in opposition to the respondent's discretionary applications for relief. The respondent ceased to pursue his studies and remained in the United States without seeking a lawful means to do so. The respondent engaged in unauthorized employment. The respondent has been arrested and charged with the commission of crimes, although he has never been convicted. The respondent knowingly presented an altered birth certificate as his own indicating a lack of character and honesty. Allegations have been made against the respondent charging that he is a suspected member of a terrorist organization, that he hosted at a meeting at his home attended by a convicted World Trade Center bomber and other co-conspirators, and that the respondent expressed a desire to murder Attorney General Janet Reno.

---

[1] "Where adverse factors are present in a given application, it may be necessary for the applicant to offset these by a showing of unusual or even outstanding equities. Generally, favorable factors such as family ties, hardship, length of residence in the United States, *etc.*, will be considered as countervailing factors meriting favorable exercise of administrative discretion. In the absence of adverse factors, adjustment will ordinarily be granted, still as a matter of discretion." Matter of Arai, 13 I&N Dec. 494, 496 (BIA 1970), quoted in Elkins v. Moreno, 435 U.S. 647, 667 (1978).

The respondent's application for adjustment of status to conditional permanent resident will be granted in the exercise of discretion. As was previously discussed, insufficient evidence was presented to establish reasonable grounds to believe that the respondent is a threat to the national security. Therefore those allegations against the respondent will not be given weight as an adverse factor.

Few applicants seeking the privilege of adjustment of status do so with a flawless immigration record. Yet the I&NS grants thousands of such applications each year in the exercise of administrative discretion. In my judgement, the adverse factors presented would rarely if ever cause a nonimmigrant student currently married to a United States citizen who is the father and step-father of two citizen children to be denied adjustment of status in the exercise of discretion by the Service. The additional unproven allegations made against the respondent should not cause a different result here. Therefore, the respondent's application for conditional residence will be granted in the exercise of discretion.

## B. Asylum and Withholding of Deportation

The Service maintains that there are reasonable grounds for regarding the alien as a danger to the security of the United States, and that the respondent is thus ineligible for the reliefs of asylum and withholding of removal pursuant to sections 208(b)(2)(A)(iv) and 241(b)(3)(B)(iv) of the Act. The Service further argues that asylum may not be granted to the respondent as he is an alien who should be found inadmissible under subclause (I), (II), (III), or (IV) of section 212(a)(3)(B)(i) of the Act. IN&A §208(b)(2)(A)(v). As discussed above, and in Attachment A, there has not been adequate evidence set forth to prove that the respondent has in the past been involved in any terrorist activity, or so that a person of ordinary prudence and caution could conscientiously entertain a reasonable belief that he will in the future, engage in any such act or other act which would create a danger to the security of the United States. The respondent is not statutorily ineligible for the relief of asylum on any of these grounds.

Although the respondent is not statutorily ineligible for a grant of asylum pursuant to section 208(b)(2)(A)(iv) of the Act, he has not met his burden of establishing that he has experienced past persecution, or that he has a well founded fear of future persecution. In his application for asylum, the respondent stated that before leaving Israel in 1990, he "was constantly subjected to mistreatment by the Israeli military." (Exhibit 3) However, the respondent also stated that the "entire population was subjected to similar abuse." Id. The respondent's asylum application further states that he fears "the Israeli military may want to interrogate, torture or kill [him] to gain information or punish [him] for imputed political opinion." Id.

The respondent testified briefly in support of his applications for asylum and withholding of removal. Although the respondent described the general situation in Gaza at the time he left as somewhat chaotic and violent, he did not describe any specific problems that he had with the Israeli authorities. If fact, Kiareldeen stated that he had not had any problems, either legal or

19

political while residing in Gaza. The respondent did state that, at the time he left Gaza, the area had become too violent, and he could not continue to work because he could not cross over into Israel. The respondent did not further elaborate on any other troubles he may have had while living in Gaza, nor did he mention the mistreatment his asylum application alleges he was subjected to. No evidence was presented that the respondent's parents or sibling have ever been persecuted. Gaza is presently governed by Palestinian authorities. The respondent also did not specify what evidence he possessed which caused him to believe he might be interrogated, tortured, or killed, if removed to Israel. It is significant that the respondent failed to apply for asylum prior to being placed in removal proceedings although he has been in the United States since 1990.

The respondent's application for asylum must be examined to determine if it is inherently plausible. See, Matter of S-M-J-, supra. The respondent has submitted voluminous documentation setting forth general country conditions in Israel, that country's human rights record, and strife within the Occupied Territories. All the documents submitted were carefully reviwed, including the State Department's The Occupied Territories- Report on Human Rights Practices for 1997, January 30, 1998. (Exhibit 3) According to the State Department, the Palestinian Authority now has full or partial control over most major Palestinian population centers in the Gaza strip. The report does state that, in the wake of terrorist bombings, the Israeli authorities arrested hundreds of Palestinians suspected of affiliation with extremist Islamic opposition groups, and that those arrested were abused and in some cases even tortured. Id.

The respondent has not submitted any evidence that persons in his position, i.e. those who have had allegations of terrorism leveled against them in the United States but have never been tried on those allegations, who have returned to Israel or the Occupied Territories, have suffered from any form of persecution. The respondent has submitted compelling evidence that many Palestinians in Israel are mistreated, but this evidence does not suggest systematic persecution of the entire population.

The respondent has submitted no evidence, aside from his own speculation, which would suggest that he faces any real danger of being persecuted should he be returned Israel. Many members of the respondent's family are currently living in Gaza, and have apparently experienced no difficulties whatsoever.

For the above reasons, the respondent has not met the burden of proof and persuasion set forth in 8 C.F.R. §208.13(a). The respondent has not established that he has suffered persecution as defined by the Act. Nor has he shown a well founded fear of future persecution.

Finally, even if the respondent had met his evidentiary burden of proof and persuasion, the Service maintains the respondent is statutorily ineligible for the reliefs of asylum and adjustment of status because his asylum application is untimely pursuant to section 208(a)(2)(B) of the Act. The respondent argues that, while it is true that the application for asylum was made well over a year following his entry into the United States, he falls under the exception to this

20

time limit provided in section 208(a)(2)(D) of the Act. The respondent's argument is that his claim is solely that, as a result of these proceedings and the allegations that he was involved in the World Trade Center bombing, he would be subject to punishment, imprisonment, torture, or other forms of persecution if he were returned to Israel. The respondent's speculation on persecution he might face because of these proceedings does not amount to changed circumstances which materially affect his eligibility for asylum.

Having determined the respondent has failed to meet the burden of proof and persuasion set forth in 8 C.F.R. §208.13(a), the respondent's application for asylum must be denied. Further, as the respondent has not met the burden of proof and persuasion for a grant of political asylum, he is *a fortiori* ineligible for withholding of removal or relief under the Torture Convention with their higher evidentiary burdens. 8 C.F.R. § 208.16(a).

Accordingly, after a careful review of the record, the following orders will be entered:

ORDER:     IT IS ORDERED that the respondent's application for asylum pursuant to section 208 of the Act be and the same is hereby DENIED.

IT IS FURTHER ORDERED that the respondent's application for withholding of removal pursuant to section 241(b)(3) of the Act be and the same is hereby DENIED.

IT IS FURTHER ORDERED that the respondent's application for relief pursuant to the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment be and the same is hereby DENIED.

IT IS FURTHER ORDERED that the respondent's application for adjustment to conditional permanent resident status pursuant to section 245(a) of the Immigration and Nationality Act be GRANTED.

Date: APRIL 2, 1999

Daniel A. Meisner
Immigration Judge

21

Kiareldeen Exhibits

Exhibit 1: NTA;
Exhibit 2: Application for Adjustment of Status and accompanying documents;
Exhibit 3: Application for Asylum and accompanying documents;
Exhibit 4: The Respondent's "Motion for Issuance of Subpoenas" and accompanying documents;
Exhibit 5: Copies of this Court's Subpoena Orders to the Registrar's Office of Essex County
        Community College, Bell Atlantic-New Jersey, Hackensack University Medical Center,
        and Public Service Electric and Gas;
Exhibit 6: Bell Atlantic-New Jersey Response to Subpoena of July 15, 1998;
Exhibit 7: Motion for Bond Redetermination, Motion for Issuance of Subpoenas, Affidavit of
        Support, and accompanying documents;
Exhibit 8: Copy of this Court's Decision Denying the Respondent's Motion for the Issuance of
        Subpoenas and briefs of both parties on the issue;
Exhibit 9: Copies of this Court's Subpoena Order to Ms. Janina Lach;
Exhibit 10: The Respondent's "Motion for Issuance of Subpoena" to Ms. Amal Kamel and
        accompanying documents;
Exhibit 11: Copies of this Court's Subpoena Order to Ms. Amal Kamel;
Exhibit 12: The Respondent's "Motion for Issuance of Subpoena" to Mr. Samir Taraby and
        accompanying documents;
Exhibit 13: Copies of this Court's Subpoena Order to Mr. Samir Taraby;
Exhibit 14: Copy of the Results of a FBI fingerprint check;
Exhibit 15: Copies of this Court's Subpoena Order to Mr. John J. Ross, Jr., and Return of
        Service of same;
Exhibit 16: Report of the Forensic Document Laboratory;
Exhibit 17: Additional documentary evidence from the Respondent dated July 30, 1998;
Exhibit 18: Additional documentary evidence regarding the Affidavit of Support filed by Carmen
        Kiareldeen;
Exhibit 19: Information regarding the Respondent's previous residences and additional
        documentary evidence in support of the Respondent's application for adjustment of
        status;
Exhibit 20: Copy of this Court's Subpoena Order to Ms. Nabilia Safwat;
Exhibit 21: Request that hearings be open to the public and copies of Birth Certificates;
Exhibit 22: Additional documentary evidence regarding the Respondent's identity;
Exhibit 23: The Respondent's "Motion for Issuance of Subpoena" to the Service;
Exhibit 24: Advisory Opinion from the Department of State regarding the Respondent's Asylum
        Application;
Exhibit 25: Classified information submitted by the Service;
Exhibit 26: Copy of the Respondent's New Jersey automobile operating license;
Exhibit 27: Documents from Essex County College;
Exhibit 28: Automobile accident report;
Exhibit 29: Letter from the Tax Assessor of Elmwood Park;
Exhibit 30: Ford Auto Club membership card;
Exhibit 31: Investigation Report from the Nutley Police Department, dated February 10, 1995;
Exhibit 32: Investigation Report, dated March 3, 1996;

Exhibit 33: Investigation Report, dated July 22, 1994;

Exhibit 34: Letter from the Service to The Respondent requesting original of Birth Certificates

Exhibit 35: The Respondent's reply to the Service, Letter to this Court from Respondent regarding *in camera* and classified;

Exhibit 36: Letter from the Respondent to the Service regarding classified evidence.

Exhibit 37: Letter from The Respondent to Office of General Counsel;

Exhibit 38: Originals of documents re Respondent's father in Gaza;

Exhibit 39: Bell Atlantic Subpoena, and response;

Exhibit 40: Service motion *in limine* to limit witness questioning;

Exhibit 41: The Respondent's brief in Support of compelling ex-wife;

Exhibit 42: Service response;

Exhibit 43: This Court's letter asking the U.S. Attorney's assistance to compel testimony;

Exhibit 44: The Respondent letter with copy of Judge Barry's decision;

Exhibit 45: August 19, 1998 letter Respondent's motion for issuance of subpoenas;

Exhibit 46: Service opposition to issuance of subpoenas;

Exhibit 47: This Courts decision concerning the issuance of subpoenas;

Exhibit 48: Letter from The Respondent, request for subpoenas and exhibits;

Exhibit 49: September 8, 1998 letter from The Respondent, police reports;

Exhibit 50: Service submission of Police Reports;

Exhibit 51: The Respondent's submission of September 18, 1998, re: Police Reports;

Exhibit 52: The Respondent's motion for issuance of subpoena and attachments;

Exhibit 53: This Court's decision denying subpoena for Laura Ann Russo;

Exhibit 54: Motion to Suppress and Exclude evidence;

Exhibit 55: This Court's decision on the Respondent's motion to Suppress and Exclude;

Exhibit 56: Document's relating to subpoena for the Star Ledger;

Exhibit 57: The Respondent's letter to Police Officer Joynt;

Exhibit 58: The Respondent's motion to set a prompt date for individual hearing;

Exhibit 59: 7 December 1998 decision rescheduling the proceedings;

Exhibit 60: Schulman motion to withdraw as Counsel and decision granting motion;

Exhibit 61: The Respondent's letter to the Court with exhibits and copies of motions

Exhibit 62: Services response to the Respondent's motion for a prompt hearing date;

Exhibit 63: This Court's decision on Respondent's motions;

Exhibit 64: The Respondent's brief regarding a prompt hearing date;

Exhibit 65: The Respondent's January 11, 1999, subpoena request;

Exhibit 66: Service's opposition to subpoena;

Exhibit 67: The Respondent's motion for a prompt hearing date;

Exhibit 68: Services response to the Respondent's motion for a prompt hearing date;

Exhibit 69: January 24, 1999 letter to Court from the Respondent;

Exhibit 70: Letter requesting a prompt hearing date;

Exhibit 71: Documents supporting the Respondent's applications;

Exhibit 72: Respondent's Submission Exhibit's A-M discussing FOIA application made by press;

Exhibit 73: Submission re: Dr Mylroie;

Exhibit 74: Services opposition to allowing Dr. Mylroie appear;

Exhibit 75: Affidavit of Marc Gettis;

Exhibit 76: Birth Certificates of the Respondent and the Respondent's Brother;

Exhibit 77 (for identification): All documents relating to proceedings before federal courts;

Exhibit A: The Respondent's Brief requesting the exclusion of *in camera* and *ex parte* evidence;

Exhibit B: The Respondent's Brief regarding relief under the Torture Convention;

Exhibit C: The Service's Briefs on the admissibility of *in camera* and *ex parte* evidence and relief under the Torture Convention;

Exhibit D: The Respondent's Motion to Record all *In Camera* and *Ex Parte* Evidence and to Cross Examine the Sources of the Classified Evidence;

Case 1:99-cv-03458-JAL Document 4 Entered on FLSD Docket 12/23/1999 Page 102 of 183
10/28/1999 15:42 19736243665 REGIS FERNANDEZ PAGE 18



**U.S. Department of Justice**

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

*5201 Leesburg Pike, Suite 1300*
*Falls Church, Virginia 22041*

Fernandez, Regis, Esquire
744 Broad Street, Suite 1807,
Newark, NJ 07102-3867

Office of the District Counsel/NE
970 Broad St., Rm. 1104B
Newark, NJ 07102

Name: KIARELDEEN, HANY MABMOUD                A77-025-332

<u>D</u>ate of this notice: **10/15/1999**

Enclosed is a copy of the Board's decision and order in the above-referenced case.

Very Truly Yours.

Paul W. Schmidt
Chairman

Enclosure

Panel Members:
    HURWITZ, GERALD S.
    MILLER, NEIL P.
    VACCA, FRED W.

**U.S. Department of Justice**
Executive Office for Immigration Review

Decision of the Board of Immigration Appeals

Falls Church, Virginia 22041

File:   A77 025 332 - Newark                    Date:   OCT 1 5 1999

In re:   HANY MAHMOUD KIARELDEEN a.k.a. Hany Kiareldeen a.k.a. Hany Khiareldeen
a.k.a. Hany Mabmoud Kiareldeen

IN REMOVAL PROCEEDINGS

APPEAL

ON BEHALF OF RESPONDENT:    Regis Fernandez, Esquire
                            744 Broad Street, Suite 1807
                            Newark, New Jersey 07102

ON BEHALF OF SERVICE:       Todd Witten
                            Assistant District Counsel

CHARGE:

    Notice:        Sec.    237(a)(1)(C)(i), I&N Act [8 U.S.C. § 1227(a)(1)(C)(i)] -
                           Nonimmigrant - failed to comply with conditions of status

APPLICATION:       Asylum; withholding of removal; adjustment of status; voluntary
                   departure; relief under the Convention Against Torture


     In a decision dated April 2, 1999, an Immigration Judge found the respondent removable as charged, denied his applications for asylum and withholding of removal under sections 208 and 241(b)(3) of the Immigration and Nationality Act, 8 U.S.C. §§ 1158 and 1231(b)(3) (Supp. II 1996), and denied his request for relief under Article 3 of the Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, Annex, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/39/51 (1984) ("Convention Against Torture"). In addition, the Immigration Judge granted the respondent's application for adjustment of status under section 245(a) of the Act, 8 U.S.C. § 1255(a) (Supp. II 1996), and thus did not reach the issue of the respondent's eligibility for voluntary departure. The respondent has appealed the denial of asylum, withholding of removal, and relief under the Torture Convention. The Immigration and Naturalization Service ("Service") has filed a cross-appeal, challenging the Immigration Judge's grant of adjustment of status. The Service's appeal will be dismissed on the merits and the respondent's appeal will be dismissed as moot. The respondent's request for oral argument before the Board is denied.

A77 025 332

## I. PROCEDURAL HISTORY

The respondent is a Palestinian and a native and citizen of Israel. [1] He was admitted to the United States on April 27, 1990, with a student visa which authorized him to remain in the United States during the course of his studies. On March 26, 1998, the Service issued the respondent a Notice to Appear (Form I-862, Exh. 1), which charged that he was subject to removal under section 237(a)(1)(C)(i) of the Act, 8 U.S.C. § 1227(a)(1)(C)(i), for failing to comply with the conditions of the nonimmigrant status under which he was admitted. At a hearing on May 22, 1998, the respondent, through counsel, admitted the allegations contained in the Notice to Appear and conceded removability as charged (Tr. at 4). The respondent then indicated his intent to seek adjustment of status to that of a conditional permanent resident under sections 245 and 216 of the Act, 8 U.S.C. §§ 1255 and 1186a, based upon his marriage to a United States citizen. He also requested relief in the form of asylum, withholding of removal, Torture Convention protection and, in the alternative, voluntary departure (Tr. at 6).

On June 12, 1998, the respondent submitted his application for adjustment of status (Form I-485), along with supporting documentation, including a notice that the visa petition filed on his behalf had been approved on June 2, 1998 (Form I-797) (Exh. 2). He also submitted his application for asylum and withholding of removal (Exh. 3). At a hearing on June 26, 1998, the Immigration Judge indicated that the Service had presented him with classified evidence from the Federal Bureau of Investigation ("FBI") in opposition to the respondent's applications for relief. The respondent was provided with an unclassified summary of this evidence, dated May 22, 1998, which reads in pertinent part:

> The Joint Terrorism Task Force of the Federal Bureau of Investigation's (FBI) Newark Division developed information that [the respondent] is a suspected member of a terrorist organization. Information has disclosed [the respondent] maintains relationships with other members and or suspected members of terrorist organizations dedicated to committing acts of violence against the people of the United States or its allies.

> A source advised that approximately one week before the bombing of the World Trade Center (WTC), New York, [the respondent] was present at a meeting with several individuals who were talking about plans to bomb the WTC. The meeting took place at [the respondent's] residence in Nutley, New Jersey. According to a source, NIDAL AYYAD (AYYAD) was present at this meeting (AYYAD is a convicted co-conspirator in the WTC bombing). AYYAD did most of the talking about bombing the WTC as the others listened. . . .

---

[1] Although on appeal the respondent claims to be stateless, at the hearing he admitted the allegation in the Notice to Appear regarding his Israeli citizenship (Tr. at 4).

2

A77 025 332

> Recently, a source advised [the respondent] expressed a desire to murder Attorney General JANET RENO for her role in the conviction of those responsible for the bombing of the World Trade Center. The information developed indicates that [the respondent] poses a credible threat to Attorney General RENO and potentially others within the United States. A source advised [the respondent] stated in the presence of others that they, including himself, must kill JANET RENO. Furthermore, [the respondent] stated that an additional person would assist in the murder of the Attorney General. The FBI took additional steps to test the veracity of the source reporting the threat against the Attorney General. [2]

The respondent objected to the use of secret evidence. On July 15, 1998, the Service made a motion in limine seeking to preclude the respondent from questioning witnesses regarding whether they had spoken to or been contacted by law enforcement agents, in order to protect the classified sources (Tr. at 35-40; Exh. 40). The motion was denied, and the Immigration Judge decided that such determinations would be made on a question-by-question basis (Tr. at 41).

On August 11, 1998, the Immigration Judge admitted into evidence the classified and unclassified material, over the respondent's objections (Tr. at 55-56). Then testimony was received from the respondent (Tr. at 62-245), as well as from Michael Campana, an attorney who had represented the respondent in his defense against domestic violence charges lodged by his ex-wife (Tr. at 246-268). On August 12, 1998, the respondent's current wife, Carmen Negron, testified (Tr. at 279-323), as did the respondent's ex-wife, Amal Kamel, [3] who appeared pursuant to the respondent's subpoena (Tr. at 324-357). Ms. Kamel admitted that she had spoken to the FBI, but she refused to answer questions about the content of these discussions, stating that her life and the lives of her children had been threatened (Tr. at 350-353). The Immigration Judge determined that he was without authority to compel the witness to testify, and he adjourned the matter pursuant to 8 C.F.R. § 3.35(b)(6) (1997). That regulatory provision states that if a witness refuses to testify as directed by the subpoena served upon him or her, the Immigration Judge who issued the subpoena shall request the United States Attorney to report such refusal to the United States District Court for an order requiring the witness to testify as directed. In response to the United States Attorney's report, the district court issued an order permitting the parties to question Ms. Kamel through the use of written interrogatories (Exh. 77). Neither the respondent nor the Service chose to do so, however.

On February 16, 1999, Laurie Mylroie, Ph.D., was accepted as an expert witness with regard to the World Trade Center bombing, over the Service's objections (Tr. at 385), and testified (Tr. at 370-431). In addition, the respondent presented testimony from a number of friends and former roommates, including Hector Vera (Tr. at 432-77), Mansour Saqfelhait (Tr. at 477-505), and Emad Qadi (Tr. at 508-42), as well as from his sister-in-law, Lily Hodge (Tr. at 542-59). On February 17,

---

[2] The July 29, 1998, unclassified summary from the FBI is essentially identical to this summary.

[3] The record reflects that the respondent's ex-wife is known by a number of names. We will refer to her as "Amal Kamel," the same name used by the Immigration Judge in his decision.

3

A77 025 332

1998, the respondent's lawful permanent resident brother testified (Tr. at 577-656), as did Joan Perez Sousa, the respondent's co-worker and friend (Tr. at 657-71). The Service did not present any witnesses. Numerous exhibits were submitted by both parties (Exhs. 1-76).

## II. TESTIMONY PRESENTED

### A. Testimony of the respondent

The respondent testified that he was born in Gaza on January 30, 1968. He stated that his father taught English for the United Nations and that his mother was a housewife. He said that both of his parents resided in Gaza, as did one of his three brothers and both of his sisters (Tr. at 62-65). The respondent advised that on April 27, 1990, he was admitted to the United States with a student visa to attend a language program at Rutgers University (Tr. at 68). He indicated that after studying at Rutgers for a few months, he transferred to Essex County College, where he studied mechanical engineering.

The respondent further related that when he first arrived in the United States, he lived in Newark for a couple of months with his brother and a friend named Nidal Rasheed (Tr. at 69-70). He stated that in the summer of 1990, he and his brother relocated to 50 Prospect Street in Garfield, New Jersey (Tr. at 71), where the respondent resided until February 1994. The respondent testified that he was therefore living in Garfield at the time of the February 26, 1993, World Trade Center bombing (Tr. at 140). He said that when they moved in, the residence was already occupied by a friend of his brother named Mohammed Abdeljaber and another man named Sayid, who has since returned to Israel (Tr. at 71-72). He advised that in September 1991, Mr. Abdeljaber moved out of the apartment and Mansour Saqfelhait moved in (Tr. at 73-74). The respondent also indicated that Esam Zemah stayed with them from December 1991 through March 1992 (Tr. at 75-76).

In addition, the respondent stated that in April or May of 1993, he met his first wife, Amal Kamel, at a nightclub in Saddlebrook, New Jersey (Tr. at 102). He said that she was living in Rhode Island at the time (Tr. at 104). According to the respondent, they married on October 15, 1993, and on January 30, 1994, their daughter, Nour, was born (Tr. at 100). The respondent also indicated that he had been working part-time delivering pizzas in Hackensack while attending school (Tr. at 92). He advised that in late 1993 or early 1994, he stopped attending classes and began working full-time to support his new family (Tr. at 69). He said that in late 1994, he began working at Infiniti Sound, an electronics store owned by his brother (Tr. at 98).

The respondent testified that in mid-1994, he and his wife, their newborn daughter, and his wife's other two children from a previous relationship moved from 50 Prospect Street in Garfield to an apartment at 66 Jackson Avenue in Hackensack, New Jersey (Tr. at 81-82, 108). He stated that in October 1994, they moved to 207 High Street in Nutley, New Jersey (Tr. at 83). The respondent emphasized that he had never lived in Nutley prior to that time (Tr. at 83) and that he did not know who had lived there before him (Tr. at 87). He testified that he sublet the basement of the house to his friend, Nidal Rasheed, and that after Mr. Rasheed moved out, his brother and his friend Hector Vera moved in around April 1995 (Tr. at 84-86).

4

10/28/1999  15:42   19736245665              REGIS FERNANDEZ                      PAGE  20

A77 025 332

The record reflects that the respondent and his wife, Ms. Kamel, began to experience marital difficulties in early 1995. On March 18, 1995, Ms. Kamel called the police alleging that the respondent had struck her in the face, and the respondent was arrested (Exh. 50-A). The following day, she called the police once again, alleging that the respondent had bent back her thumb, and the respondent was again arrested (Exh. 50-B). A police report dated March 20, 1995, also indicates that Ms. Kamel "contacted HQ and spoke with Detective Barry regarding information she wanted to volunteer" about the respondent and his brother. According to the report, Ms. Kamel stated that the respondent and his brother "are in this country illegally in that their visas are expired. She also made allegations about their activities and their ties to certain Islamic groups . . . . Special Agents . . . of the FBI were also contacted and provided with the information and allegations" (Exh. 50-A). In his testimony, the respondent explained that these charges were false and that his wife had lodged the complaints in retaliation for his refusal to take her out for the evening (Tr. at 110). Both complaints were dismissed on March 24, 1995, upon Ms. Kamel's withdrawal of the charges (Exh. 50-A).

The respondent testified that he moved out of the house in Nutley in the summer of 1995 to avoid further problems with his wife (Tr. at 84). He indicated that thereafter, he lived in various places, including Martha Avenue in Elmwood Park, New Jersey, 39 Westervelt Place in Passaic, New Jersey, where he lived with his brother, and 205 Van Houten Street in Passaic, New Jersey (Tr. at 88-89; Exh. 19). He said that in April 1997, he moved to his present residence in Bloomfield, New Jersey. According to the respondent, he and Ms. Kamel divorced on June 11, 1997 (Tr. at 109).

The record reflects that on four further occasions between November 1995 and July 1997, Ms. Kamel filed criminal charges against the respondent, all of which were ultimately dismissed (Tr. at 109-128). On November 1, 1995, Ms. Kamel alleged that the respondent had stolen some of her possessions, and he was charged with theft and unlawful taking. Ms. Kamel was granted a temporary restraining order (TRO) on November 8, 1995, but the charges were dismissed and the TRO was vacated on December 6, 1995 (Tr. at 114; Exhs. 51-F; 17-F). On May 18, 1997, Ms. Kamel filed a complaint against the respondent for an assault which she alleged occurred during a disagreement over visitation rights regarding their daughter (Exh. 17-F). After a hearing on the merits in the Superior Court, Hudson County Family Court, the judge found that Ms. Kamel had failed to establish that she had been a victim of domestic violence (Exhs. 17 G and H, transcripts from hearing). The TRO was vacated and the complaint was dismissed.

The respondent indicated that on July 18, 1997, his former mother-in-law refused to release his daughter to him for visitation. On July 23, 1997, Ms. Kamel reported to the police that on July 18, 1997, the respondent had told her mother that he would place a bomb in Ms. Kamel's car (Tr. at 118). A hearing was held in October 1997, before a Superior Court family law judge, on Ms. Kamel's request for a domestic violence restraining order. The judge concluded that the allegations of threats made by the respondent on July 18, 1997, to his former mother-in-law were not credible. Ms. Kamel's complaint was dismissed, and the judge denied the request for a restraining order (Exh. 17-L, at 82).

5

A77 025 332

Finally, on September 1, 1997, Ms. Kamel filed child abuse charges against the respondent in the Bloomfield Municipal Court. These charges were dismissed on February 18, 1998 (Tr. at 115-116; Exh. 57-C).

The respondent testified that he married his current wife, Carmen Negron, in August 1997 (Tr. at 89), and that she and her son, Brian, moved in with him. The respondent vehemently denied all of the allegations in the unclassified summary and insisted that they were a "total fabrication" and "absolutely false" (Tr. at 140-145). He believed that the report was based on lies by his ex-wife (Tr. at 116, 122). The respondent testified that he had "never been religious" (Tr. at 108) or an extremist (Tr. at 116). He denied any acquaintance with Nidal Ayyad (Tr. at 140), denied threatening Janet Reno (Tr. at 143), and insisted that he was living in Garfield, not Nutley, during the week prior to the World Trade Center bombing (Tr. at 140).

### B. Testimony of Michael Campana

Mr. Campana represented the respondent on two occasions in 1997 in his defense against the charges brought against him by Ms. Kamel. He testified that in his 20 to 30 meetings with the respondent, he had never seen him exhibit a temper (Tr. at 260). Mr. Campana also referred to an April 2, 1998, letter which he sent to the Immigration Judge regarding the domestic violence complaints filed by Ms. Kamel. In that letter he wrote, "It is my opinion that [Ms. Kamel] has engaged in a course of behavior whose intended result is to harass [the respondent] and frustrate his attempts to exercise any type of relationship with his daughter" (Tr. at 262; Exh. 57-C).

### C. Testimony of Carmen Negron

Carmen Negron, the respondent's current wife, testified that she first met the respondent in the winter of 1995, and that they began dating in the summer of 1996. She described the respondent as "the most caring and loving person anyone could know" (Tr. at 285). She stated that she had a son with whom the respondent had developed a close relationship. Ms. Negron testified that her son had been upset by the respondent's absence during his detention and that she had received many calls from her son's school telling her that he had been crying because he missed the respondent (Tr. at 287). She said that she had sent her son to spend the summer with family in Puerto Rico to distract him from the situation (Tr. at 287). Ms. Negron also advised that the separation from the respondent had a great emotional impact on her too, causing her to be depressed and a "wreck" emotionally (Tr. at 298). She stated that since the respondent had been detained, he had been calling her constantly to see how she and her son were doing (Tr. at 286, 300).

Ms. Negron also testified that the respondent had never tried to harm her or her son in any way (Tr. at 300). In addition, she stated that it had been more difficult to pay the bills since the respondent had been detained, because he was "the main provider" (Tr. at 306). Ms. Negron indicated that the respondent's brother had helped her financially, and that she had been required to

6

A77 025 332

work more hours to earn more money. She acknowledged that the respondent had not paid child support for his daughter Nour for the previous 7 months due to his incarceration. She noted that the respondent's father occasionally sent him money (Tr. at 314-15). Ms. Negron did not know how that money was conveyed to him (Tr. at 320), explaining that the respondent usually gave it to her in cash to deposit in their bank account.

Ms. Negron testified that she was acquainted with many of the respondent's friends. She related that she and the respondent had gone out socially with these friends to restaurants where they all consumed alcohol, and that these friends often came over to the house on weekends for dinner (Tr. at 290). She stated that neither the respondent nor his friends were particularly religious (Tr. at 289). Ms. Negron also said that the respondent had never expressed any interest in going to a mosque, but that he did go to church with her on occasion (Tr. at 283-84). She testified that the respondent had never talked about the World Trade Center bombing and that he had not known who Janet Reño was (Tr. at 302).

### D. Testimony of Amal Kamel

Ms. Kamel, the respondent's ex-wife, testified that she came to the United States from Egypt in October 1986 on a visitor's visa (Tr. at 337). She said that during her first 2 years in this country, she lived in New York with a man by whom she had two children, and that she then moved to Rhode Island (Tr. at 339). Over the Service's objections, she admitted that she had spoken to agents from the FBI and that she had been asked "to confirm some information" (Tr. at 350). She refused to testify any further about the matter, however, claiming that her life had been threatened (Tr. at 350). The case was adjourned at the respondent's request to seek a district court order to compel her to testify. The district court judge dismissed the complaint upon a motion by the United States Attorney. The Immigration Judge then permitted the parties to pose questions to Ms. Kamel in the form of written interrogatories, but neither side chose to pursue this opportunity (Tr. at 361). The respondent objected to the interrogatories because of a belief that the Service had worked with the U.S. Attorney's office and that they would then collaborate on the answers for Ms. Kamel (Tr. at 362).

### E. Testimony of Dr. Laurie Mylroie

Dr. Mylroie testified that she earned a bachelor's degree from Cornell University and a Ph.D. from Harvard University in Gulf Security (Tr. at 371-72). She said that she had also taught as an assistant professor at Harvard University and as an associate professor at the U.S. Naval War College in Newport, Rhode Island. She indicated that she had been published in The New York Times, The Wall Street Journal, and National Interest on the subject of middle eastern terrorism, and that she received a journalism award for her article in National Interest on the World Trade Center bombing

7

A77 025 332

(Tr. at 372-3). Dr. Mylroie testified that she had done "considerable research" on the World Trade Center bombing, and that she served as a consultant to both ABC News and Newsweek in the spring of 1994 following the conclusion of the first World Trade Center bombing trial of Mohammed Salaamed. She stated that her research on the World Trade Center bombing involved analysis of "thousands of pages of material and documents" (Tr. at 375). She indicated that she subsequently co-authored a book about the bombing, which was praised by James M. Fox, who served as the director of the New York office of the FBI at the time of the bombing (Tr. at 375, 408). Dr. Mylroie advised that she also was the publisher of a newsletter entitled, "Iraq News," with a circulation of about 1,000 (Tr. at 379). She said that she possessed a secret security clearance which was granted to her when she worked at the U.S. Naval War College (Tr. at 380). Her field of expertise, for purposes of the respondent's hearing, was narrowed to the study of the World Trade Center bombing and the profiles of the conspirators involved (Tr. at 381-82).

Dr. Mylroie testified that she had studied the evidence presented in the first World Trade Center trial, at which conspirators Mohammed Salameh, Mahumud Abouhalma, Ahmad Ajaj, and Nidal Ayyad were convicted for their role in the bombing (Tr. at 386). She said that this evidence included telephone toll records, passports, airline tickets, and consular documents (Tr. at 386). She stated that the telephone toll records, which the government relied on to establish the existence of the conspiracy, revealed that Ramzi Yousef was at the center of the conspiracy and spoke to all of the co-conspirators, but that the other defendants did not necessarily speak with one another (Tr. at 387). Dr. Mylroie testified that the records indicated that "the final green light for that bombing was given after the November 1992 presidential elections because shortly after that Ramzi Yousef began calling companies to purchase chemicals and supplies for the bombing" (Tr. at 388). She also stated that with the exception of Ramzi Yousef, none of the co-conspirators attempted to conceal their identities, calling from their homes and offices (Tr. at 389-90). She said that she had reviewed all of the telephone toll records during 1992 and 1993 for the co-conspirators, including those of Nidal Ayyad, and had cross-referenced them against the respondent's home and work numbers. Dr. Mylroie indicated that no match was found, despite the fact that Nidal Ayyad "was one of the conspirators who gave away his role in the conspiracy because of his telephone records" (Tr. at 389-90). She also noted that the respondent's name did not appear in the evidence she reviewed.

Dr. Mylroie advised that in her analysis, she had concluded that Ramzi Yousef used Muslim extremists "inclined to violence against the United States to carry out this act of terrorism" (Tr. at 386). She said that her research revealed that Nidal Ayyad "was motivated by anti-American and anti-Israeli feelings and a sense of pride that Moslems could carry out such a bombing" (Tr. at 386). In her opinion, based upon the information she had been given about the respondent, the respondent did not fit the profile of the Muslim extremists responsible for the World Trade Center bombing. She noted in particular that the respondent drank alcohol, that he did not appear to be religious or to have any strong political or ideological beliefs, and that his friend Mr. Vera was not someone whom a Muslim fundamentalist would associate with (Tr. at 392-93, 417).

8

A77 025 332

Dr. Mylroie was shown a copy of the July 29, 1998, unclassified summary. She testified that the statement therein, that the respondent "maintains relationships with other members and or suspected members of terrorist organizations," is inconsistent with the FBI's position that none of the individuals involved in the bombing was a member of a known terrorist organization (Tr. at 393). She also stated that if the allegation that the respondent hosted a meeting attended by Nidal Ayyad 1 week before the bombing was correct, "it should have come out" at one of the trials of the convicted conspirators, which it did not, or the respondent should have been charged for failure to warn of the bombing (Tr. at 394-95).

Dr. Mylroie testified that based upon her review of the unclassified summary and her analysis of the World Trade Center bombing, her opinion was that there was no reasonable ground to believe that the respondent had engaged in terrorist activity or that his presence in the United States threatened national security (Tr. at 405). She said that she was not particularly sympathetic to the Palestinian cause, and indicated that members of her extended family had perished in the Holocaust (Tr. at 407-08). She stated that there was no reason to believe the allegations against the respondent, and opined that they were the result of actions of a "disgruntled" former wife from an "unfortunate marriage" (Tr. at 408).

On cross-examination, Dr. Mylroie admitted that she was not involved in the official investigation of the World Trade Center bombing, but noted that she had reviewed thousands of pages of evidence from the first World Trade Center trial and had worked with ABC News and Newsweek. She testified that in the course of her research, she had interviewed "numerous" government officials, who provided information to her, although none of it was classified (Tr. at 408-09). Dr. Mylroie also admitted that the telephone records would not indicate a personal meeting or pay telephone calls (Tr. at 418-19). She added, however, that it did not appear that the conspirators utilized pay telephones to obscure their communications, given that their calls turned up "so frequently and blatantly on the telephone toll records" (Tr. at 418, 428).

F. Testimony of Hector Vera

Mr. Vera testified that he first met the respondent at the end of 1993 at the electronics store where they both worked (Tr. a 434). He said that he first visited the respondent at his home in February 1994 in Hackensack, when he went there to babysit the respondent's children (Tr. at 436). He stated that thereafter, he would watch the children almost every weekend and sometimes during the week, until the beginning of 1996 (Tr. at 436). Mr. Vera described the respondent as a caring and loving person who would not harm anyone or anything (Tr. at 451). He also testified that Ms. Kamel had told him that the respondent and his brother were conspirators in the World Trade Center bombing and that they were exporting and importing guns through the store (Tr. at 452-53). He said that he knew that these allegations were untrue, because he had been around the respondent and his brother "24 hours a day," both working with them and living with them (Tr. at 453). He testified that the FBI searched the store in May 1998 looking for guns but found nothing (Tr. at 454-55). Mr.

9

A77 025 332

Vera further stated that the respondent had never threatened Janet Reno and did not belong to a terrorist organization (Tr. at 455). He also related that the respondent had told him that he loved America (Tr. at 456).

### G. Testimony of Mansour Saqfelhait

Mr. Saqfelhait testified that he met the respondent in 1990, and lived with the respondent and his brother from September 1991 through September 1993 on Prospect Street in Garfield (Tr. at 479). He stated that during the entire time that he lived there, the respondent resided there as well (Tr. at 479). To Mr. Saqfelhait's recollection, no meetings were held at their home in Garfield during the weeks prior to the bombing, and he testified that it would not have been possible for such a meeting to have taken place without his knowledge because he used to be with the respondent "all the time," as they were close friends (Tr. at 481-82). Mr. Saqfelhait testified that he knew all the people the respondent knew (Tr. at 483). He explained that when they lived together, there was little privacy and anyone could answer the phone (Tr. at 482-83). He said that he had never met Nidal Ayyad, and had only heard his name on the news.

In addition, Mr. Saqfelhait claimed that the respondent could never have had involvement with anyone who took part in the World Trade Center bombing (Tr. at 489). He asserted that the respondent was not associated with any terrorist organizations and that he held no strong political or religious views (Tr. at 489). He testified that the respondent loved the United States, which he had "chosen" to be his country (Tr. at 490). Mr. Saqfelhait also said that the respondent was not a violent man and was in fact very gentle (Tr. at 485). According to Mr. Saqfelhait, the respondent was a good father to his daughter and would treat his stepchildren "like his own kids" (Tr. at 488).

### H. Testimony of Emad Qadi

Mr. Qadi testified that he met the respondent at a social club in January 1991 (Tr. at 509). He stated that he visited the respondent on Prospect Street in Garfield in early 1991, and last visited him there in early 1993 (Tr. at 511). He said that he had seen the respondent about 30 times since 1993, including in July 1995 at the respondent's residence in Nutley (Tr. at 512, 525). Mr. Qadi did not believe the allegations against the respondent because he found the respondent to be a gentle, nonviolent person who loved the United States and "always made comparison [sic] between this country and our regimes back in the Middle East" (Tr. at 523, 517, 526). He testified that the respondent did not believe in the cause of the terrorist groups (Tr. at 527), and that he was not political or religious (Tr. at 517). Mr. Qadi also related that he had seen the respondent with his child and with Ms. Kamel's two children, and that he was a loving father (Tr. at 516).

10

A77 025 332

## I. Testimony of Lily Damiano Hodge

Lily Hodge is married to the respondent's brother. She testified that she had been raised as an Orthodox Jew but now considered herself to be a "nonpracticing Jew." She said that she first met the respondent in July 1994, when she babysat his children (Tr. at 544). Ms. Hodge described Ms. Kamel as "extremely cold," "cruel," "very manipulative," and "spiteful" (Tr. at 545). She stated that the respondent believed in America and would never do anything against the United States. She also testified that he was not political, religious, or an extremist. Ms. Hodge further asserted that the respondent "would have no reason to hurt anybody. He wouldn't even hurt this vindictive woman that was, that was harassing him continually. Why would he hurt somebody he didn't even know?" (Tr. at 550).

## J. Testimony of the respondent's brother

The respondent's brother testified that he and the respondent resided at 50 Prospect Street in Garfield during February 1993, when the respondent is alleged to have resided in Nutley (Tr. at 582). He characterized the allegations against the respondent as "ludicrous" (Tr. at 599), and stated that no such meeting did take place or could have taken place at their home in Garfield without his knowledge (Tr. at 582-83). He testified that there was not much privacy, and that "we did pretty much everything together" (Tr. at 583).

The respondent's brother stated that when he was first told of the allegations against the respondent, he assumed that Ms. Kamel was behind them (Tr. at 600). He said that he immediately called the FBI and told them, "Listen, this guy has never done anything of that sort in his life. He has no tendencies, no interest, no affiliation, and you can go and investigate and if you want to interrogate me I will be more than happy" (Tr. at 600). According to the respondent's brother, however, no one from the FBI ever contacted him. He testified that the respondent had no interest in politics (Tr. at 607). He also asserted that the allegations were an injustice and that the FBI did not appear have checked to determine whether they were true (Tr. at 609). The respondent's brother further testified that the respondent was a good father and that he had always been very attached to his daughter and his stepchildren (Tr. at 598).

## K. Testimony of Joan Perez Souza

Ms. Souza is a friend and former co-worker of the respondent. She testified that she did not believe the allegations against the respondent, because the respondent was not a violent person but was in fact a "very sweet person" who was "very laid back," and he got along with everyone (Tr. at 664). She said that she had seen the respondent with his daughter at least 20 times and that she knew that he loved his daughter (Tr. at 662, 666). Ms. Souza also related that she was present in the store when the FBI came to search for guns, and that she told them that she was not aware of any "gun running" at the store (Tr. at 663).

11

10/28/1999 15:42 19736245665 REGIS FERNANDEZ PAGE 27

A77 025 332

### III. IMMIGRATION JUDGE'S DECISION

The Immigration Judge found the respondent statutorily eligible for adjustment of status, concluding that "[t]he allegations by the Service that the respondent was involved in the planning of the World Trade Center bombing and threatened to assassinate the Attorney General have not been sufficiently documented to reasonably establish that the respondent has engaged in or is likely to engage in a terrorist act" (I.J. at 12). The Immigration Judge also found that the Service had failed to prove its allegation that the respondent was a member of a foreign terrorist organization (I.J. at 12). In making his determination, the Immigration Judge noted that the Service's only evidence of the respondent's alleged threat to national security consisted of the classified and unclassified information which, in the opinion of the Immigration Judge, the respondent had rebutted (I.J. at 15).

In his decision, the Immigration Judge referred to an attachment entitled, "Analysis of Classified materials submitted by the Service," which has not been released to the respondent. He found that the respondent had presented "persuasive evidence to establish that he did not maintain a residence in Nutley at the time he was alleged to have hosted a meeting with convicted World Trade Center bombing conspirators." This evidence consisted of both documentary evidence and credible testimonial evidence from witnesses (I.J. at 13). The Immigration Judge also relied upon the expert testimony given by Dr. Mylroie, who concluded that the respondent did not fit the profile of those involved in the bombing. The Immigration Judge further found no reasonable ground to believe that the respondent would engage in terrorist activity in the future (I.J. at 12). In addition, he noted that the Service had failed to present any witnesses, either in court or in camera, to respond to the additional evidence submitted by the respondent (I.J. at 15-16). The Immigration Judge further observed that criminal proceedings had yet to be initiated against the respondent and that the Service had not charged the respondent with removability as a terrorist under sections 237(a)(4)(A) or (B) of the Act, 8 U.S.C. § 1227(a)(4)(A) or (B) (I.J. at 12). He also found that the respondent warranted adjustment of status in the exercise of discretion (I.J. at 16-18).

In addition, the Immigration Judge determined that the respondent had not established his eligibility for asylum, withholding of removal, or relief under the Torture Convention, and denied his applications for those forms of relief

### IV. ARGUMENTS ON APPEAL

On appeal, the Service asserts that the Immigration Judge erred in granting adjustment of status because the respondent is inadmissible under section 212(a)(3)(B) of the Act and thus is statutorily ineligible for such relief. It is also argued that relief should have been denied as matter of discretion, given the numerous adverse factors present and the respondent's inability to demonstrate any unusual or outstanding equities. The Service further contends that the Immigration Judge erred in allowing the respondent to present the testimony of Dr. Mylroie and in accepting her as an expert witness.

12

A77 025 332

The respondent's appeal contests the use of secret evidence, which he contends has limited his ability to prepare and present an adequate defense against the allegations contained therein (Respondent's Brief on the Granting of Adjustment of Status, June 1, 1999). Furthermore, the respondent maintains that he qualifies for asylum, withholding of removal, and Torture Convention relief.

## V. ANALYSIS

### A. The Respondent's Statutory Eligibility for Adjustment of Status

To be statutorily eligible for adjustment of status under section 245 of the Act, an alien must (1) make an application for adjustment; (2) be eligible to receive an immigrant visa and be admissible to the United States; and (3) have an immigrant visa immediately available to him at the time his application is filed. The record reflects that the respondent submitted an application for adjustment of status (Form I-485, Exh. 2) with supporting documentation, as well as a June 2, 1998, notice that the visa petition filed on his behalf by his United States citizen wife, Carmen Negron, had been approved (Form I-797) (Exh. 2). On appeal, however, the Service contends that the respondent is ineligible for adjustment of status, as he is inadmissible under section 212(a)(3)(B)(i)(II) of the Act, 8 U.S.C. § 1182(a)(3)(B)(i)(II). That provision states, "Any alien who . . . a consular officer or the Attorney General knows, or has reasonable ground to believe is engaged in or, is likely to engage after entry in any terrorist activity . . . is inadmissible."

As the Immigration Judge pointed out in his decision, the "reasonable ground to believe" standard is not defined in the Act or the regulations, and the case law interpreting this phrase is limited. However, both parties accept the standard set forth in Adams v. Baker, 909 F.2d 643 (1st Cir. 1990), which was relied upon by the Immigration Judge (Service Br. at 5-6; Respondent's June 1, 1999, Br. at 21). That case involved the interpretation of section 901(b)(2) of the Foreign Relations Authorization Act, 101 Stat. 1399 (1988), which provided that a waiver of certain grounds of inadmissibility was not available to aliens who "the Attorney General knows or has reasonable ground to believe has engaged . . . in a terrorist activity or is likely to engage after entry in a terrorist activity." In that case, the First Circuit Court of Appeals held that "'reasonable belief' may be formed if the evidence linking the alien to terrorist violence is sufficient to justify a reasonable person in the belief that the alien falls within the proscribed category." Id. at 649.

The Service bases its argument that there is "reasonable ground to believe" that the respondent is engaged in, or is likely to engage in, terrorist activity exclusively on classified evidence and two unclassified summaries issued by the FBI (Service's Br. at 6; Exhs. 25, 36-A). The respondent vehemently denies the allegations contained in this evidence, and in his defense, he presented testimonial, documentary, and expert evidence to rebut the claim that he had lived in Nutley in

13

10/28/1999  15:42    19736245665         REGIS FERNANDEZ              PAGE  29

A77 025 332

February 1993 and that he had ties to terrorist organizations. The Service argues that the respondent's evidence is inherently unreliable and insufficient to overcome the classified and unclassified evidence (Service's Br. at 6).

### 1. Evidence concerning the respondent's residence in February 1993

The respondent maintains that in February and March 1993, during the weeks prior to and following the February 26, 1993, World Trade Center bombing, he resided at 50 Prospect Street in Garfield, New Jersey, not in Nutley, as alleged by the Service and the FBI. In fact, the respondent testified that he never lived anywhere in the town of Nutley prior to 1994. In support of this claim, the respondent presented testimony from numerous witnesses, including his brother and Mansour Saqfelhait, the respondent's roommates at the time, all of whom confirmed his residence in Garfield during the time period in question.

The Service argues on appeal that the weight accorded to such testimony should be limited, given that the witnesses were non-objective, and that no disinterested parties, such as landlords or neighbors from Garfield, were produced as witnesses (Service's Br. at 8). The fact that witnesses are not disinterested parties is a factor to be considered in evaluating their testimony. Matter of Lugo-Guadiana, 12 I&N Dec. 726, 730 (BIA 1968). We note, however, that the Immigration Judge expressly considered this point in his evaluation of the testimony and found all the witnesses to be credible (I.J. at 13). It is well-established that because the Immigration Judge has the advantage of observing witnesses as they testify, the Board accords deference to the Immigration Judge's findings concerning credibility and credibility-related issues. See Matter of A-S-, Interim Decision 3336 (BIA 1998); Matter of B-, Interim Decision 3251 (BIA 1995); Matter of Burbano, 20 I&N Dec. 872, 874 (BIA 1994); see also Senathiraiah v. INS, 157 F.3d 210, 216 (3d Cir. 1998) (holding that the Board may defer to credibility rulings of an Immigration Judge who actually heard the testimony and observed the witnesses).

Furthermore, contrary to the Service's claim that the record is "devoid of any documentary evidence to corroborate the respondent's allegation that he resided in Garfield at the time the meeting occurred" (Service's Br. at 8), the respondent submitted copies of 17 canceled checks written during the first half of 1993 (Exhs. 12 and 19). All of the checks are printed with the respondent's name and the address, "50 Prospect St., Garfield, NJ" (Exhs. 12 and 19). He also submitted corresponding bank statements for late 1992 and early 1993 which were mailed to him at the Garfield address (Exh. 17). Furthermore, three of these checks, dated March 20, 1993, May 20, 1993, and June 22, 1993, are in the amount of $825, which he testified was the amount he paid for rent at 50 Prospect Street in Garfield (Tr. at 76, 78). All three rent checks are made out to "cash" but are endorsed by Janina Lach, the respondent's landlord for the residence in Garfield (Tr. at 78; Exh. 12). The word "Rent" is written in the memo section of two of these checks.

The Service claims that there are a "multitude of explanations" for the fact that the respondent's name appears on his checks (Service's Br. at 8), as the respondent may have decided to use up his old checks after moving to Nutley, he may have only intended on living in Nutley for a short period of time and never had his checks changed, or "he might not have wanted to create a 'paper trail'

14

A77 025 332

establishing his residence at Nutley" (Service's Br. at 8, n.6). However, we find it at least as plausible that the respondent did in fact live in Garfield as he maintains. The Service also finds it "highly suspicious" that the respondent only submitted 14 of the 20 checks he received in response to his request to Hudson City Savings Bank. [4] We do not, however, draw the same negative inference that the Service does from the respondent's decision to offer only 14 checks. We note that it was the respondent who requested these checks from the bank. It is unlikely that he would have specifically solicited "possibly damning pieces of evidence," as the Service characterizes the missing checks (Service's Br. at 8). The Service also argues that the respondent has failed to present utility bills from the house in Garfield in his name indicating his residence as of February 1993. The respondent explained, however, that the utilities were never in his name at that residence (Tr. at 198, 200; Exh. 7-E).

In addition, the Service maintains that the affidavit purportedly from the owner of the house at 207 High Street in Nutley which the respondent rented in 1994 (Exh. 71), should be accorded limited weight, given the unavailability of the affiant for cross-examination. We are not considering this affidavit on appeal, not only for the reasons advanced by the Service, but also because the affidavit is of limited probative value. Even if the facts stated therein were determined to be true, they would establish only that the respondent lived at 207 High Street in Nutley in 1994, and that he did not live in that house prior to 1994. The unclassified summary, however, does not allege that the respondent lived in that particular house in February 1993, but rather that he lived in some undisclosed location somewhere in Nutley.

The Service further argues that the need for documentary evidence of the respondent's address during February 1993 is more apparent in light of the what it finds to be discrepancies in the evidence regarding some of the respondent's subsequent addresses (Service's Br. at 8-9). Specifically, the Service refers to the copies of the "May 1993 - April 1994" and "May 1994 - April 1995" Bergen County Phone Books, which indicate that the respondent lived at 50 Prospect Street in Garfield (Exh. 7-D). This is consistent with the respondent's testimony that he lived Garfield from 1990 until mid-1994 (Tr. at 81, 108). We acknowledge that the address list provided by the respondent reflects that he moved from Garfield in February 1994 (Exh. 19). We give little weight to such a minor discrepancy, however, especially since it does not relate to the respondent's address during the February 1993 time period in question.

The Service also notes that the respondent's 1993-1994 course record from Essex County College (Exh. 27) lists a Newark address, although the respondent's address list indicates that he

---

[4] In fact, 17 checks were submitted in all. The Service is evidently referring to the July 31, 1998, batch of requested checks (Exh. 19), of which only 14 were submitted. We note, however, that a previous batch of three checks was sent by the respondent's bank on July 29, 1998, all of which were submitted (Exh. 12).

15

A77 025 332

resided at Prospect Street in Garfield and on Jackson Avenue in Hackensack during this time period (Exh. 19). A sufficient explanation for this apparent discrepancy was provided by the respondent's brother, who testified that the respondent never lived at that address in Newark (Tr. at 643). He explained that the Newark address was always in the respondent's school record because when the respondent applied for admission, he was out of the country and therefore used the address of a friend who lived at the Newark address. He said that the respondent never bothered to change the address because he so frequently saw the person who lived at that address (Tr. at 642). We also note that a printout from the college registrar which was sent to the respondent's attorney on July 16, 1998, lists the Newark address for the respondent as a "mailing" address only (Exh. 7-C).

In addition, the Service refers to a letter from the Tax Assessor of Elmwood Park (Exh. 29) which indicates that there is no such address as 126 Martha Avenue in Elmwood Park, New Jersey, as listed by the respondent as his place of residence for September through December 1995 (Exh. 19). In his testimony, however, the respondent admitted that he was unsure of the exact address on Martha Avenue (Tr. at 211), an explanation we accept as reasonable given that the respondent only lived there for a relatively short period of time 4 years ago. [5] Finally, the Service observes that the respondent's Ford Auto Club membership card, which indicates membership from November 1996 through November 1998, reflects the respondent's address as 608 Main Avenue in Passaic, New Jersey (Exh. 30), whereas his address list indicates that he was living on Van Houten Street in Passaic and later on Baldwin Street in Bloomfield during this period of time (Exh. 19). The respondent explained in his testimony, however, that the Main Avenue address was his work address at Infiniti Sound electronics store, which his brother owned (Tr. at 98, 215). We note that the Main Avenue address does indeed correspond to the address provided by the respondent for his place of employment at Infiniti Sound (Exhs. 2, 3, 50-E).

In addition, the Service argues that the respondent's own testimony should be accorded little weight in light of the fact that he submitted a fraudulent birth certificate. The record reflects that the respondent submitted a copy of a translation of his "registered birth certificate" with his application for adjustment of status (Exh. 2). On the stand, the respondent's brother was asked to compare the translation of the birth certificate he had previously submitted with his own application for adjustment of status to the one submitted by the respondent in connection with his application for adjustment of status (Exhs. 2 and 76). The respondent's brother stated that his own was correct but admitted that the one with the respondent's name on it could not have been correct, as both documents bore the same serial and control numbers and age of parents despite the 1½-year difference between his and the respondent's ages (Tr. at 625, 629).

---

[5] The respondent's address at that time is listed in one of the police reports as 256 Martha Avenue (Exh. 51-F).

16

A77 025 332

Although the Immigration Judge determined that the respondent's birth certificate was fraudulent, he did not find that it mandated a per se adverse credibility finding, noting that it pertained to a non-material fact (I.J. at 16). The Service challenges this finding, and cites to Matter of O-D-, Interim Decision 3334 (BIA 1998), which held that presentation by an asylum applicant of an identification document which is found to be counterfeit by forensic experts not only discredits the applicant's claim as to the critical elements of identity and nationality, but also indicates an overall lack of credibility regarding the entire claim. Id. at 6. Yet we agree with the Immigration Judge that the instant case is distinguishable, as the respondent's identity is not a central or contested issue in this case. In Matter of O-D-, supra, we explained:

> Underlying the entire record is the respondent's fundamental claim that he is a citizen and national of Mauritania and seeks refuge therefrom. A concomitant to such claim is the burden of establishing identity, nationality, and citizenship. . . . We find that this respondent's presentation of at least one counterfeit document, and probably two, submitted to prove a central element of the claim in an asylum adjudication, indicates his lack of credibility.

Id. at 3-4. Although the translation of the respondent's birth certificate was not genuine, the record contains sufficient evidence of the respondent's identity, and the Service does not dispute the respondent's identity or place of birth. Thus, the birth certificate does not relate to a material fact. Furthermore, in determining that the respondent in Matter of O-D-, supra, was not credible, we considered not only the respondent's tainted documents and their centrality to his application for asylum, but also the inconsistencies between the respondent's asylum application and his testimony, and the Immigration Judge's adverse credibility finding. Id. at 7. Given that the respondent's testimony in the instant case was detailed, internally consistent, and consistent with that of the other witnesses, we do not find that the fraudulent birth certificate renders the entirety of the respondent's testimony incredible.

### 2. Evidence to rebut allegations of terrorism links

The respondent denied any ties to any terrorist organization, and denied any knowledge of Nidal Ayyad or any of the other conspirators in the World Trade Center bombing. He presented testimony from numerous friends, family members, and co-workers who described him as a gentle, non-violent, non-extremist person who held no particularly strong political, ideological, or religious views. The respondent also presented the testimony of an expert witness, Dr. Mylroie, who reviewed thousands of pages of evidence from the first World Trade Center bombing trial, authored several articles on the subject, and served as a consultant on the World Trade Center bombing for a major news network and a major national weekly news magazine. This expert concluded that the respondent did not fit the profile of the World Trade Center bombing conspirators, that there was no evidence

A77 025 332

In addition, the Service asserts that Dr. Mylroie's profile of the respondent should be given little weight, as it was based upon a 15-minute interview with the respondent and information from his attorneys and friends. Because we accept the testimony of the respondent and his witnesses as credible, however, we find that Dr. Mylroie's opinion based on her discussions with them is valid. The Service also contends that Dr. Mylroie's opinion that the respondent does not fit the profile of the bombing conspirators should be disregarded, as the Service has never alleged that the respondent was a co-conspirator, but only that he hosted a meeting attended by at least one of the conspirators (Service's Br. at 10). The FBI information, however, extends beyond an allegation that the respondent hosted a meeting attended by at least one conspirator in the bombing. It also alleges that plans for the bombing were discussed at the meeting, that the respondent is a suspected member of a terrorist organization, and that he maintains contact with other members of terrorist organizations. Given these facts, we find Dr. Mylroie's evaluation and profile of the respondent to be probative.

We have also considered the Service's arguments that Dr. Mylroie was not a party to the government's investigation or privy to all of the information gathered during the investigation of the World Trade Center bombing, and that she has had no formal training in terrorism. Yet we agree with the Immigration Judge's conclusion that "the witness has studied the World Trade Center bombing in depth and has expertise in that regard" (Tr. at 385).

Finally, we have considered the factors set forth by the Service as indicators of the reliability of the FBI evidence. Specifically, the Service notes that: (1) it was obtained from "multiple reliable sources who have provided reliable information in the past;" (2) "[t]he FBI took additional steps to test the veracity of the source reporting the threat against the Attorney General;" (3) the evidence was classified as national security information pursuant to the rigid guidelines set forth in Executive Order 12958 and certified as relevant by the Commissioner of the Service; and (4) it was the product of a thorough investigation by the FBI.

Upon our review of the record before us, including the classified evidence, we conclude that the respondent is not inadmissible under section 212(a)(3)(B)(i)(II) of the Act. The FBI's classified evidence and unclassified summaries, standing alone, may have been sufficient to establish a "reasonable ground to believe" that the respondent is engaged in or is likely to engage in terrorist activity. The evidence submitted by the respondent to rebut the allegations raised therein, however, significantly diminishes the reasonableness of that belief.

In this regard, we find that the respondent has presented sufficient documentary and testimonial evidence to establish that he resided in Garfield during the time in question. Furthermore, he presented the expert testimony of Dr. Mylroie, which also calls into question the reliability of the information in the FBI reports. She testified that not only does the respondent not fit the profile of the terrorists who bombed the World Trade Center, but also that she found no evidence of the respondent's ties to the bombing or the conspirators in her review and analysis of the evidence

19

A77 025 332

presented at the trial of Nidal Ayyad and three other conspirators.  She even cross-referenced the respondent's telephone numbers to those of Nidal Ayyad and the other conspirators, but found no match.

Accordingly, we agree with the Immigration Judge that the respondent's evidence raises serious doubts regarding the reliability of the information contained in the FBI reports.  Furthermore, we find it significant, as did the Immigration Judge, that the Service failed to present a single witness to address the rebuttal evidence proffered by the respondent, either at the hearing or even in camera, choosing to rely exclusively upon the FBI reports.  Thus, upon an evaluation of the record as a whole, we do not find that the classified and unclassified evidence presented by the Service would "justify a reasonable person in the belief" that [the respondent] is engaged in or will likely engage in terrorist activity.  See Adams v. Baker, supra, at 649.  Therefore, we find that the respondent is statutorily eligible for adjustment of status.

### B.  Adjustment of Status as a Matter of Discretion

Section 245 of the Act reposes with the Attorney General and her delegates the discretionary power to grant or deny adjustment of status.  INS v. Bagamasbad, 429 U.S. 24 (1976); Thomaidis v. INS, 431 F.2d 711 (9th Cir. 1970), cert. denied, 401 U.S. 954 (1971); Matter of Arai, 13 I&N Dec. 494 (BIA 1970).  Thus, the burden of proof is upon an applicant to establish not only that he or she meets all the statutory requirements for eligibility but also that he or she is worthy of the exercise of discretion in his favor.  8 C.F.R. § 242.17(a); Ameeriar v. INS, 438 F.2d 1028 (3d Cir.), cert. denied, 404 U.S. 801 (1971); Thomaidis v. INS, supra.

The Immigration Judge found that the respondent merited the favorable exercise of discretion because he had compelling equities which outweighed the adverse discretionary factors.  We agree with the Immigration Judge's analysis and determination on this issue.  The respondent entered the United States legally as a nonimmigrant student and in fact attended college for over 3 years until he left school to support a new family.  He has strong family ties here, including a United States citizen child, a lawful permanent resident brother, and a United States citizen wife and step-son to whom he provides emotional and financial support.  No doubts have been raised about the bona fides of the respondent's current marriage, and an immediate relative visa petition filed on his behalf by his wife has been approved.  As we noted in Matter of Ibrahim, 18 I&N Dec. 55, 57 (BIA 1981), "immediate relative status [is] a special and weighty equity."  In addition, the respondent has now resided in the United States for over 9 years, and conditions for Palestinians in his country continue to be unstable.

The Immigration Judge correctly determined that these equities outweighed the adverse factors argued by the Service.  The allegations of assaults committed by the respondent during and after a particularly contentious marriage never resulted in any convictions, and the record reflects negatively

20

A77 025 332

on the credibility and character of his ex-wife, who made these allegations. With regard to the allegation that the respondent is a security risk, we note that as discussed above, the record does not establish a "reasonable ground to believe" that the respondent is engaged in, or is likely to engage in any terrorist activity. The assertion that the respondent failed to file accurate tax returns because his expenses exceeded his reported income is similarly speculative and unproven; the respondent provided a copy of his bank book showing a large deposit to corroborate his testimony that his father provided financial assistance to him (Tr. at 173, Exh. 48-A).

In addition, the allegation that the respondent failed to pay court-ordered child support before he was placed in detention has not been substantiated. The respondent admitted only that he had not paid child support since he had been placed in detention (Tr. at 163). He was never specifically confronted with and asked to explain the June 11, 1997, divorce decree which reflects that he was in arrears for child support payments from January 10, 1997, through May 9, 1997 (Exh. 2). According to a transcript of a June 30, 1997, hearing in a New Jersey family court regarding a TRO obtained by Ms. Kamel against the respondent, Ms. Kamel responded, "Yes and no," when asked whether the respondent paid child support. She explained that she "always" received his checks about 2 weeks late (Exh. 17-H at 7). Thus, the evidence on this issue is ambiguous and insufficient to establish a basis for a discretionary denial of relief in this case.

Moreover, the Immigration Judge properly exercised his discretion when he decided that the remaining adverse factors argued by the Service were not determinative: the respondent's failure to have his student visa transferred when he transferred colleges, his having remained in the United States beyond the time permitted, his having worked without authorization, and his submission of a fraudulent translation of his birth certificate. As the Immigration Judge noted, the violations on the respondent's immigration record are shared by many successful applicants for adjustment of status. In addition, the Immigration Judge correctly characterized the fraudulent document submitted by the respondent as not material. The document was the translation of his brother's birth certificate, which the respondent apparently altered and submitted as his own. There is ample evidence in the record to establish the fact that the respondent is the person whose birth is reported in the altered document. Thus, the respondent may have altered the document for some collateral reason, such as to save himself the inconvenience or expense of obtaining his own translated birth certificate, but his actions did not serve to gain him a benefit for which he was fundamentally ineligible. Therefore, we disagree with the Service's argument that the fraudulent birth certificate alone "mandates a denial" of the adjustment application. Although it is a factor to be considered in the exercise of discretion, we do not find that it is a sufficient ground for denial in the context of this case. Accordingly, we agree with the Immigration Judge's discretionary grant of adjustment of status in this case.

21

A77 025 332

## VI. PROCEDURAL ISSUES

The parties have raised several procedural issues relating to the Immigration Judge's handling of the hearing on the merits of the respondent's application for adjustment of status. We will first address the argument of the Service that the Immigration Judge erred in allowing the respondent to present the testimony of Dr. Mylroie as an expert witness. The respondent served upon the Service and filed with the Immigration Court a submission on February 11, 1999, regarding his intention to present Dr. Mylroie as an expert witness at the hearing on February 16, 1999 (Exh. 73). The Service objected to the presentation of the witness on the basis that the submission was filed only 5 days before the hearing, in violation of the Local Operating Procedures ("local rules") for the Immigration Court in Newark. Specifically, the Service notes that Rule 3(e) of the local rules provides that parties must file evidentiary submissions "not later than ten (10) calendar days prior to the scheduled hearing date."

We find that the Immigration Judge did not err in allowing Dr. Mylroie to testify. Rule 6 of the local rules allows an Immigration Judge to waive any of the local rules in the interest of justice or where good cause is shown. The record reflects that on several occasions, the Immigration Judge waived the 10-day rule for both sides (Tr. at 40, 214-15). Given the seriousness of the allegations against the respondent, denying him the rebuttal testimony of Dr. Mylroie on the basis of the 10-day rule would have been contrary to the interests of justice.

Moreover, the Service has not shown any prejudice by having only 5 days' notice of Dr. Mylroie's appearance as a witness instead of 10 days' notice. The letter submitted by the respondent set forth the substance of Dr. Mylroie's testimony and included a description of her education, her past teaching experience, her experience as a consultant for ABC News and Newsweek, and the books and articles she has written. Furthermore, the Immigration Judge indicated during Dr. Mylroie's testimony that he would be willing to grant the Service a continuance before completing cross-examination (Tr. at 402-403), but the Service did not request one. In addition, the Service has not demonstrated on appeal that it has information impeaching Dr. Mylroie's credentials or the opinions she expressed which it was unable to present because the respondent gave only 5 days' notice of her testimony instead of the 10 days' notice required by the local rules.

The Service further contends that the Immigration Judge erred in permitting the respondent to present Dr. Mylroie as an expert witness. It is argued that she had neither the requisite training nor experience in the field of intelligence of terrorism and that she "has an interest in the outcome of this case." According to the Service, Dr. Mylroie has built a career attempting to establish that the Government of Iraq is responsible for the World Trade Center bombing: ". . . this hearing was nothing more than another opportunity for her to espouse her theory in public and once again denounce the Government's findings in what can only be characterized as an unbridled attempt to bolster her personal theory" (Service's Br. at 9). As we stated above, however, we agree with the

22

A77 025 332

Immigration Judge's assessment that Dr. Mylroie has sufficient knowledge of, and expertise in, the World Trade Center bombing to qualify as an expert witness. Moreover, we reject as unfounded the Service's accusation that Dr. Mylroie agreed to testify solely to use the hearing as a forum to advance her theory that Iraq was responsible for the World Trade Center bombing. The record reflects that Dr. Mylroie did not discuss her theory during her direct examination, but instead kept her remarks focused on the questions asked of her. The subject of this theory did not arise until the Service directly asked her about it during cross-examination (Tr. at 410-411).

The procedural issue which the respondent raises is a challenge to the use of ex parte and in camera evidence. [6] The short answer to this challenge is that the regulations provides for such evidence and the Immigration Judge properly considered it. See 8 C.F.R. §§ 103.2(b)(16)(iv), 240.33(c)(4), 240.49(a); see also section 240(b)(4)(B) of the Act, 8 U.S.C. § 1229a(b)(4)(B). The Commissioner of the Service determined that the evidence was relevant and properly classified under Executive Order 12958 (60 Fed. Reg. 19825, April 17, 1995) (Exh. 25). Although the issues of due process and First Amendment rights are important issues, the constitutional challenge to such evidence and the procedures by which it is considered is beyond our jurisdiction. The Board cannot rule upon the constitutionality of the Act and the regulations. See Matter of Punu, Interim Decision 3364 (BIA 1998); Matter of C-, 20 I&N Dec. 529, 532 (BIA 1992) (and cases cited therein); Matter of Hernandez-Puente, 20 I&N Dec. 335, 339 (BIA 1991); Matter of Fede, 20 I&N Dec. 25, 30 (BIA 1989). Furthermore, we need not consider whether the respondent was given an adequate summary of the classified evidence. The respondent cannot show prejudice where the Immigration Judge found in his favor.

Because we find that the Immigration Judge properly granted the respondent's application for adjustment of status, we need not address the respondent's arguments on appeal relating to asylum, withholding of removal, and the Torture Convention. His appeal will be dismissed as moot.

Accordingly, the following orders will be entered.

ORDER: The Service's appeal is dismissed.

FURTHER ORDER: The respondent's appeal is dismissed.

_FOR THE BOARD_

---

[6] The Board acknowledges with appreciation the thoughtful arguments on this issue raised in the brief of amici curiae, Gail Pendleton, Esquire, National Immigration Project, and Anna Gallagher, Esquire, American Immigration Law Foundation.

23

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT: 201 VARICK STREET
NEW YORK, NEW YORK


File No.  A90 674 238                                  July 30, 1999[1]


In the Matter of                          )
        Nasser AHMED,                     )
        aka Nasser Ahmed El Hommosany,    )
                        Respondent.       )            In Deportation Proceedings



Louis M. Bograd, American Civil Liberties Union Foundation, Washington, D.C.,
David Cole, Georgetown University Law Center, Washington, D.C., Abdeen Jabara,
Lawrence W. Schilling, Lynne Stewart, New York, New York, for respondent

Suzanne McGregor, Assistant Regional Counsel, Anne E. Gannon, Assistant District Counsel,
John Mulrooney, Assistant District Counsel, for the Immigration and Naturalization Service



DECISION FOLLOWING REMAND


        On May 5, 1997, this court denied the respondent's applications for asylum and
withholding of deportation on the basis of confidential information which indicated that there
were reasonable grounds for regarding the respondent as a danger to the security of the United
States. The court granted voluntary departure to the respondent and both sides appealed. The
Board of Immigration Appeals remanded the matter to this court in a decision dated August 7,
1998. The Board's decision noted that, while the matter was on appeal, the Service had provided
to the respondent a more extensive unclassified summary of the classified material.


------

[1]This public portion of the court's decision was initially drafted on June 24, 1999 and
thereafter submitted for classification review. After that review, it was determined that the
public portion of the decision contained no classified information. Upon return of the decision
after such review, the court has made minor corrections and additions unrelated to the classified
information presented in this case.

While the case was pending on remand, the Service submitted the classified material to the originating agency for "declassification review". Also, while the matter was pending on remand, the Service presented additional classified material to the Immigration Court in camera. This additional classified information was also subject to declassification review. Following these declassification reviews, redacted versions of the material and a separate unclassified summary were served on respondent. (Exhibits R-1, R-2 & R-4). The court's review and analysis of the confidential material is contained in a separate "Classified Attachment".

After respondent's receipt of the declassified material, additional evidentiary hearings were held in open court at which the respondent and the Service were given the opportunity to provide additional evidence. Testimony was taken on December 15 & 16, 1998 and on January 14, 1999. Respondent's presentation focused on four areas of concern: 1) respondent's alleged association with al-Gama'a al-Islamiyya, 2) respondent's alleged efforts to send bomb making manual overseas, 3) the implication that respondent relayed a call to violence from Sheik Omar Rahman to the outside world and 4) that respondent has threatened Mohammad Al-Sharif, an imam at the Abu Bakr Mosque in Brooklyn, New York.

The Service presented a witness, Mohammad Al-Sharif to testify concerning activities at the mosque, the respondent's actions and his words. The Service also presented documentary evidence concerning the al-Gama'a al-Islamiyya as well as a copy of a District Court indictment charging the respondent with submitting a false application for temporary residence as a Special Agricultural Worker. (Exhibit R-6).[2]

Following the open sessions, the court scheduled a further in camera session to allow follow up questioning of the in camera witness. In anticipation of that session, the court composed a list of questions which would be asked. The in camera witness responded to the list of questions by indicating an intention not to answer most of the questions. Accordingly, the follow up in camera session was canceled. Thereafter, the parties were allowed a period of time to submit additional evidence and argument. Both parties submitted additional evidence and argument which included discussion of the possibility of relief under the Torture Convention pursuant to recently promulgated regulations. Also, the Service submitted an affidavit with an attachment from a New York City Police Detective and a memorandum of investigation. On April 20, 1999, the court requested an updated advisory opinion from the U.S. State Department which has not been received as of the date of this decision. On the basis of the original record and the evidence submitted on remand, the court's original order will be withdrawn and the respondent will be granted asylum and withholding of deportation.

---

[2]After testimony was taken in this case, the INS submitted documentation to show that the respondent was found guilty of a violation of 18 USC 1426(b) and he is presently awaiting sentencing.

## Evidence Presented on Remand

The declassified material provided by the INS to the respondent allowed the respondent to focus more clearly on the allegation that he should be regarded as a danger to the security of the United States. The declassified material made the respondent aware of some of the specific reasons for being considered a security risk. To the extent that the respondent was aware of the specific reasons, his presentation of evidence at the remanded hearing was effective in overcoming the evidence presented against him.

Among the previously classified information which was disclosed to the respondent was the name of the organization of which he was accused of being a member. That organization was identified as the al-Gama'a al-Islamiyya ("al-Gama'a"). Also, it was disclosed to the respondent that he had visited Sheik Omar Rahman on specific dates in March 1996 just prior to the release of a letter from Sheik Rahman to the international media. (Exhibit R-2-1, p.2). That information implies that respondent had carried the message from Sheik Rahman to the outside world and, a few days later, the al-Gama'a responded by killing a group of tourists in Cairo.[3] Also disclosed was the statement that the respondent was an "unindicted co-conspirator" in the criminal case against Sheik Rahman, that associates of the respondent had been arrested and convicted in the World Trade Center ("WTC") bombing case and in Sheik Rahman's case, and that respondent had attempted to obtain bomb making manuals to send overseas. Further disclosure included a discussion of Osama bin Laden's alliance with the al-Gama'a.

## Membership in al-Gama'a al-Islamiyya

Respondent testified at the remanded hearing, and part of his testimony concerned his alleged affiliation with al-Gama'a. The respondent spoke convincingly in opposition to al-Gama'a. He spoke of his opposition to the culture of violence and to the cycle of violence which the al-Gama'a promotes. Respondent testified that he believes the al-Gama'a's tactics are futile. Although the respondent admitted his admiration for Sheik Omar Rahman, who is generally regarded as the spiritual leader of al-Gama'a, the respondent adamantly denied any connection with al-Gama'a.

Among the documents submitted at the remanded hearing were affidavits (Exhibit R-7-1, R-7-2 & R-5-5) and articles (Exhibits R-5-6, R-5-7, R-5-8) describing the al-Gama'a. This material was provided by both sides and the court found the material to be very helpful. Additionally, the respondent recalled Neil Hicks as a witness. Mr. Hicks had testified during the initial deportation proceedings in 1997 on the issue of country conditions in Egypt. During the remanded hearing, Mr. Hicks focused on the al-Gama'a. Mr. Hicks explained that it is important

---

[3]That implication was apparent in the public record created in the 1997 proceedings. In those proceedings, the respondent testified to visiting Sheik Rahman in April of 1996. Also, the Service introduced a newspaper report dated April 15, 1996 describing the Sheik's letter.

to draw a distinction between the "al-Gama'a al Islamiyya" and the "al-Gama'at al Islamiyya". The first is a specific organization and its name may be translated as "the Islamic Group". The second is a collection of hundreds of groups which are known loosely as "the Islamic Groups". The Islamic Groups are not linked by any formal structure. Rather, they are linked by a common outlook. Some of the constituent groups within the al-Gama'at include groups engaged in political opposition to the existing regime which they oppose as being insufficiently Islamic. Other parts of the al-Gama'at are social welfare, health and community organizations. Most of the organizations which form the Islamic Groups are non-violent. Millions of people may consider themselves affiliated with the al-Gama'at. However, some organizations within the Islamic Groups are indeed violent, i.e. terrorists. This distinction between the "al-Gama'a" and the "al-Gama'at" is also reflected in the material provided by the INS. (Exhibit R-5-8, p. 46, fn.1).

The court finds the distinction between al-Gama'a and al-Gama'at to be an important concept in this case. According to the testimony of Mr. Hicks, confusion of these two types of organizations is common. Mr. Hicks pointed out that the Egyptian government does not distinguish between the violent and non-violent supporters of al-Gama'at. Indeed, it would appear that even the U.S. State Department has blurred the distinction in its designation of terrorist organizations. (See Exhibit R-5-9: "Gama'a al-Islamiyya ... also known as Egyptian al-Gama'at al-Islamiyya"). Another vivid example of the possibilities of confusion occurred at the remanded hearing when a contract interpreter was disqualified after admitting that she had failed to properly distinguish between al-Gama'a and al-Gama'at.

Accordingly, the respondent's evidence was successful in exposing the potential for confusion regarding respondent's affiliations. A person who admits that he associates himself with the Egyptian Islamic Groups does not necessarily admit an association with the violent organization called the Islamic Group.

Moreover, it is questionable that association with al-Gama'a is sufficient to trigger the disqualification provisions in the Act. In a similar context, the Board of Immigration Appeals has held that "mere membership in an organization, even one which engages in persecution, is not sufficient to bar one from relief, but only if one's action or inaction furthers that persecution in some way. It is the objective effect of an alien's actions which is controlling." Matter of Rodriquez-Majano, 19 I &N Dec. 811, 814-15 (BIA 1988). The evidence in this record, including classified and non-classified evidence, contains very little to show any objective effect of the respondent's actions which pose a danger to the nation. Indeed, some of the evidence suggests that respondent's actions may have been effective in diffusing potentially dangerous situations.

### April 15, 1996 Message From Sheik Rahman

The declassified material provided to the respondent shows that the INS had presented

evidence in camera implying that the respondent carried a message from Sheik Omar Rahman which was published in the international press on April 15, 1996. The material shows that, three days after the publication of that letter, 18 tourists were killed and 17 were wounded in Cairo. (Exhibit 2-1, p. 3). The central importance of these events can been understood when it is observed that the respondent's bail was revoked by the INS and respondent was taken into custody on April 23, 1996. This chronology strongly suggests that concern over the respondent's ability to convey messages from Sheik Rahman was the primary motivating factor in deciding to revoke the respondent's bail.

Although concerns about the letter from Sheik Rahman were disclosed to the respondent during the 1997 hearing, he did not convincingly rebut those concerns until the remanded hearing. At the remanded hearing, the respondent provided prison records to show that other people had contact with Sheik Rahman in the days and weeks preceding the publication of the Sheik's letter. Therefore, it is clear that many people had the opportunity to convey Sheik Rahman's letter. Even more importantly, the respondent showed that the letter of Sheik Rahman was not related to the killing and wounding of the tourists in Cairo. The respondent introduced a document from the perpetrators of that incident (Exhibit 19). That document clearly states that the purpose of the "operation" was to avenge Israeli actions in Lebanon. The authenticity of the document was confirmed in an affidavit from Mohammed Yousri (Exhibit 13) who obtained the document from the Executive Director of the Egyptian Human Rights Organization, Hisham Mubarak. (Exhibit R-13). Mr. Mubarak is the author of an INS exhibit (Exhibit R-5-8) and would appear to be a reliable source for information concerning specific acts of terrorism in Egypt. The conclusion that Sheik Rahman's letter had no connection with the attack on the tourists in Egypt is underscored by the affidavit of Christopher W.S. Ross, Coordinator for Counterterrorism in the U.S. Department of State who appears to accept the authenticity of Exhibit 19. "The (al-Gama'a) claimed responsibility for the attack in a fax dated April 19, explaining that it thought the Greeks were Israeli tourists. The attack was in retaliation for fighting occurring in southern Lebanon at the time." (Exhibit R-5-5, paragraph 23).

The implication that respondent's actions were connected to the attack on Greek tourists in Cairo on April 18, 1996 appears to have provided the motivation for respondent's detention without bail by the INS. The respondent thoroughly discredited this connection through evidence presented during the remanded proceedings. This aspect of the case standing alone would justify reconsideration of the court's prior finding that respondent is a threat to national security.

## Bomb Making Materials

The INS disclosed that the classified information includes evidence that the respondent "made efforts to obtain a bomb-making manual to send overseas". At the remanded hearing, the respondent acknowledged that he did, indeed, obtain a bomb-making manual. He described the document as appearing to be professionally printed and to be a type of CIA document in the Arabic language. He described the document as being more of a guerilla warfare manual than a

simple bomb-making manual. The respondent explained that the document was given to him by an attorney, Clover Barrett, who needed the document translated in connection with the trial of an accused terrorist. Ms. Barrett corroborated this story in her testimony at the remanded hearings. The respondent also testified that he had access to bomb-making manuals when he worked as paralegal and translator for Sheik Rahman during his federal trial for seditious conspiracy.

It would appear that the respondent had access to these manuals properly in the course of his work for the federal courts. There is no public evidence that the respondent made any attempt to copy or to send any of these manuals overseas. As discussed in the classified attachment, the classified evidence is not sufficient to warrant a finding that the respondent attempted to send the manual(s) overseas. Accordingly, I find that this aspect of the INS case does not support a finding that the respondent is a threat to national security.

### Threats Against Sheik Al-Sharif

On remand, much of the court's time and energy was taken in consideration of the politics of the Abu Bakr Mosque in Brooklyn, New York. This is not altogether inappropriate since it appears that the highly contentious atmosphere at the mosque serves as a backdrop and a reference point for this case. The basic outline of the doctrinal struggles at the mosque were set out in the court's 1997 decision. At the remanded hearing, the respondent elaborated on the mosque's history and his part in it. He called two influential mosque members as witnesses. Additionally, both sides expressed a desire to call the present imam of the mosque, Sheik Al-Sharif, as a witness. By agreement of the parties, Sheik Al-Sharif was considered an INS witness and he testified at length subject, of course, to cross examination by the respondent.

The recent history of the mosque which emerges from the testimony and the legal documents is extremely contentious. According to the respondent's witnesses, the mosque was founded in the early 1970's. By the late 1980's, when the respondent joined, the mosque had become somewhat moribund. The respondent became very active in the mosque's affairs and is credited with helping to revive the mosque. In the early 1990's, the mosque became affiliated with Sheik Omar Rahman. "He was a member of the (al-Gama'a) in 1980-1986. However, in 1989, he left the group, and in the same year, he left Egypt. While he is sometimes referred to as the group's 'spiritual leader,' the best evidence is that he is not the group's leader, and in fact has no role in the group's activities." (Exhibit R-7-2, paragraph 4). Respondent has acknowledged unequivocally that he is a supporter of Sheik Rahman and respects him as true Islamic scholar. Despite Sheik Rahman's conviction in the United States, the respondent continues to believe in the Sheik. The respondent testified that he has never heard Sheik Rahman make any statement supporting retaliation against the United States.

In 1995, Sheik Al-Sharif was invited to come to Brooklyn from Egypt to be the imam at the Abu-Bakr Mosque. Initially, Sheik Al-Sharif was hired for a period of three months. Soon,

-6-

he and the respondent fell into conflict. The respondent objected to Sheik Al-Sharif visiting the Egyptian Consul in New York. According to the respondent's witness, Mohammed El-Zoghby, Sheik Al-Sharif met with the Egyptian Security Officer at the Consulate. Also, the witness claimed that the Sheik sent a congratulatory cable to Hosni Mubarak and signed the witness' name. Sheik Al-Sharif acknowledged that he does, indeed, visit the Egyptian consulate. He stated that he goes with members of the congregation for business and marital matters.

At one point, the board of directors of the mosque, of which the respondent was the secretary, decided to terminate Sheik Al-Sharif's employment. The respondent was the officer who delivered the termination notice to the Sheik. However, Sheik Al-Sharif refused to be terminated. In June of 1998, a successor board (not including the respondent who is unable to serve because of his detention) also tried to terminate Sheik Al-Sharif's employment. Nevertheless, he remains the imam at the Abu-Bakr Mosque. Multiple court proceedings have addressed the continuing internecine struggle for control of the mosque which appears to continue unabated and undiminished at the present time.

Sheik Al-Sharif has alleged that the respondent admitted that he was a member of al-Gama'a and that respondent passed out literature favoring the al-Gama'a.[4] Further, Sheik Al-Sharif claimed that the respondent threatened him and his family back in Egypt.

It is obvious that there is a bitter and implacable conflict between the respondent, who supports the chief religious opponent of the present Egyptian government, and Sheik Al-Sharif who appears to have regular contact with the Egyptian government representatives in New York. Sheik Al-Sharif testified that his immigration status in the United States is dependent on the approval of an employment based petition which is pending before the INS. If he is not employed by the mosque, the petition will be deemed withdrawn and, it seems, he will have no way to remain legally in this country. Sheik Al-Sharif's interest in employment by the mosque and his interest in remaining in the United States would be threatened by respondent's release from INS custody. Sheik Al-Sharif has a substantial interest in seeing that the respondent remains in INS custody and that he be deported from the United States. Accordingly, Sheik Al-Sharif is considered by this court to be seriously prejudiced against the respondent, highly interested in the outcome of this case and he appears to be under the control of the INS which holds his future immigration status in its hands. Under these circumstance, I cannot give substantial weight to testimony of Sheik Al-Sharif regarding the actions of the respondent.

Additionally, I find that the internal affairs of the mosque do not implicate any legitimate national security concerns of the United States. If, indeed, the parties in the mosque's struggles hurl insults and threats at each other, it would seem that the matter could be adequately handled by the criminal or civil court system in Brooklyn, New York.

---

[4] Copies of the literature were not offered as evidence.

-7-

Haggag Interview

After hearing the testimony in this case, the parties were permitted to submit additional argument and to make further offer of proof. The INS submitted an affidavit from New York City Police Department Detective Thomas F. Corrigan. Attached to Detective Corrigan's affidavit is a five page summary of an interview with Abdo Rahman Haggag. The affidavit has been heavily redacted to preserve the privacy of persons other than the respondent. Detective Corrigan offers no opinion on the credibility of Mr. Haggag.

Detective Corrigan explained that Mr. Haggag is a former confidant of Sheik Rahman and previously testified in the federal prosecution against Sheik Rahman and others. Haggag's interview discloses that an unnamed person had argued with the respondent over respondent's management of the Abu Bakr Mosque. Further, the interview included a description of a meeting at Sheik Rahman's apartment involving seven people including Haggag and the respondent. At that meeting, hijacking an airplane was discussed. However, talk of hijacking was terminated "as hijackings for the most part are unsuccessful." Finally, Haggag indicated that he was unaware of any al-Gama'a contacts at "the airport".

The offered evidence is too ambiguous and too irrelevant to have much importance in these proceedings. The fact that Mr. Haggag is aware of an argument between respondent and another person is simply insignificant. Even more insignificant is the statement that Mr. Haggag is unaware of al-Gama'a contacts at the airport.

The portion of the interview describing a meeting at Sheik Rahman's apartment is curious. Although it contains an ominous reference to airplane hijacking, it seems that the idea was completely rejected by those assembled. Although the INS apparently offers the document to support its claim that the respondent is a danger to the security of the U.S., the document appears to be mildly contradictory to that claim. According to the offered document, the respondent was present when the use of violence was thoroughly rejected. Although the document states that the reason for rejecting the hijacking idea was its unfeasibility, no alternative operations were proposed. The most that could be made from this document is that some irresponsible comments about airplane hijacking were made and the idea was rejected. There certainly were no objective steps taken in furtherance of any plan to hijack an airplane. This incident cannot be seen as any form of direct or indirect threat to the security of this country.

The respondent has countered the government's offer of proof with portions of a transcript of Mr. Haggag's testimony at Sheik Rahman's trial. The transcript shows clearly that Mr. Haggag agreed to burn down a restaurant for $3,000. He actually set fire to the restaurant which did, in fact, burn down. (Respondent's Post Hearing Brief, Attachment D, transcript, pp. 9871-9873).

-8-

## District Court Indictment

The INS introduced a copy of an indictment against the respondent which is in the record as Exhibit R-6. The indictment was filed in the US District Court for the Southern District of New York on December 4, 1998 (98 Crim. 1397). By this indictment, the respondent is accused of making a false application under the Special Agricultural Worker ("SAW") provisions of the Immigration and Nationality Act, 8 USC 1160 (INA Sec. 210). The respondent is accused of submitting a certification containing false statements of fact as well as submitting a false affidavit of employment. Subsequent to the testimony in this case, the INS informed the court that, on June 8, 1999, the respondent was found guilty of violating 18 USC 1426(b).[5] The offense carries a maximum penalty of 5 years in prison and a fine. The court was informed that sentencing is scheduled for September 7, 1999.

In its decision of May 5, 1997, this court discussed the significance of respondent's application under the SAW provisions. The respondent had claimed the Fifth Amendment privilege against self incrimination concerning certain questions about his manner of entry. Inasmuch as it was clear that the respondent could not have qualified under the SAW program, this court took into consideration the possibility that "the respondent ...obtained counterfeit documents or ... obtained immigration status by fraud or mistake". The failure to explain this situation was viewed by the court as "a substantial failure of proof with respect to the respondent's requests for ...discretionary relief...." (Dec. p. 6).

The recent guilty verdict is consistent with the court's earlier assessment of the respondent's SAW application. The fraudulent nature of respondent's SAW application was assumed by the court in its evaluation of respondent's credibility and his suitability for a favorable exercise of discretion. The substantial favorable factors in respondent's case were balanced against the highly negative assumption that "the respondent knowingly submitted false documents and made material misrepresentations in order to gain entry into this country." (Dec. pp.17-18). The recent verdict is based on an indictment that describes conduct already assumed by this court to have occurred. Thus, despite the indictment and guilty verdict, this court's prior analysis of respondent's credibility and his suitability for discretionary relief will not be changed.

---

[5]This offense may qualify as an aggravated felony if the respondent is sentenced to at least twelve months. INA Sec. 101(a)(43)(P). If that were the case, the respondent would be ineligible for asylum. 8 CFR 208.13(c)(2)(i)(D)(1999). He would also be presumed ineligible for withholding of deportation. 8 CFR 208.16(c)(2)(1999) referring to prior INA Sec. 243(h)(2). See Matter of Q-T-M-T-, Int. Dec. 3300 (BIA 1996). However, because the respondent has not been sentenced, the offense does not now qualify as an aggravated felony and it does not make the respondent presently ineligible for the relief he requests.

-9-

## Classified Information

As discussed in the court's May 5, 1997 decision, the Immigration Court is authorized by regulation to receive classified information in camera in connection with applications for asylum and withholding of removal. When such evidence is received, the respondent must be notified and the agency which provided the information "may provide an unclassified summary of the information" to the respondent. "The summary should be as detailed as possible, in order that the applicant may have an opportunity to offer opposing evidence." 8 CFR 240.11(c)(3)(iv)(1999).

When this case was initially heard by the Immigration Court in 1997, the unclassified summary of the information consisted solely of pedigree information and the brief statement that the evidence included "information concerning respondent's association with a known terrorist organization." The court concluded that this summary was largely useless. While the matter was pending on appeal to the Board of Immigration Appeals, the INS made significant additional disclosure of the evidence presented in camera. In light of the expanded disclosure, the Board deemed it appropriate for the matter to be remanded to the Immigration Court to allow the respondent an opportunity to respond to the additional unclassified information. Additionally, the Board instructed the Immigration Judge to request reexamination by the INS of the classified information "to assure that the unclassified summary of information provided to the respondent is as complete as possible." (BIA Dec. p. 2).

While the matter was on remand, the INS presented additional classified information in camera and ex parte. Additionally, the Service submitted all of the classified material for "declassification review". The result of this effort was a significant increase in disclosure.[6] Dozens of pages of previously classified material were disclosed to the respondent. The court expresses its thanks to the INS attorneys who worked on this matter to secure the declassification reviews. I believe that the INS has now done its best to secure disclosure which "is as complete as possible" given the time constraints inherent in a case involving a detained respondent. As a result of the expanded disclosure, the respondent was able to present a more focused defense to the allegation that he is a danger to the security of the United States.

Armed with a better understanding of the government's case, the respondent was successful in rebutting most of the factual allegations underlying the charge that he is a danger to the security of the United States. Although the respondent was unable to divine all of the evidence presented in secret, the more focused presentation at the remanded proceeding was useful to the court in formulating questions and identifying areas of concern regarding the

---

[6]Although the regulation refers to "unclassified summary", that term is not defined. In this case, most of the material provided to respondent was "declassified material". Most of the declassified materials were redacted versions of documents or verbatim transcripts. However, some declassified material took the form of an "unclassified summary", apparently because the original material was an oral presentation which was not recorded. See Exhibit R-2-3.

classified information.  As set forth in the Classified Attachment[7], the evidence presented in camera can no longer be viewed as sufficiently reliable to support a finding that the respondent is a danger to the United States.

A persistent concern of the court was the reason for classification of much of the secret evidence.  It appears that some of the classified information could be gathered from non-confidential sources.  If the information could be presented in open court as coming from an unclassified source, the respondent would be able to confront the evidence against him.  This is certainly a desirable feature of any court proceeding.  Indeed, the court is concerned about the possibility for abuse in this area.  Imagine, for example, an agency which has two sources of evidence of a particular fact.  One source is classified and the other source is public.  If the agency chooses to present the information through the public source, the respondent will have an opportunity to confront the evidence.  However, if the agency chooses to present the evidence through a classified source, the evidence could remain unassailable.  Imagine further the situation where an agency has classified information of a certain fact, but does not yet have a public source for that fact.  If the agency knows it can present the classified information in camera, what is the incentive to expend investigatory resources on developing a public source for that evidence?

In the instant case, the specific reasons for classifying the information remained generally unstated.  The INS Commissioner's determination which accompanies the classified information provides only a pro forma justification for the classification: "I have determined that this information is relevant to the present case and was provided by another agency which had classified it pursuant to Executive Order 12958 as requiring protection from unauthorized disclosure in the interest of national security." (Exhibit R-3, citation omitted).  As this case vividly demonstrates, much classified information bearing the Commissioner's determination can be "declassified" if there is the will to do so.  Most of the court's questions regarding the reasons for classifying certain evidence were answered with simple "boilerplate" phrases, denial of knowledge or denial of authority to discuss the matter.  The court does not ascribe any improper motives to the agency's reluctance to discuss its inner workings.  Yet, the possibilities for abuse, albeit inadvertent, are manifest.  Accordingly, where the court has determined that there are no expressed and no apparent reasons for classification of a particular piece of evidence, it is fundamentally unfair to present that evidence ex parte.  To use such evidence against the respondent would deprive him of due process of law.  See Matter of Velasquez, 19 I&N Dec. 377,380 (BIA 1986).  The matter is discussed more fully in the Classified Attachment.[8]

---

[7]After classification review of this document, it was determined that nearly all of the information in this attachment should be considered unclassified at the present time.  A redacted version of this attachment should be available through Freedom of Information Act procedures.

[8]This discussion indicates that there is a constitutional basis for rejecting a specific piece of the evidence presented by the INS in camera.  However, apart from constitutional objection, that specific piece of evidence was also found by the court to be insufficiently reliable to support any factual findings.

As a final note on the topic of confidential information, the court's previous decision touched on two issues which were resolved in the remanded proceedings. The first issue concerned the court's inability to store classified material which has been resolved with delivery to the court of the appropriate equipment. Accordingly, all material in this record is now being maintained by the court consistent with the regulatory requirements. 8 CFR 3.36(1999). The second issue concerned the possibility of limited security clearances for respondent's attorneys so that they could participate in the in camera proceedings. When the court introduced this topic at a pre-hearing conference in the remanded proceeding, the respondent's attorneys were not interested in pursuing the matter. They expressed the general opinion that such procedure would be unworkable. There would be an unbearable tension between the attorneys' need to communicate with their client and the attorneys' promise not to disclose the classified information to anyone without the appropriate security clearance.

## Withholding of Deportation-Convention Against Torture

By letter dated April 15, 1999, the respondent requested the Immigration Court to consider his application under the Convention Against Torture ("CAT"). That application had originally been filed with the District Director in June of 1997 when the Immigration Courts did not have jurisdiction over CAT claims. See Matter of H-M-V-, Interim Decision 3365 (BIA 1998). However, a recent regulatory change has assigned to the Immigration Courts jurisdiction over CAT claims. 64 FR 8478 (Feb. 19, 1999).

Under the interim regulations, the Immigration Court is to decide whether the respondent has met his burden of proof "to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 CFR 208.16(c)(1). This decision is not difficult for this court to make at this time. The court has previously found that the evidence in this case shows that the "respondent's association with Sheik Rahman will result in his detention and will likely result in his torture if he is returned to Egypt." ( Dec. p. 16). Thus, the court has already made the essential factual finding which establishes the respondent's eligibility for the relief of withholding of deportation under the CAT. There was no substantial evidence adduced on remand which would cause the court to reconsider this finding. Indeed, the testimony of witness Neil Hicks convincingly shows that the human rights situation in Egypt remains essentially unchanged. "There has been no improvement in such basic areas as the right to a fair trial, the right not to be tortured and even the right not to be extra-judicially killed. The State Security Intelligence Service operates with impunity for its disregard of the rights of citizens suspected of political opposition to the government." (Exhibit R-8, p. 1). Accordingly, the court finds that the respondent is eligible for the relief of withholding of deportation under the Convention Against Torture.

## Asylum-Discretion

In its post-hearing memorandum, the Service correctly points out that the court must deny asylum and withholding of deportation if there are reasonable grounds for regarding respondent as a danger to the security of the United States.[9] The Service observes that the term "danger" is not expressly modified in the statute. Accordingly, the Service argues that this disqualification provision should apply regardless of the degree of danger which the respondent poses. The Service believes that "any" degree of danger is sufficient to trigger disqualification. Under this reading of the statute, an alien could be denied asylum upon a finding that he poses a "minimal" degree of danger, a "slight" degree of danger or, perhaps even if he is regarded as a "possible" danger to the United States.

The Service's position is made even more clear in its discussion of the issue of discretion. An asylum application may be denied in the exercise of discretion and the Service urges the court to deny this respondent a favorable exercise of discretion because there are national security concerns present in this case. In the Service's opinion, where evidence "suggests" that the respondent is a danger to national security, a grant of discretionary relief is "unthinkable". (INS memorandum, pp. 34-35). Following the Service's argument, asylum should be denied where there is a suggestion of minimal danger to the security of the United States.

Further, the Service argues that the quantum of evidence needed to create the suggestion of danger is "slight". The government need only provide enough evidence to show an "articulable suspicion" of danger. (INS Memorandum p. 35). And, the INS believes that it is appropriate for the Immigration Court "to defer to the experience and expertise of government agents charged with protecting national security." (INS Memorandum, p. 36).

Distilled to its essence, the INS position is that the court should deny asylum where law enforcement agents suggest that the respondent may pose at least some minimal risk of danger to the security of the United States. That suggestion may be communicated without the opportunity of cross examination by the respondent and, as shown in the Classified Attachment, without answering the court's questions concerning the source of the information. Simply stating the INS position in this way is to reject it. The INS seems to be asking the court to abdicate its statutory and regulatory duty to decide the respondent's asylum claim based on the evidence presented at the hearing. The court will respect the expertise of law enforcement personnel and their dedication to protecting our country. But, the court will not defer to their credibility findings, their weighing of the evidence or their interpretations of law. When a case has been assigned to the Immigration Court, these issues are to be resolved by the court which will make

---

[9]The CAT, however, does not exclude such persons from relief. If the respondent were found ineligible for asylum and "straight" withholding, he would still be eligible for "deferral of removal" under the interim regulations. 8 CFR 208.17(1999). In that case, although the respondent could not be deported to Egypt, the INS would not be required to release the respondent and could keep him in custody indefinitely.

-13-

its own findings and conclusions based on the evidence presented.

The Service analogizes the "reasonable ground" standard to the "reason to believe" standard developed in the stop and frisk arena. Terry v. Ohio, 392 U.S. 1 (1968) (INS Memorandum, p. 23). I believe the analogy is appropriate. The court will look at the evidence presented to determine if there is reason to believe the respondent is a danger to the security of the United States. There must be evidence of sufficient quality that the court can believe the respondent is a danger to the United States.

Although a "suggestion" of danger is insufficient to require denial of asylum, where the evidence "indicates" that a ground of disqualification exists, the burden shift to the respondent to show by a preponderance of the evidence that the disqualification does not apply. 8 CFR 208.13(c)(2)(ii). In this case, the classified information, when originally presented, was sufficient to indicate the applicability of the ground of disqualification. Without a useful summary of the classified information presented in the 1997 proceedings, the respondent was unable at that time to meet the preponderance of the evidence standard. However, in the remanded proceedings, the respondent had the benefit of vastly improved disclosure. As set out above, he was able to focus on known areas of concern and was able to successfully rebut most of the evidence, including most of the classified evidence, presented by the Service. I conclude therefore that the record in this case no longer contains reliable evidence sufficient to regard the respondent as a danger to the security of the nation.

As the evidence in this matter does not establish that the respondent is a danger to national security, I conclude that there are not sufficient negative factors in this case to warrant denial of asylum in the exercise of discretion. "(T)"he danger of persecution should generally outweigh all but the most egregious of adverse factors." Matter of Pula, 19 I&N Dec. 467,474 (BIA 1987). In the May 5, 1997 decision, the court balanced the positive and negative factors in this case and found that the respondent did merit a favorable exercise of discretion. It appears that since the date of that decision, the discretionary factors have not changed substantially. Although respondent has been found guilty of a crime, which is a powerful negative factor, the court had already generally allowed for the facts which form the basis of the crime. The respondent's U.S. citizen children are now two years older, and the respondent has spent two more years in confinement. Both of those facts would militate even more strongly for a favorable exercise of discretion. Additional support for a positive exercise of discretion is found in the regulation at 8 CFR 208.16(d)(1999). That provision calls for reconsideration of a discretionary denial of asylum where the alien is to be granted withholding of deportation. The provision applies where the alien has a spouse or children who would be effectively precluded from admission to the United States by a discretionary denial. The provision applies in this case due to respondent's wife having been previously denied asylum/withholding of deportation (See Exhibit R-5-14) and this court's finding that the respondent qualifies for withholding of deportation.

The respondent has now been detained for more than three years while the court and

-14-

C

counsel wrestle with the issues involved in the use of classified information in a court setting. Although some may believe that this procedure is a valuable tool in fighting terrorism, this tool is unsuited for use in a courtroom. Handling this tool outside the investigative environment has proved to be extremely awkward. Special procedures are required at every step and the proceedings are necessarily protracted. Moreover, despite the professionalism of all counsel appearing in this case, the poisonous atmosphere created by secret accusation is impossible to completely eradicate. A recent decision by the U.S. District Court for the Eastern District of Virginia sums up the situation aptly. "The use of secret evidence against a party, evidence that is given to, and relied on, by the IJ and BIA but kept entirely concealed from the party and the party's counsel, is an obnoxious practice, so unfair that in any ordinary litigation context, its unconstitutionality is manifest." Haddam v. Reno, ___F. Supp.2d___ , 1999 WL 258420 (E.D. Va., Ellis, J.).

Accordingly, for the reasons set forth in the court's decision on May 5, 1997, as modified and expressed herein and in the Classified Attachment hereto, the previous order of this court is withdrawn and the following order shall be entered.

## ORDER

The respondent's application for Withholding of Deportation to Egypt is GRANTED, and it is further ordered that the respondent's application for Asylum in the United States is GRANTED.

DONN LIVINGSTON
IMMIGRATION JUDGE

-15-



-SEC█T-

## UNITED STATES DEPARTMENT OF JUSTICE
### EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
### IMMIGRATION COURT: 201 VARICK STREET
### NEW YORK, NEW YORK

File No. A90 674 238                                     June 24, 1999

In the Matter of                          )
    Nasser AHMED,                        )            In Deportation Proceedings
    aka Nasser Ahmed El Hommosany,  )
           Respondent.            )

## CLASSIFIED ATTACHMENT

There are eight items of classified information which were offered as evidence by the Immigration and Naturalization Service in these proceedings. Some of the items were offered in the context of bond proceedings and some were offered in the context of deportation proceedings. By stipulation of the parties, the court will consider all of the items together as one record. Both parties have expressly waived their rights to have the deportation and bond proceedings considered separate and apart pursuant to 8 CFR 3.19(d)(1999). The classified information will be considered chronologically according to the date of creation of the document or the date the testimony was given. ( See "Schedule of Classified Information" appended hereto.)   (U)

Classified by:

Reason:

Declassify on:

7/23/99
CLASSIFIED BY: SPS1-SC
REASON: 1.5 (C,D)
DECLASSIFY ON: X1,6

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
EXCEPT WHERE SHOWN
OTHERWISE

- 1 -



█ET-



## Item 1

The earliest document is an unsigned three page memorandum created by the Federal Bureau of Investigation office in Los Angeles on January 4, 1995. It relates to Yousef Mohamed Saleh. Mr. Saleh was a witness for the respondent during the initial deportation hearings held in this case in 1997. Mr. Saleh's support for Sheik Rahman is described in this document. The document states that there is reason to believe that Saleh "is or may be engaged in international terrorism." (S)(u)



Saleh is labeled "Armed and Dangerous" in this 1995 document. (S)(u)

The sources of much of the information in this document are described as "T-1", "T-3" and "T-4". The reliability of T-1 is not described. However, T-3 is described as "an asset who has provided reliable information in the past." T-4 is "a highly reliable asset". (S)(u)

## Item 2

"Item 2" is a five page unsigned memorandum, created by the FBI in New York, dated April 23, 1996. In later ex parte testimony, FBI Special Agent ████████ acknowledges drafting the document. The date of the memorandum is the same date that the respondent was taken into custody by the INS as they revoked respondent's previous bail of $15,000. (S) (u)

This memorandum focuses specifically on the respondent. It states that an investigation has concluded that the respondent is a member of al-Gama'a. Respondent is identified as a "loyal supporter" of Sheik Omar Abdel Rahman. Respondent's relationship with Sheik Rahman is described as "a close personal and professional association" which survived the Sheik's conviction for seditious conspiracy. (U)

Portions of the document describing respondent's visits to Sheik Rahman at a federal prison in Springfield, Missouri have been declassified. Likewise, unclassified portions of the (U)





document draw a correlation between respondent's visit to Springfield and the release of a letter from Sheik Rahman on April 15, 1996 calling on his supporters to "make your voice heard." A further connection is implied between that letter and the April 18, 1996 attack by terrorists on Greek tourists in Cairo.  **(U)**

The respondent is described as maintaining contact with al-Gama'a members,

**(S)**

The memorandum states that respondent indicated that a particular witness against Sheik Rahman would be killed by the "Brothers" if they could find him.  Also, the memorandum repeats "reliable source reporting" that respondent "maybe selling fraudulent immigration documents in the Arab community of Brooklyn."  **(S)(u)**

Respondent's association with the Abu Bakr Mosque is described.  **(S)**

Elgabrowny has since been convicted, along with Sheik Rahman, of seditious conspiracy and other charges.  The clear implication of the information regarding the check is that it may have been used to purchase supplies for the WTC bombing.  Despite this court's later attempts to have the bank records produced and disclosed to the respondent, further documentation regarding this transaction was not provided either in camera or in court.

**(b)(X) (s)**

Item 3

Bond redetermination proceedings were conducted following respondent's arrest on April 23, 1996.  In the course of those proceedings, in camera testimony was presented on April 28, 1996.  The proceedings were not recorded.  Item 3 is a summary of those proceedings prepared by an unknown author.  The summary basically repeats information contained in the memorandum of April 23, 1996 (Item 2).  Among additional facts disclosed by the investigation of respondent is that respondent was responsible for raising funds for the legal defense of Sheik Rahman and also raised funds to aid Muslims in Bosnia.  **(S)(u)**



This document justifies the use of classified information as necessary to protect the FBI's sources which include "a friendly foreign intelligence service" and ████████████ ██████ (S)

**Item 4**

On January 30, 1997, in camera testimony was taken in the course of the deportation hearing. FBI Agent ████████ who was assigned to the "Joint Terrorist Task Force in New York" testified under oath. The testimony reiterated information previously received by the court. Agent ████████ emphasized the importance of the April 18, 1996 attack on Greek tourists in Cairo and again implied that the respondent carried a message from Sheik Rahman which sparked the attack. (S) (U)

From this testimony, certain themes clearly emerge. First, respondent is deemed a danger to the security of the United States because of his association with Sheik Rahman who has been convicted of seditious conspiracy. Respondent is viewed as a conduit of information from Sheik Rahman to his followers. The FBI assumes there is a relationship between respondent's contact with Sheik Rahman and the release of Sheik Rahman's letter complaining of his treatment in federal prison. That activity is deemed objectionable because it presumably led to the attack three days later on Greek tourists in Cairo. (U)



- 4 -





-SECRET-

## Item 5

On August 7, 1998, the BIA remanded the record in the deportation case to this court. In the course of the remanded proceedings, the INS indicated its intention to present further in camera testimony. By letter dated September 14, 1998, FBI Chief Division Counsel ████ ████ explained why the FBI requested that the testimony of the witness be taken in secret. That letter is classified "Secret" and will be referred to herein as "Item 5".  (X)(U)

████████ letter indicates that the FBI investigation of the respondent was ████ (S) ████████████ and is "pending inactive" since March 26, 1998. ████████ identifies the prospective witness as Special Agent ████████ who has been the case agent ████████ ████████████████ (S)

████████ expresses a desire to protect "sensitive intelligence sources" developed in the United States and abroad as well as other government agencies, foreign intelligence services and foreign law enforcement agencies.  (S) (U)

## Item 6

This is a memorandum dated September 22, 1998 presented in connection with Special Agent ████ October 7, 1998 in camera testimony. The memorandum continues to express the themes delineated in the earlier documents and testimony. The respondent is again identified as a dedicated follower of Sheik Rahman who is the spiritual leader of al-Gama'a.

████████████████████████████████████████████████ (S)

This memorandum likewise continues a recitation of specific actions taken by the respondent. Interestingly, the memorandum repeats the story concerning Sheik Rahman's April 15, 1996 complaint letter but it omits any description of respondent's trips to Springfield. Likewise, the memorandum fails to mention the April 18, 1996 attack on the Greek tourists in Cairo. These omissions lead to the conclusion that the author of the memorandum no longer believes there is a connection between respondent's actions and the April 18, 1996 attack. This is a significant shift considering that respondent's present detention dates from the week (U)

- 5 -



-SECRET-



following that attack. Moreover, the implied connection between respondent's actions and the attack had figured prominently in the original submission justifying respondent's continued detention. (See item 2 above.) It would appear that, in item 6, the FBI abandons one of the primary factors supporting its initial conclusion that the respondent is a threat to national security. (X)(u)



Additional acts are spelled out in this memorandum. ▮▮▮▮▮▮▮▮▮▮▮ (S) ▮▮▮▮▮▮▮▮▮▮ (Another source learned from a "subsource" that the respondent attempted to obtain bomb making manuals to send to overseas terrorist groups. Respondent is reported to be involved in the sale of fraudulent immigration documents and to have obtained false Afghanistan passports for himself and his family. One source reported that respondent was present when the ▮▮▮▮▮▮▮▮ (S) ▮▮▮▮▮▮▮▮ was discussed. (S)

(R)(X)(S)

Much of the information provided in this memorandum is described as emanating from four sources. The sources are identified as "T-1", "T-2", "T-3" and "T-4". (It would appear that these sources are not the same sources identified in the Los Angeles FBI memo, "Item 1", as T-1, T-3 & T-4.) The memorandum offers assessments of the credibility of each source. The FBI appears to have complete faith in T-2 and T-3 but the memorandum expresses some doubt about T-1 and T-4. Indeed, later in the proceedings, the FBI witness indicated that the agency had lost confidence in T-1. (Item 7, p. 57). Given the central importance of the credibility of these sources, the court asked if the sources could be produced as witnesses in an in camera proceeding. When that request was denied, the court submitted questions to the agency concerning these sources (see Item 8) in order to properly assess the credibility of the sources and the reliability of the information set out in the various in camera submissions. The result of this effort will be discussed below. (R)(u)

Unclassified portions of item 6 set forth public information concerning Osama bin Laden's "fatwa" against the United States which is motivated in part by Sheik Rahman's (u)

- 6 -





imprisonment in this country. An unclassified portion of the document also refers to respondent as an "unindicted co-conspirator" in the seditious conspiracy prosecution of Sheik Rahman. (U)

### Item 7

This item is an 80 page transcript of the in camera testimony of FBI Special Agent ███████ taken on October 7, 1998. Special Agent ██████ identified himself as the team leader for the investigation into the bombings in East Africa ████████████████████ (S) ████████ His testimony repeated the themes contained in the prior secret information and provided some fresh insights. (U)

Special Agent ██████ reported tha[███████████████████████] (S)

██████████████████████████████████████████████████████████████████████████████████ (S)

As in the prior in camera submission, S.A. ██████ testimony describes specific acts of the respondent. Prominent in S.A. ██████ testimony is respondent's participation ███████ ██████████████████████████████████████████████████████ (S)

Another specific act of the respondent described by Special Agent ██████ was respondent's attempt to obtain bomb manuals to export overseas. This information was provided by a "subsource". (U)

Special Agent ██████ also described respondent's function as an informational conduit for Sheik Rahman. S.A. ██████ specifically identified the purpose of these communications as including affairs of the mosque and communicating Sheik Rahman's complaints about the conditions of his incarceration. S.A. ██████ indicated that "the actual individuals with whom (U)

-SECRET-



(the respondent) was communicating for the Sheik were not involved in nefarious activities." (p. 20). (S)(U)

As in item 6, Special Agent [redacted] testimony appears to abandon the implied accusation that the respondent was instrumental in having Sheik Rahman's letter of April 15, 1996 released to the international media.

"Q.....The question was how did that letter get out of Springfield?
"A. We don't know.
"Q. You don't know (?)
"A. We don't know." (S)(U)



Special Agent [redacted] testimony discloses an additional concern, not made evident in earlier submissions (pp. 28-29):

"A.... plus, his prominence in the community will increase if he is released.
"Q. Why?
"A. [redacted] (S)

"Q. Well, does that mean that he would be any more credible than he was before to the members?
"A. Yes, he would be more well known, lending to his credibility in the community both inside the United States and outside the United States. They are aware of his incarceration outside the United States. Should he be released, his popularity has increased, people would be more inclined to listen to him."

This concern is echoed in a latter passage where S.A. [redacted] believes that respondent's release (u)

- 8 -





from custody would result in him becoming "a leader in the community." (p.42). Alternatively, S.A. ▮▮▮▮ feels respondent would flee the United States if he were released. (p.45).  (X)(U)



## Item 8

Following Special Agent ▮▮▮▮ in camera testimony, the respondent was provided with declassified portions of that testimony. Declassified portions of the other secret items had also been provided to respondent. The matter was then heard in open court where the respondent had an opportunity to address the information of which he had been made aware. Following the open court proceedings, the court indicated that it wished to question Special Agent ▮▮▮▮ further. Respondent's presentation in the open court proceedings was successful in challenging much of the in camera information. Issues of credibility and reliability were made obvious. In anticipation of S.A. ▮▮▮▮ being recalled as an in camera witness, the court assembled a series of questions in writing and presented them to the INS. The purpose of presenting these questions in advance was to help secure the appropriate clearance for S.A. ▮▮▮▮ to be able to answer the questions.  (X) (U)

In response to the questions, the INS submitted an unclassified response and a classified declaration from Special Agent ▮▮▮▮ The court's questions, the unclassified response and the classified declaration together are "Item 8".  (X) (U)

The classified declaration of S.A. ▮▮▮▮ makes it clear that most of the questions would not be addressed because answers would involve divulging potentially source-identifying information. Special Agent ▮▮▮▮ acknowledges that the obvious purpose of the questions is to elicit information which would be useful to the court in assessing the reliability of the FBI's sources. S.A. ▮▮▮▮ indicates that the F.B.I. follows internal guidelines regarding the assessment of the reliability of confidential sources. He also points out that FBI Special Agents have expertise in assessing the reliability of its sources.  (X) (U)

Special Agent ▮▮▮▮ points out that he has "worked closely with the Special Agents who (U)

- 9 -

-SECRET-



-SECRET-

have served as handlers to the sources who have provided information on Nasser Ahmed ." (p.3). It thus appears that the information provided by sources T-1, T-2, T-3 & T-4 was communicated first to handlers. The handlers then communicated the information to S.A. ████ who testified before the court. The source material is thus properly characterized as hearsay upon hearsay. (S/U)

## Assessment of the Secret Information

The court has been willing to begin consideration of the secret evidence by presuming that the FBI has correctly assessed the value of its information. This presumption grows out of the respect which this court has for the FBI based on the knowledge, training and skill of the members of the organization. However, when that information is successfully challenged by other evidence, and when logical and factual inconsistencies appear, the presumption is no longer applicable. The relevant statute and regulations clearly assign the Immigration Judge the task of deciding whether the evidence warrants a grant or denial of an asylum application submitted in deportation proceedings. If Congress or the Attorney General wished the FBI or any other agency to exercise veto power over asylum applications, that power would appear in statute or regulation. (See e.g. INA sec. 212(f)). In the absence of such provision, this court is charged with evaluating the reliability of the evidence presented in each case. In this particular case, the court is charged with evaluating the reliability of the FBI's confidential sources. (S/U)

Virtually all of the secret information is hearsay not subject to any exception to the hearsay rule. Most of this information is double or triple hearsay. Of course, hearsay evidence may be admissible in deportation proceedings. 8 CFR 240.46(b)(1999). However, hearsay may be relied upon only if it is probative and its use would not be fundamentally unfair. See Matter of Grijalva, 19 I&N Dec. 713, 722 (BIA 1988); Saidane v. INS, 129 F.3d 1063 (9th Cir. 1997). (U)

The main problem with hearsay, of course, is that it is difficult to evaluate the credibility of the evidence where the declarant is not produced for examination. Nevertheless, the court must undertake an analysis of the credibility of the evidence using the tools at its disposal. (U)

In the instant case, the court requested the INS to present the hearsay declarants ("sources") in court. The proceedings would have been held in camera to protect the confidentiality of the information. Citing national security concerns, the government declined to produce the declarants as witnesses. (U)

In an effort to obtain information to assess the credibility of the hearsay declarants, the (U)

- 10 -



or relationships which would cause animosity toward the respondent or whether they have been witnesses or defendants in criminal trials. (U)

Case 1:99-cv-03458-JAL Document 4 Entered on FLSD Docket 12/23/1999 Page 151 of 183

One specific area of questioning concerns the role of the Egyptian government in this proceeding. The desire of the Egyptian government to silence Sheik Rahman, one of its harshest critics, is manifest on the public record in this case. The very real danger that the Egyptian government may seek to silence Sheik Rahman by persecuting the respondent has also been established on the public record. Accordingly, the extent to which the Egyptian government may have provided the information presented in camera is a very real concern of this court. (U)

The FBI, however, decided it would make no substantial response to most of the court's questions. S.A. ████ declaration acknowledges the court's interest in the reliability of the information. However, S.A. ████ in refusing to answer questions about the FBI sources, stresses the importance of protecting "source identifying information." (U)

The government's failure to respond to the credibility questions leaves the court utterly unable to assess the reliability of the government's hearsay evidence. The FBI urges the court to defer to its assessment of credibility. As Special Agent ████ points out, FBI personnel are specially trained in assessing reliability. This approach may have been appropriate earlier in the proceedings when there were no apparent reasons to doubt the reliability of the FBI's sources. However, on remand, the respondent has provided evidence to challenge the allegations against him. He has shown the existence of strong political-religious controversy within the expatriate Egyptian community and a fierce internecine struggle for control of the Abu Bakr Mosque. The interests of the Egyptian government clash head-on with the respondent's political and religious activities. That government's animosity toward the respondent is manifest on this record and its role in assembling evidence and providing it to the FBI should be explored. However, the FBI has refused to provide the court with evidence from which the court could make an independent evaluation of the credibility of its sources. In light of that refusal, this court must reject the secret information as being of unproven reliability. (U)

Even if the court were able to accept the secret information, that information is not sufficient to disqualify the respondent for asylum and withholding of deportation. The main themes set out in the secret presentations do not show the respondent to be a danger to national security when the record is considered as a whole. Those themes can be identified as follows. 1. Respondent is associated with Sheik Omar Rahman. 2. Respondent is a member of al-Gama' (U)

- 11 -



al-Islamiyya. 3. Respondent is associated with the Abu Bakr Mosque in Brooklyn, New York. 4. Respondent has taken several specific actions showing his dangerousness.   **(U)**

    With respect to respondent's association with Sheik Rahman, the respondent has admitted clearly that he is a follower of Sheik Rahman's religious teachings. Respondent claims to be non-violent and believes Sheik Rahman has no desire to "retaliate" against the United States. The non-classified evidence in this case indicates that Sheik Rahman has millions of followers and the vast majority of them are normal non-violent people. Thus, respondent's claim to being a non-violent follower of Sheik Rahman is plausible. Respondent's association with Sheik Rahman also has a business aspect since the respondent was his court appointed paralegal. Clearly, this activity was legally sanctioned by the U.S. District Court which shows a legitimate basis for at least part of respondent's association with Sheik Rahman.   **(U)**



    In order to establish membership in al-Gama'a, it is necessary to go beyond evidence that respondent associates with "known members". The INS has attempted to do this by providing evidence of respondent's statements that he is an al-Gama'a member. However, that evidence takes the form of hearsay from declarants of unproven reliability (sources T-1 et al.) or from the testimony of a seriously biased witness (Sheik Al-Sharif).   **(U)**



- 12 -



Other specific acts cited by the government <u>in</u> <u>camera</u> include respondent's visit to Sheik(U)

-S█████T-

Rahman in Springfield ██████████████████████████████████ (S)

██████████████████████████████████████ respondent's efforts in securing bomb making materials to send overseas and a possible attempt to elude U.S. government agents. With respect to the respondent's visit to Springfield, the issue is thoroughly discussed in the court's public decision. Clearly, this can no longer be regarded as a reason to regard the respondent as a danger to national security. (S) (U)



(S)

The classified information concerning a bomb making manual was basically declassified in the course of the remanded proceeding and it is discussed in the court's public decision. What was not apparent from the declassification is that the source for the information was actually a "subsource" with which the FBI had no direct contact. The reliability concerns which the court has expressed is multiplied in this situation. The credibility determination for this information is apparently in the hands of a private person of unproved credibility. Accordingly, the information relating to the bomb-making manuals provides little support for the claim that respondent is a danger to national security. (S) (U)



███████████████████████████████████████ (S)

- 14 -

-S█████T-



Although the classified information appeared sufficient in 1997 for this court to find the respondent a danger to national security, that conclusion is no longer warranted. Respondent's presentation has convinced the court to take a new look at the classified information. That information is now found to be too insubstantial to indicate that the respondent is a danger to national security. In view of the infirmities of the classified information, the court finds that respondent's denial of al-Gama'a membership is uncontradicted by substantial evidence.   (U)



-SECRET-

## SCHEDULE OF CLASSIFIED INFORMATION

Item 1.    Jan. 4, 1995    Document    3 pages, created by FBI, Los Angeles, re: Yousef M. Saleh. (Exhibit IC-2). (X( u )

Item 2.    April 4, 1996    Document    5 pages, created by FBI, New York, re: Nasser Kadri Ahmed, aka Nasser Ahmed, aka Nasser Homosamy  (Exhibit IC-1).

Item 3.    April 29, 1996    Document    3 pages, summary of in camera bond proceeding

Item 4.    Jan. 30, 1997    Transcript    24 pages, testimony of Special Agent ▮▮▮▮

Item 5.    Sept. 14, 1998    Document    3 pages, letter from ▮▮▮▮

O-1

Item 6.    Sept. 22, 1998    Document    10 pages, letter from FBI, New York to Office of the Immigration Judge

Item 7.    Oct. 8, 1998    Transcript    80 pages, testimony of Special Agent ▮▮▮▮

Item 8    March 19, 1999    Document    5 pages, declaration of ▮▮▮▮ responding to IJ questions, 1 page.

-SECRET-

## DELETION CODES

A    INFORMATION WHICH IS PROPERLY CLASSIFIED PURSUANT TO EXECUTIVE ORDER, THE DISCLOSURE OF WHICH COULD REASONABLY BE EXPECTED TO CAUSE DAMAGE TO THE NATIONAL SECURITY OR THE CONDUCT OF THE GOVERNMENT'S INTERNATIONAL RELATIONS.

O-1    FBI SPECIAL AGENTS NAMES

U.S. Department of Justice
Executive Office for Immigration Review

Decision of the Board of Immigration Appeals

Falls Church, Virginia 22041

==================================================================

File:   A90 674 238 - New York

Date:   NOV 1 5 1999

In re:   NASSER AHMED

IN BOND REDETERMINATION PROCEEDINGS

APPEAL

ON BEHALF OF RESPONDENT:   Louis M. Bograd, Esquire
American Civil Liberties Union Foundation
1875 Connecticut Avenue, N.W.
Suite 410
Washington, D.C. 20009

ON BEHALF OF SERVICE:   Julia Doig
Chief Appellate Counsel

Suzanne McGregor
Assistant Regional Counsel

John J. Mulrooney II
Anne E. Gannon
Assistant District Counsels

APPLICATION:   Stay of execution

Chief Appellate Counsel for the Immigration and Naturalization Service has requested a stay of execution of the Immigration Judge's order in bond redetermination proceedings of September 27, 1999, ordering respondent released on his own recognizance. On September 28, 1999, the Board granted a temporary stay pending further consideration of the case. After consideration of all information submitted as reflected in the Immigration Judge's order of October 21, 1999, clarifying the record on appeal, the Board has concluded that the request for stay of execution will be denied. The Board has concluded that there is little likelihood of the Service prevailing in its appeal of the Immigration Judge's order in bond redetermination proceedings on September 27, 1999. The previously granted temporary stay is vacated.

ORDER:   The request for a stay of execution of the Immigration Judge's September 27, 1999, decision is denied and the previously granted temporary stay is vacated.

_Lauren R. Mathon_
FOR THE BOARD

Board Member Lauri Steven Filppu would maintain the stay during the pendency of this bond appeal, and dissents without opinion.

UNITED STATES DEPARTMENT OF JUSTICE

EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

IMMIGRATION COURT

NEW YORK DISTRICT

------------------------------------------------------------------

IN THE MATTER OF

Nasser Ahmed

aka Nasser Ahmed Homosany                    File: A90-674-238

aka Nasser Ahmed Kadri

aka Ahmed Aly El-Homosany


RESPONDENT IN DEPORTATION PROCEEDINGS

------------------------------------------------------------------


Declassified Material


On Behalf of Service:

Anne E. Gannon
Assistant District Counsel
New York District

Suzanne McGregor
Assistant Regional Counsel
Eastern Region, INS


September 25, 1998


R - 2

Declassified Material

Please find attached redacted versions of :

1.     The classified document previously presented to the Immigration Court *in camera* and *ex parte* redacted according to declassification review completed September 24, 1998;

R-2-1

2.     Transcript of *in camera* testimony redacted according to declassification review completed September 24, 1998;

R-2-2

3.     Unclassified summary of the material which remains classified after declassification review completed September 24, 1998;

R-2-3

April 23, 1996

**NASSER KADRI AHMED**, aka **NASSER AHMED**, **NASSER HOMOSAMY**
INTERNATIONAL TERRORISM

This document is classified "S~~ECR~~ET" in its entirety unless otherwise marked.

**NASSER KADRI AHMED**, aka **NASSER HOMOSAMY**, born February 6, 1960, in Cairo, Egypt, currently resides at 3726 Cypress Avenue, Brooklyn, New York. **HOMOSAMY** has lived in the United States since 1983 with his spouse, **SALWA M. ELBYADI**, born February 4, 1961. U.S. **IMMIGRATION** records reflect that both **HOMOSAMY** and **ELBYADI** are illegal aliens, and have two children born in the **UNITED STATES**. (U)

Investigation of **HOMOSAMY** has confirmed that he is a known member of **AL-GAMA AL-ISLAMIYYA** (**AGAI**). Reliable source reporting reflects that **HOMOSAMY** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ a close personal associate of **HOMOSAMY**, are members of **AGAI**. **AGAI** is an Egyptian based international radical fundamentalist/extremist organization whose members espouse the overthrow of the secular Egyptian government by using terrorism to intimidate that government, its citizens, and supporters of the Egyptian government, to include the United States. The **AGAI** and **AL-JIHAD** have, over the past decade, been the most persistent security threats to the Government of Egypt, and have undertaken numerous violent acts in support of their goals. To some as yet unknown degree, **AGAI** is affiliated with **HAMAS**, an organization that espouses an extremist Islamic fundamentalist ideology that encompasses Israel and the Israeli-occupied territory in the West Bank. (TS)

Investigation has further confirmed that **AGAI** has claimed responsibility for several acts of violence to include the attempted assassination of Egyptian President **HOSNI MUBARAK** in Addis Ababa, Ethiopia in June, 1995. It should be noted that although the assassination attempt failed, the operational planning for the attack was sophisticated and highlights the group's (**AGAI**) improved operational capability. Further, on October 20, 1995, a car bomb detonated outside of police headquarters in Rijeka, Croatia, killed the driver and critically injured two (2), to include the loss of a leg by a police officer. Moreover, twenty-four (24) others, mostly police



personnel, were injured in the Rijeka bombing. On October 21, 1995, AGAI claimed responsibility for the Rijeka bombing. (U)

HOMOSAMY, is a loyal supporter of SHEIK OMAR ABDEL RAHMAN, the spiritual leader of AL-GAMA AL-ISLAMIYA, who was convicted of conspiracy for his role in assassination and bombing plots in the United States and Egypt. On January 17, 1996, SHEIK RAHMAN and several of his followers were sentenced on seditious conspiracy charges related to the conspiracy to bomb the UNITED NATIONS, the New York FEDERAL BUILDING located at 26 Federal Plaza, New York City, and the LINCOLN and HOLLAND Tunnels. SHEIK RAHMAN was sentenced to life for his involvement in the above plots which were intended to force the United States to end its support of the Governments' of Israel and Egypt. SHEIK RAHMAN was subsequently remanded to the U.S. MEDICAL FACILITY FOR FEDERAL PRISONERS located in Springfield, Missouri. (U)

According to the presiding judge at SHEIK RAHMAN's trial and sentencing, JUDGE MICHAEL B. MUKASEY stated that had the plots of SHEIK RAHMAN and his followers been carried out and subsequently accomplished in the New York Metropolitan area, that the destruction caused would have resulted in the murder of hundreds if not thousands of people, and would have made the related 1993 bombing of the WORLD TRADE CENTER seem insignificant. (U)

HOMOSAMY has maintained a close personal and professional association with SHEIK RAHMAN during his trial in New York, and following RAHMAN's conviction and sentencing (October, 1995 and January, 1996). Prior to RAHMAN's conviction, HOMOSAMY was one of SHEIK RAHMAN's paralegals. Following HOMOSAMY's arrest by the IMMIGRATION AND NATURALIZATION SERVICE (INS) on April 24, 1995, JUDGE MUKASEY relieved HOMOSAMY as SHEIK RAHMAN's paralegal due to his illegal alien status. (U)

███████████████████████████████████ has confirmed that SHEIK RAHMAN placed NASSER AHMED of New York, New York, telephone number (718) 714-9377, on his telephone list from prison. Moreover, from March 22, 1996 to March 26, 1996, HOMOSAMY traveled on Northwest Airlines from New York to Springfield, Missouri. ████████ reporting further reflects that HOMOSAMY traveled to Missouri on or about November 2, 1995. ██████ ██████opines that HOMOSAMY traveled to Missouri for the purpose of visiting SHEIK RAHMAN in prison. (U)

2

On April 15, 1996, the **NEW YORK TIMES** reported that Mr. **ABDEL RAHMAN** submitted a letter to a London-based Arabic daily newspaper, **AL HAYAT**, accusing prison guards at the **UNITED STATES MEDICAL CENTER FOR FEDERAL PRISONERS**, in Springfield, Missouri, of racial discrimination and religious prejudice. **RAHMAN** called on his supporters to "make your voice heard" to improve his living conditions. **RAHMAN** further stated that "People of manhood, support, sacrifice and dignity: Rise up from your deep slumber and make your voice heard", "Rise up and see justice done." (U)

On April 18, 1996, in Cairo, Egypt, gunman with automatic rifles and pistols opened fire on Greek tourists outside their hotel, killing eighteen (18) people and wounding at least seventeen (17) others in the most violent attack on foreigners since tourists became targets in Cairo beginning in 1992. Although no group claimed responsibility for the attack, senior Egyptian officials said they suspected cells of the Islamic Group, fundamentalist Muslims who have waged a violent four-year old campaign to undermine Egypt's secular Government. Their former spiritual leader, **SHEIK OMAR ABDEL RAHMAN**, is serving a life sentence in the United States. As previously set forth, **SHEIK RAHMAN** made a statement from prison recently calling on his followers to avenge him based upon his treatment in prison by U.S. authorities. (U)

On ▆▆▆▆▆▆▆ 1996, a reliable source reported that **NASSER HOMOSANY** supports statements made by **SHEIK RAHMAN** about retaliation against the United States. ▆▆▆▆▆▆▆

Finally, investigation ▆▆▆▆▆▆▆▆▆▆▆▆ reflects that NASSER AHMED HOMOSANY was arrested on or about April 9. 1996, by NYPD (70th Precinct) for violating a restraining order at the ABU BAKR Mosque.   (U)

Based upon the foregoing, to include the recent sentencing of SHEIK RAHMAN and his followers, New York's heightened security concerns are well founded as recent events and U.S. Intelligence community reporting illustrate. ▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ guilty verdict and sentencing of SHEIK RAHMAN greatly enhances the potential for SHEIK RAHMAN's followers and other radical fundamentalists/extremists, to initiate terrorist operations against United States interests worldwide.   To this end, NASSER KADRI AHMED, aka NASSER HOMOSANY, should be classified a special interest case, and all steps

4

should be taken by INS ▇▇▇▇▇▇ to commence deportation proceedings. It is further recommended that HOMOSAMY be detained without bond to limit his ability and mobility to participate in any action which might threaten the national security of the UNITED STATES or its citizens.  ⊠ U

The following represents background information about HOMOSAMY:  (U)

```
NAME:    NASSER KADRI AHMED, aka NASSER HOMOSAMY
DOB:     February 6, 1960
POB:     Cairo, Egypt
Sex:     Male
Social Security Number:  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 and 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
A #:     A90-674-238
New York Driver License Number:  A08465 74529 701387-60
Education:  BSEE, Alexandria University - 1986
Occupation:  Electrical Engineer
Previous Employment: RHODES AND BASSO ENGINEERS, PC
                     38 East 30th St., NYC
Spouse:  SALMA M. ELBYADI
         DOB:  02/04/61
         Sex:  Female
         NY Driver License Number:
                     E12091 57221 551356-61
                                           (U)
```

5

Tape 1

(U) This is file A90 674 238. This is an in camera proceeding in the Matter of Nasser Ahmed. Immigration Judge John Livingston is present and Suzanne McGregor for the Immigration Service is present. Deputy District Counsel New York District; also Assistant District Counsel Anne Gannon is present and counsel has provided me with two documents: one is a memorandum. The memorandum itself is dated April 23, 1996, and the other is a memorandum, dated January 4, 1995, both of them have the certification from the Commissioner that the information is relevant and classified under the Executive Order. They'll be marked IC-1 and IC-2. "IC" standing for "in camera."

(U) MCGREGOR (?): Judge, I just ask that you speak to [unintelligible]

(U) JUDGE: Okay. Alright, let the tape reflect that I'll mark on the outside also and the tape will be handed to you, Ms. McGregor, because, as you know, the Court doesn't have the facilities for maintaining any classified information. And you have a witness today?

(U) MCGREGOR: Yes.

(U) JUDGE: Okay. And the witness is?

(S) MCGREGOR: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(U) JUDGE: Okay. ▮▮▮▮▮▮▮

(S) MCGREGOR: ▮▮▮▮

(U) JUDGE: Okay. Alright. Would you stand and raise your right hand. Do you swear to tell the truth, the whole truth, and nothing but the truth?

(U) ▮▮▮▮▮▮▮ I do.

Classified by:  39645, Office of General Counsel, National Security Affairs

Reason: _____
Declassify on: _____

R-2-2

Document is unclassified as redacted.

(S) JUDGE: Okay. I read the microphone pulled over. Okay. Mr. McGregor.

(S) MCGREGOR

(S)

(S) MCGREGOR

(S)

(u) (S) MCGREGOR: We have represented to Judge Livingston two documents that are classified as Secret in their entirety. [Unintelligible] document dated April 23, 1996, does have certain unclassified portions of it which we will get to later [unintelligible]. The document that I just referred to dated April 23, 1996, document references an organization called Al-Gama. What, if anything, can you tell Judge Livingston about the nature of that organization?

(u) (S)                    Al-Gama Al-Islamiyya is an Egyptian based, radical, fundamentalist organization that espouses the overthrow of the Egyptian government through means of terrorcy and by acts of terrorism to intimidate that government and supporters of that government, including the United States and Israel.

(u) (S) MCGREGOR: Between the time that Mr. Homosamy was subject to these proceedings, he became a subject of investigation by             at the time of his present incarceration last April. What actions has Al-Gama taken in furtherance of the goals that you just described?

(u) (S)                 Well, number one, there was the attempted assassination of Egyptian President Hosni Mubarak in Ethiopia.

(u) (S) MCGREGOR: When was that?

(u) (S)             believe that was in June of 95. Then in October of 95, there was a bombing outside of police headquarters in the Rijeka, Croatia. A police officer was killed and possibility 25 other individuals were killed. And then in Islamabad, Pakistan, there was a bombing of the Egyptian embassy. And finally, on April 18, 1996, there was a killing of 18 Greek tourists in Cairo at [unintelligible].

(u) (S) MCGREGOR: And, the bombing of the Egyptian embassy in Pakistan, was when?

(u) (S)             I believe it was 95.... 1995.

(u) (S) MCGREGOR: Who is the spiritual leader of Al-Gama?

(u) (S)             The spiritual leader of Al-Gama is Sheik Omar Abdel Rahman.

Page 2 of 24

(u) MCGREGOR: He was recently convicted as a result of a trial by charges of conspiracy to overthrow the Government of the United States. Since his incarceration, has he continued to act in this capacity as spiritual leader of Al-Gama?

(u) ▇▇▇▇ Yes, he has.

(u) MCGREGOR: What actions has he called on, if any, for his followers to take as a result of his incarceration?

(u) ▇▇▇▇ Well, specifically, three days prior to the killing of the 18 tourists in Egypt, which was April 18, 1996, three days prior to that, Rahman interviewed two Arabic newspaper [?], Al Hayat, and in that interview, he specifically states that the prison facility where he is incarcerated, he believed that there is prejudice against him, against his ability to pray, and that the living conditions were deplorable and Rahman further stated in this article that his followers should avenge him and three days later that's when those individuals, those Greek tourists, were killed.

(u) MCGREGOR: And has Mr. Homosamy maintained contact with the Sheik, with Sheik Rahan since his incarceration? Since Sheik Rahman's incarceration, I mean.

(u) ▇▇▇▇ Yes, he has. The information that we have from the Bureau of Prisons is that Sheik Rahman specifically requested that Homosamy's telephone number be placed on his list of individuals that he can call from the prison facility and we have information that in November in 1995 that Nasser Ahmed flew from New York to St. Louis to visit Sheik Rahman in prison and also on March, I believe it was March 26...22nd through the 26th, of 1996,... and that was a month before Homosamy was arrested by Immigration...he went out to St. Louis to visit Sheik Rahman.

(u) MCGREGOR: What is Mr. Homosamy's role in the Al-Gama organization? Would you describe what the...what his role is in that organization?

(u) ▇▇▇▇ Our investigation has shown that he was on the Board of Directors at the Abu Bakr Mosque, which is in Brooklyn. And our investigation has shown that only the most radical elements of the group served as a trustee on the Board of Directors. And also, I might add, that if you peruse his asylum application, he states that he was on the Board of Trustees, and we know for a fact that, as I said, it was mostly the... it was only the most radical elements of the Mosque [unintelligible]

(u) MCGREGOR: [unintelligible]

(u) ▇▇▇▇ [unintelligible]

(U) (U) MCGREGOR: [unintelligible]   Mr. Homosamy has testified...and the Government doesn't contest...that he's worked as a paralegal for the Sheik.  He...in his testimony...indicated that, in his position as paralegal, his duties included delivering and translating documents for the Sheik and the Sheik's attorneys? In the criminal case. . What else...what else, have Mr. Homosamy and other paralegals used the position of paralegals for? 



(U) (S) ██████████ They've used their positions to act as a courier of information from the Sheik to other Al-Gama followers. ██████████

(S) MCGREGOR: ██████████

(U) (S) ██████ [unintelligible]

(S) MCGREGOR ██████

(U) (S) ██████ Yes.

(S) MCGREGOR: ██████████

(S) ██████████

(S) MCGREGOR: ██████████

(S) ██████████

(U) (S) MCGREGOR: Okay.

(S) ██████████

(S) MCGREGOR: ██████████



(S) MCGREGOR



(u) (S) MCGREGOR: Has Al-Gama expressed any intentions regarding taking action against U.S. citizens?

(S) MCGREGOR:

(u) (S) ...cts of terrorism on U.S. soil or U.S. interests abroad...and its citizens.

(u) (S) MCGREGOR: ...including kidnapping or...?

(u) (S) Yes.

(u) (S) MCGREGOR: Bombing?

(u) (S) Well, specifically [unintelligible]...

(u) (S) MCGREGOR: And in what newspaper did that occur?

(u) (S) Al Hayat.

(u) (S) JUDGE: When was that?

(u) (S) Let's see...one second...

(u) (S) JUDGE: What was the date?

(u) (S) ...excuse me. That was incorrect. Excuse me.

(u) (S) JUDGE: Want to give an approximate date?

(u) ▓▓▓▓▓▓ I would say approximately, um, mid-1995. Excuse me, mid-1996.

(u) ▓▓ MCGREGOR: You mean, 1996?

(u) ▓▓▓▓▓ Yes.

(u) ▓▓ MCGREGOR: Okay.

(u) ▓▓ JUDGE: This was after Mr. Homasamy was taken into custody.

(u) ▓▓▓▓▓ This was around.... I believe, it was around the time when Rahman made, when Rahman came [unintelligible] himself in Al Hayet on April 15ᵗʰ. So, I would say that it was shortly before actually...

(u) ▓▓ MCGREGOR: Shortly before?

(u) ▓▓▓▓▓ Yeah.

(u) ▓▓ MCGREGOR: Can we continue?

(u) ▓▓ JUDGE: Yes.

(u) ▓▓ MCGREGOR: Thanks. The document dated April 23, 1996, that we provided to Judge Livingston also references in the second full paragraph on the first page an organization named Al Jiad. What is this organization?



(S) MCGREGOR: ▓▓▓▓▓▓▓▓▓▓▓

(S) ▓▓▓▓▓▓▓▓

(S) MCGREGOR: ▓▓▓▓▓▓▓▓▓▓▓

(S) ▓▓▓▓▓▓▓

Page 6 of 24



(3) (S) MCGREGOR: Okay.

(S)

(S) MCGREGOR:

(S)

(S) MCGREGOR:

(3) (S) Recent letter bombs that have come to the U.N. and the El-Hiyad [phonetic spelling] in Washington and the El-Hiyad [phonetic spelling], the one that exploded at the London-based organization. There was a call that came in to the Washington El-Hiyad [phonetic spelling] long distance that stated that they claimed responsibility in the Vanguards of Conquest.

(U) (S) MCGREGOR: Okay.

(S)

(S) MCGREGOR:

(S)

(S) MCGREGOR:

(S)

(S) MCGREGOR:



(U) (S) MCGREGOR: Is there any reason to believe that he might continue his association with Sheik Rahman

(S)

(U) (S) MCGREGOR: And is there any reason to believe he might stop?

(U) (S) LIEBER: We don't believe he's going to stop doing it. No.

(U) (S) MCGREGOR: I want to ask you about the April 23rd document.

(S)              : Yes.

(S) MCGREGOR:

(S)

(S) MCGREGOR:

(S)

Nasser Ahmed aka Homosamy, INS Transcript

**PAGES 9-16 OF 24 REMAIN CLASSIFIED "SECRET"
IN THEIR ENTIRETY**

Nasser Ahmed aka Homosamy, INS Transcript



**(S) MCGREGOR:**

**End of Tape 1/Side A**

**Begin Tape 2/SideA**

(u) (S) JUDGE: This is Tape 2 in the in camera proceedings: A90 674 238.

(u) (S) MCGREGOR: ▮▮▮▮▮▮▮ with respect to what we call the terrorist.[unintelligible] the plans by Sheik Rahman and other members of Al-Gama who were later convicted of seditious conspiracy here in the United States, ▮▮▮▮▮▮ er able to identify a list or a number of people who were considered to be [unintelligible] conspirators?

(u) (S) ▮▮▮▮▮▮ Yes. And that was Nasser Ahmed ....

(u) (S) MCGREGOR: He was included on that list?

(u) (S) ▮▮▮▮▮ Yeah, he was on all the list of unindicted co-conspirators.

(S) JUDGE: Why wasn't he indicted?

(u) (S) ▮▮▮▮▮ At the time, the United States Attorneys Office came up with a list...there were numerous people that were on that list, and I'm not really in a position to answer because I don't know.

(u) (S) JUDGE: Okay. So, explain that again...who made this list? Who made the list of the unindicted .....?

(u) (S) ▮▮▮▮▮ I believe it was the United States Attorneys Office.

(U) (S) MCGREGOR: And wh.....what agency did the agency work up a case [unintelligible].

(U) (S) ▮▮▮▮▮▮▮▮▮

(U) (S) JUDGE: Okay.

(U) (S) ▮▮▮▮▮ I have a list in the file.



(S) MCGREGOR ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(S) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(S) MCGREGOR: ▮▮▮▮▮▮▮▮▮▮▮▮

(S) ▮▮▮▮▮▮▮▮▮▮▮

(S) JUDGE: ▮▮▮▮▮▮▮▮▮▮▮

(S) ▮▮▮▮▮▮▮

(U) (S) JUDGE: Two boys, and one girl?

(U) (S) ▮▮▮▮▮ Um-hum.

(U) (S) JUDGE: So, if...if he has to be deported, he goes back to Egypt. It's most likely to be a very difficult time for him there. But, his kids are citizens, and it's difficult for me to think about making an order without explaining to his children for the future...they are going to want to know what happened to their Dad...without any inkling in the papers, any public record of why their Dad couldn't stay here. And that's...I guess I'm speaking more to Ms. McGregor...this has to do with the disclosure.

(U) (S) MCGREGOR: I think, Judge, that with respect to...and I would like an opportunity to put this on the record ... in response to...I think that what you have to do is ...is...that was done, and has been done in [unintelligible] in the past, that is to say that...that based upon information ...classified information...there's reason to believe he's a danger to the United States. And, frankly, I know...I understand it's difficult, but I don't think you will be able, because of the classified nature of the information, to reveal it...much of it.

(3) (S) ▓▓▓▓▓ Yes.

(U) (S) MCGREGOR: ...is that fact [unintelligible] even without naming the organization?

U (S) ▓▓▓▓▓ ...how would you say it... the Immigration believes that you were.....?

(U) (S) MCGREGOR:  Immigration believes that your...the Immigration Service believes that you are a member of a terrorist organization. [unintelligible]

(U) (S) ▓▓▓▓▓ [unintelligible]

(U) (S) JUDGE: No.

(S) GANNON: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

(U) (S) MCGREGOR:  Persecution. Persecution on account on [unintelligible] grounds.

(S) GANNON: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

(S) JUDGE: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

(U) (S) GANNON: Well, it does that, yes. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

(U) (S) JUDGE: Okay.

(S) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

(u)(S) JUDGE: (laughs)...yes, ...at's right.

(u)(S) MCGREGOR: And...who was the other one? [unintelligible]

(u)(S) JUDGE: Bob [?]. But, I mean, with respect to this particular issue because you're asking me to decide the issue..I mean, if...without the secret information, he tells me the story he's going to go back to Egypt and he's going...he's going to be tortured. And, it seems relatively compelling...I think Mubarak probably would give him a hard time if he went back there. But, what you're telling me is it's justified because he belongs to a terrorist organization and he's not entitled to protection in this country because of that. Right?

(u)(S) MCGREGOR: That's right.

(u)(S) JUDGE: So, that's a very key fact...that's the key fact...everything else almost is irrelevant except that he's a member of a terrorist organization. Right? And, on that issue, he doesn't...I mean, he's got to know that this is what people have in mind, and yet he's not informed of that and he doesn't have a way of meeting that allegation directly.

(u)(S) MCGREGOR: Is...?

(u)(S) JUDGE: Can we tell him?

(u)(S) MCGREGOR: Is it classified? Can the Judge say that the Government believes that he's a member of a terrorist organization without [unintelligible]? Is that...is the fact that we believe that he is a member of a terrorist organization, would that phrase be classified?

(u)(S) ██████ Well, one of the questions I might ask him is, and that's going back to what he said on page 5 of his asylum application, where he states that he was a member of an organization to overthrow the Egyptian government. How do you expect to overthrow a government without violent means? I mean....

(u)(S) MCGREGOR: Well, like public protest.

(u)(S) ██████ ...But, that's not....[unintelligible]

(u)(S) JUDGE: "Overthrow"...the term "overthrow" is different. Change is something ....

(u)(S) ██████ [unintelligible] He specifically [unintelligible] "I was a member of..." oh, excuse me [unintelligible] ..."I was a member of student organizations and religious groups that opposed the Egyptian government".

(u)(S) MCGREGOR: Is the...is the fact that the American Government believes he's a member of a terrorist organization ....

Page 20 of 24

Nasser Ahmed aka Osamy, INS Transcript

PAGE 22 OF 24 REMAINS CLASSIFIED "SECRET"
IN THEIR ENTIRETY

(u) (S) JUDGE: Well, it's no ▐▐▐▐▐ that he's closely associated with Sl▐▐▐ Rahman, so that's...

(u) (S) ▐▐▐▐▐▐▐▐▐ But, you know, you can have an association with Sheik Rahman and not be a terrorist.

(u) (S) JUDGE: Well, that's what he says. That's....

(u) (S) ▐▐▐▐▐▐▐▐▐ I mean, you could be...you can have an association with Rahman and not be a terrorist, I mean, he is a ...I mean he's a preacher and he preaches in the Islamic faith. And that is what Nasser Ahmed would say. I mean, that's what...he wants to stay here, there's no question of that he wants to stay here. But to think...you know, we have an obligation to the safety of Americans first, and I think that ▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐ and probably there will be others similar like this...he is definitely a security ri▐▐ ▐▐ ▐▐▐ country and to the citizens...and specifically to the New York area.

(u) (S) JUDGE: Well, the law is pretty clear, if he's member of a terrorist organization then he can't have asylum or withholding...and that's what you're telling me. The problem, of course, that any judge is going to have is if he doesn't have a chance to respond to that.

(u) (S) ▐▐▐▐▐▐▐▐ But, do you think he would come and say "I belong to a terrorist organization that would blow up the World Trade Center, or one that..."......?

(u) (S) JUDGE: Oh, I don't think he would say that, no.

(u) (S) MCGREGOR: He's not going to say that.

(u) (S) JUDGE: No. But we would like to give everybody a chance to try to clear themselves...clear their....clear the situation up. Maybe there's an explanation that he could give, who knows, I don't know. But, that's the whole problem we have with the _in camera_ testimony.

(u) (S) MCGREGOR: But, Judge, it's an invaluable tool.

(u) (S) JUDGE: Uh-huh.

(u) (S) MCGREGOR: I mean, otherwise, ▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

(u) (S) JUDGE: Right.

(S) MCGREGOR ▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

(u) (S) JUDGE: We need somebody to speak up for Mr. Homosamy. We need somebody to...

(S) MCGREGOR: ▐▐▐▐▐▐▐▐▐▐▐▐



(S) MCGREGOR:

(S) JUDGE:

(S) MCGREGOR:

(S)

(S) JUDGE:

(S)

(u) (S) JUDGE: Okay. Alright. So, we can't even...we can't even say this relates to him being a member of a terrorist organization? That the information we received ...?

(u)(S) MCGREGOR(?) [unintelligible]

(u)(S) JUDGE: Well, we'll tell him....

(u)(S) MCGREGOR: Judge Livingston can say "I'm sorry, I can't reveal this classified information..." In fact, ......

(u) (S) JUDGE: Well, he's not going to question me. The question...the question...the situation may not require it...there's a provision in the regulations that allows me to hear this information and it says that after I hear it I should, or we should, provide to the other side a summary of what it was so that they have some idea of what the information was. We should provide the summary to the extent that we can do so without compromising the sources, without revealing...without compromising national security. So, it's something that the regulations require that we give them as much information as possible without jeopardizing your sources and jeopardizing your investigations and so on.

(u) (S) ████████ Well, Judge, I can certainly check...that decision would have to be made at a level higher than myself. I can certainly check for you and call, but...

(u)(S) MCGREGOR: [unintelligible]

(u)(S) ████████ [unintelligible]

Page 23 of 24

(u) (S) MCGREGOR: [unintelligible]

(u) (S) JUDGE: Sure, yeah, uh-huh.

**OFF THE RECORD**

(u) (S) JUDGE: Okay, we're back on the record and we were off the record for the purpose of allowing ██████████ to speak to ██████ffice and the following wording came up that which is acceptable to ██████████ and that is that the in camera presentation included evidence of the respondent's association with a known terrorist organization. That's right ██████████

(u) (S) ██████████ Yes.

(u) (S) JUDGE: Okay. Alright then, is there anything further?

(u) (S) MCGREGOR: Nothing further, Judge.

(u) (S) JUDGE: Okay. Alright, if there's nothing further, then this session is concluded.

**Page 24 of 24**